CASE MANAGEMENT CONFERENCE

JAN 2 6 2015          Judge C. Karlan

Date _____ Dept N@ 8, 30am

1   Mark D. Petersen (State Bar No. 111956)
    mpetersen@fbm.com
2   Christina R. Hollander (State Bar No. 267292)
    chollander@fbm.com
3   Farella Braun + Martel LLP
    235 Montgomery Street, 17th Floor
4   San Francisco, CA 94104
    Telephone: (415) 954-4400
5   Facsimile: (415) 954-4480

6   Attorneys for Plaintiff
    MIOTOX LLC

7

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 08 2014

Sherri R. Carter, Executive Officer/Clerk
By Darnetta Smith, Deputy

8           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF LOS ANGELES

10                  UNLIMITED CIVIL JURISDICTION

11

| | |
|---|---|
| 12  MIOTOX LLC, a California Limited Liability Company, | Case No. SC123232 |
| 13              Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; UNJUST ENRICHMENT; ACCOUNTING; AND DECLARATORY RELIEF** |
| 14        vs. | |
| 15  ALLERGAN, INC., a Delaware Corporation; ALLERGAN BOTOX LIMITED, an Irish Corporation, and DOES 1-25 inclusive, | |
| 16 | |
| 17              Defendants. | |
| 18 | |

19

20       Plaintiff Miotox LLC ("Miotox"), a California Limited Company, alleges against

21   Defendants Allergan, Inc. ("Allergan") a Delaware Corporation, Allergan Botox Limited, an Irish

22   Corporation ("Allergan Limited"), and Does 1-25 (collectively "Defendants") as follows:

23                              **VENUE**

24       1.       Venue is proper in this Court because Miotox is headquartered in Beverly Hills,

25   California. As a result, the October 30, 1998 License Agreement between Miotox,[1] Allergan, and

26   Allergan Limited ("License Agreement") is to be performed in this county, the obligation to pay

27   _____

28   [1] The License Agreement was originally signed by Miotech Inc. As explained below, Miotox was
     later substituted as the contracting entity.

Farella Braun + Martel LLP
1 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

COMPLAINT

30488\4580448.2

1    Miotox under the License Agreement arises in this county, and the breach of the License

2    Agreement occurred in this county. Cal. Civ. Proc. Code § 395.5.

**PARTIES**

4    2.    Miotox is a California Limited Liability Company, with its principal place of

5    business in Beverly Hills, California.

6    3.    Allergan is a Delaware Corporation with its principal place of business in Irvine,

7    California.

8    4.    Upon information and belief, Allergan Limited is an Irish Company, and a

9    subsidiary of Allergan. The personal jurisdiction of this Court over Allergan Limited in this case

10   is proper because, on information and belief, Allergan Limited, through various commercial

11   arrangements, has engaged in continuous and systematic activities within the State of California

12   by *inter alia*, placing products in the stream of commerce directed at California, with the

13   knowledge and/or understanding that such products would be sold in the State of California.

14   5.    Miotox is ignorant of the true names or capacities of the Defendants sued herein

15   under the fictitious names Does 1-25, inclusive. Miotox will amend this Complaint to allege their

16   true names and capacities when ascertained. Miotox is informed and believes, and on that basis

17   alleges, that each Defendant sued herein by such fictitious names is in some manner responsible

18   for the events or happenings described in this Complaint, and that Miotox's damages as herein

19   alleged were proximately caused by such Defendants.

20   6.    At all times herein mentioned Defendants Does 1 through 12 were the agents,

21   servants, and employees of their codefendants, and in doing the things alleged below were acting

22   in the scope of their authority as such agents, servants, and employees, and with the permission

23   and consent of their codefendants.

**GENERAL ALLEGATIONS**

25   **A.    Introduction**

26   7.    Miotox brings this action to recover damages for breaches of its 1998 License

27   Agreement with Allergan and Allergan Limited (collectively "Allergan" or "Licensee"). The

28   License Agreement requires Allergan to pay Miotox a Royalty for every sale of Botox used to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 2 -

30488\4580448.2

COMPLAINT

1   treat migraine headaches.  The parties have operated under this License Agreement for sixteen

2   years and Allergan paid Royalties consistent with these terms.  As of May 9, 2014, when the

3   original patent claiming Miotox's invention expired, Allergan proposed to change its long-

4   standing practice, arguing for the first time that Miotox is only entitled a Royalty for Botox used

5   in the precise manner claimed in an unexpired Miotox patent.  Miotox has obtained several new

6   patents recently that cover and are related to the administration of Botox for migraine headache

7   treatment.  Instead of embracing the new patents that will provide prolonged exclusivity, Allergan

8   instead "reinterpreted" the License Agreement, claiming that Miotox is now only entitled to a

9   Royalty when Botox is administered in the exact manner described in one of those new patents.

10  Now that Miotox has received the first Royalty payment after expiration of the patent, it is

11  apparent that Allergan is not paying Royalties on United States sales at all— a breach under even

12  its own interpretation.  Allergan's failures to comply with material terms of the License

13  Agreement entitle Miotox to damages in an amount that could exceed $600 million and a

14  declaration of Allergan's obligations under that Agreement.

15  **B.    Dr. Binder's Invention**

16      8.      In 1992, Doctor William J. Binder ("Dr. Binder") developed a novel therapy for

17  the treatment of migraine headaches.  He discovered that more than 90 percent of patients treated

18  with his therapy experienced a significant reduction in the symptoms and frequency of migraine

19  headaches.  His method calls for the administration of presynaptic neurotoxins, such as botulinum

20  toxin A ("Botox"), to areas like the face, neck and back, to reduce or prevent the pain associated

21  with migraine headaches.  Dr. Binder filed patent applications in 1994 and 1996, claiming his

22  invention.  U.S. Patent No. 5,714,468 (the "'468 Patent") was issued to Dr. Binder on February 3,

23  1998, titled "Method For Reduction Of Migraine Headache Pain."  The '468 Patent expired on

24  May 9, 2014.

25      9.      Dr. Binder formed Miotech, Inc. ("Miotech") in 1994 to promote his invention.

26  He was intent on finding a supplier of botulinum toxin, completing formal clinical trials, and

27  acquiring funding.

28      10.     In June 1997, Allergan and Miotech, signed an Option Agreement granting

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

- 3 -

30488\4580448.2

COMPLAINT

1    Allergan the right to acquire an exclusive license to make, have made, use and sell any medical

2    product containing botulinum toxin for the treatment of migraine headaches.  As part of the plan

3    to begin testing to obtain FDA approval, the Option Agreement provided, *inter alia*, that Allergan

4    would consult with Miotech about the proposed clinical protocol for human testing of botulinum

5    toxin.  At the time of negotiation, Miotech understood that the parties expected that Phase II and

6    Phase III FDA studies would last no more than four years.

7         11.    On October 30, 1998, Allergan exercised the option right by signing a License

8    Agreement with Miotech (sometimes called "Licensor") which gave them all rights to Miotech's

9    Botox-for-migraine headache patents.  The License Agreement is attached hereto as Exhibit A

10   and incorporated herein by this reference.

11        12.    Dr. Binder formed Miotox in 1998, with Miotech as its general partner.  Miotech

12   subsequently assigned its patent rights to Miotox and the License Agreement was amended, as

13   discussed below.  Accordingly, this Complaint will refer to "Miotox" to represent either Miotox

14   or Miotech.

15   **C.   The License Agreement**

16        13.    The License Agreement provides Allergan a license to all patents or inventions

17   owned by Miotox that cover or are related to the treatment of migraine headaches with Botox.  It

18   also requires that Allergan pay Royalties to Miotox for all units of Botox sold for the treatment of

19   migraine headaches, in countries where Miotox has obtained patents covering or relating to Botox

20   for migraine headache therapy.

21        14.    Specifically, the License Agreement provides the following broad license to

22   Allergan:

23       LICENSOR [Miotox] hereby grants LICENSEE [Allergan] and
         its Affiliates a worldwide, exclusive license, with the right to
         grant sublicenses, to the Licensed Patents and Improvements,
24       to make, have made, use and sell the Licensed Products for the
         Licensed Use in the Territory and to practice the inventions
25       covered by the Licensed Patents and to use the Clinical Data.

26

27   Ex. A, License Agreement § 2(a).  "Licensed Patents" include "all patents and patent applications

28   in the Territory presently owned or later acquired by LICENSOR . . . which cover the Licensed

Farella Braun + Martel LLP
35 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 4 -

30488\4580448.2

COMPLAINT

1   Use." *Id.* at § 1(a). "Licensed Patents" includes patents that claim "Improvements" for the

2   Licensed Use, which means "inventions, modifications, combinations, technologic advances or

3   improvements developed or acquired by LICENSOR during the term of this Agreement related to

4   the Licensed Use, whether patentable or not." *Id.* at §§ 1(a), (e).

5       15.   "Licensed Use" is defined in the License Agreement as broadly as possible: "the

6   use of Licensed Product for the treatment of migraine headache." *Id.* at § 1(b). A "Licensed

7   Product" is "any medical product containing Botulinum Toxin or other toxin made, used, or sold

8   by LICENSEE, its Affiliate, or any sublicensee thereof whose use is covered by a Valid Patent

9   Claim." *Id.* at § 1(d). "Valid Patent Claim" is given a broad definition: any "bona fide,

10  unexpired claim in the Licensed Patents for the License Use . . . ." *Id.* at § 1(c).

11      16.   In consideration for the license granted to Allergan, the License Agreement

12  provides that Fees and Royalties shall be paid to Miotox. Most relevant here are Royalties.

13  Allergan fulfills its obligation to pay Miotox Royalties by remitting payment to Miotox's office.

14  Royalties are based on the Net Sales of the Licensed Product. *Id.* at § 3(b). "Net Sales" means

15  "the actual selling price of Licensed Product sold by LICENSEE, its Affiliate, or any sublicensee

16  to others in countries in which Licensed Patents have been granted for the Licensed Use . . . ." *Id.*

17  at § 1(g). Botox sold for use in treating non-migraine headache conditions, however, is to be

18  excluded from the Net Sales calculation. The License Agreement has a sales audit provision

19  which calls for the segregation of Licensed Product used to treat other indications from Licensed

20  Product used to treat migraine headaches:

> A Licensed Product will not be reportable for purposes of
> calculation of Net Sales for any other indication . . . including,
> but not limited to, treatment of blepharospasm, torticolis,
> cerebral palsy, non-headache pain, or non-migraine headaches
> (such as tension headache).

25  *Id.* at § 3(c)(2). It then states that the amount of reportable Net Sales shall be calculated through

26  an annual audit. *Id.* at § 3(c)(3). Allergan is required to use "procedures which provide a

27  reasonable approximation of reportable Net Sales." *Id.* The "primary intent" of such audit "is to

28  distinguish, in LICENSEE's target audiences, (a) the use of Licensed Products for the primary

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

- 5 -

30488\4580448.2

COMPLAINT

1   treatment of acute and/or chronic migraine headache from (b) the use of Licensed Product for all

2   other indications as described in Section 3(c)(2)." *Id.* The audit is not tied to any specific patent

3   language, and there is no provision allowing the audit to change when a patent expires or

4   additional patents are added to the License Agreement.

5        17.    The '468 Patent qualifies as a "Licensed Patent" for the "Licensed Use;" Allergan

6   has never disputed this. Therefore through at least the expiration of that patent on May 9, 2014,

7   Royalties were due under the License Agreement based on the Net Sales of Botox in the United

8   States for the treatment of migraine headaches. *See id.* at §§ 1(b), (g), 3(b). Miotox is informed

9   and believes that Allergan paid all Royalties based on the '468 Patent incurred through May 9,

10   2014 (except as otherwise alleged herein).

11        18.    The current dispute is about Royalties due after May 9, 2014, when the '468 Patent

12   expired. As is common in the industry, the License Agreement is drafted to incent Miotox,

13   through Dr. Binder, to develop related therapies to extend the exclusivity period on migraine

14   headache treatment beyond the life of the '468 Patent. If Miotox could obtain new patents for the

15   treatment of migraine headaches using Botox, those new patents would extend beyond the period

16   covered by the original '468 Patent. This creates new barriers for other companies to enter the

17   market, allowing Allergan additional years of exclusivity on sales of Botox therapy for migraine

18   headaches.

19        19.    The License Agreement reflects this goal. It licenses *all* Licensed Patents and

20   Improvements to Allergan. Thus, any patents, patent applications, continuations, inventions,

21   modifications, or technological advances, whether patentable or not, owned at the time *or later*

22   *acquired* by Miotox, that cover, or are related to, the treatment of migraine headaches with Botox,

23   are assigned to Allergan. *Id.* at §§ 1(a), (b), (e), and 2(a). In exchange for such a broad license,

24   Allergan agreed to pay Miotox Royalties based on Net Sales of *any* Licensed Product sold by

25   Allergan, in countries where Licensed Patents covering or relating to the Licensed Use have

26   issued, for the term of the License Agreement. Only sales of the Licensed Product used for

27   treatment of other indications, specifically described and defined in the License Agreement (and

28   further reinforced by the audits and audit procedures), are excluded. *Id.* §§ 1(g), 3(c)(2). It also

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

30488\4580448.2

1  requires Allergan to pay the "out-of-pocket costs, including reasonable legal expenses for the

2  maintenance by LICENSOR of Licensed Patents, including foreign filing fees which LICENSEE

3  has requested," as well as foreign filing fees for the countries identified in Schedule 1 of the

4  Agreement. *Id.* at § 5(a). This requirement makes sense because all patent filings are done for

5  the ultimate benefit of Allergan. *Id.* The maintenance payments then are credited against

6  Royalties "at a rate not to exceed Fifty Percent (50%) of the royalties payable in a Quarterly

7  Period." *Id.* at § 5(d). The License Agreement does not provide an end date; rather it remains "in

8  effect as to any Licensed Product covered by any Licensed Patents for the Licensed Use, until the

9  expiration of such Licensed Patents or at the earliest date on which at least one Valid Patent

10  Claim therein does not exist." *Id.* at § 6(a). In other words, the License Agreement remains in

11  effect for as long as any Miotox patents covering, or related to, the treatment of migraine

12  headaches exist. *Id.*

13       20.    Finally, if a dispute over its terms arises, the License Agreement provides that the

14  prevailing party will be compensated for pursuing enforcement. The License Agreement states

15  that "[i]n the event of any dispute over the interpretation or enforcement of this Agreement, in

16  addition to any other recovery, the prevailing party in such a dispute shall be awarded its

17  reasonable attorneys' fees and costs, including reasonable expert witness fees and court costs or

18  the costs of any arbitration." *Id.* § 9(d).

19  **D.   FDA Approval Of Botox For Migraine Headaches**

20       21.    As part of the arrangement between Allergan and Miotox, Allergan undertook

21  responsibility for completing the clinical trials required to obtain FDA approval of Dr. Binder's

22  therapy. Both the Option Agreement and the License Agreement were executed before this FDA

23  approval process had begun, so at that time, neither Allergan nor Miotox knew exactly what

24  methods of administration the approval would cover. Royalties were due on all migraine

25  headache sales of Botox even though approval had not yet been obtained. The License

26  Agreement was intentionally drafted broadly to ensure that it licensed any and all patents related

27  to Botox administered for the treatment of migraine headaches, and a Royalty was to be paid

28  anytime Botox was administered for the treatment of migraine headaches, regardless of what kind

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 7 -

30488\4580448.2

1    of approval was granted by the FDA.

2          22.    As described above, the Option Agreement specifically provided that Allergan

3    should work with Miotox to develop the clinical protocol for human testing. Dr. Binder, as the

4    inventor and a highly respected medical professional, had superior knowledge of the best methods

5    of Botox administration to treat migraine headaches most effectively, and ideas about the best

6    way to structure the FDA studies and trials.

7          23.    Allergan ignored the Option Agreement's requirements, and unilaterally decided

8    to conduct the Phase II tests with altered doses of Botox, submitting a testing protocol to the FDA

9    without input from Dr. Binder. The procedures outlined in the testing protocol were not the best

10   methods, and in February 1998, Dr. Binder protested, requesting that Allergan withdraw the

11   proposed protocol because it was unlikely to achieve positive results. Dr. Binder further

12   requested that Allergan design a new, supplemental protocol to the one submitted by Allergan,

13   and he outlined in detail why the clinical trials as proposed by Allergan would likely fail.

14   Allergan refused to heed Dr. Binder's advice, and in fact, the results were not as strong as

15   Allergan and Miotox had hoped or expected. As a result, the trial that originally began in

16   1998/99 and ended in 2000 failed, and Allergan had to start over with the Phase II trials in

17   2001/02, based on Dr. Binder's suggested protocol and recommendations. After a long delay, a

18   new protocol was developed and submitted to the FDA similar to the one Dr. Binder had

19   originally recommended. Based on this protocol, Botox was approved on October 15, 2010 for

20   the treatment of adult patients with *chronic* migraine headaches.

21         24.    The '468 Patent provided exclusivity for Miotox and Allergan for only a limited

22   period of time. The delay in the FDA approval process meant that broad marketing of Dr.

23   Binder's invention was delayed while the clock on the '468 Patent was ticking. Due to Allergan's

24   mistakes and failures, Miotox missed the opportunity to obtain Royalties on sales of Botox for

25   migraine headaches during an earlier period, and the ramp-up period for sales of Botox for

26   migraine headaches was delayed. In addition, while FDA approval was pending, competing

27   forms of botulinum toxin type A were in the process of being approved for sale in the United

28   States, such as Dysport manufactured by Ipsen, and Xeomin which is manufactured by Merz

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 8 -                                   30488\4580448.2

COMPLAINT

1   Pharmaceuticals.

2       25.    Miotox and Allergan eventually reached an agreement over Allergan's failure to

3   properly conduct the FDA trials in 2001.  That agreement is captured in the Amendment

4   discussed below.  There is no way to know, however, how much Allergan's failure delayed the

5   establishment of this market, or what the full impact was on Miotox.

6   **E.    Amendment No. 1 To The License Agreement**

7       26.    Miotech, Miotox and Allergan entered into Amendment No. 1 to the License

8   Agreement on September 25, 2001 (the "Amendment").  *See* Exhibit B, attached hereto and

9   incorporated herein by this reference.  The Amendment clarifies that the identity of the Licensor

10  is Miotox, and revises the sales audit provisions in Section 3(c)(3) of the License Agreement.

11  The Amendment explains that Miotech assigned its patent rights to Miotox and revises the terms

12  of the License Agreement to reflect Miotox as the relevant licensing entity.  Ex. B, Amendment at

13  § 1(A).

14      27.    The Amendment also clarifies that the Territory is worldwide.  *Id.* at § 1(D).

15      28.  ·  Finally, the Amendment inserts a paragraph after Section 3(c)(3) allowing Miotox

16  to elect whether to use an independent audit or Allergan's internal audit to segregate sales under

17  Section 3(c)(3) to identify Net Sales in the United States, providing in relevant part:

18              Upon the earlier of (a) the FDA's approval of the Licensed
19              Product in the United States for the primary treatment of acute
                and/or chronic migraine headache, or (b) January 1, 2006,
20              LICENSOR may thereafter elect annually either (i) continue to
                utilize LICENSEE'S internal annual audit for the determination
21              of Net Sales in the United States, or (ii) utilize the independent
                annual audit procedures referenced in the first paragraph of this
22              Section 3(c)(3) for Net Sales in the United States. LICENSOR
                shall be provided LICENSEE's internal annual audit data without
23              cost to LICENSOR, but shall share in the cost of any
24              independent audit as provided in Section 3(c)3 [sic].

25  *Id.* at 1(G).

26      29.    Even as amended, the intent of Section 3(c)(3) of the License Agreement is clearly

27  to segregate migraine headache treatment from non-migraine headache treatment; it does not

28  consider any other factors, such as the scope of FDA approval or whether treatment is

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 9 -

30488\4580448.2

COMPLAINT

1  administered according to any specific patent claim.  As long as Botox is used to treat any type of

2  migraine headache by any method of administration, Miotox is entitled to a royalty— it's as

3  simple as that.

4  **F.   Miotox's New Licensed Patents**

5       30.    Botox was finally approved by the FDA for the treatment of chronic migraine

6  headaches on October 15, 2010.  Following that approval, Dr. Binder continued to develop novel

7  migraine headache therapies, filing several patent applications in 2012.  Miotox notified Allergan

8  in late 2013 that Schedule 1 to the License Agreement should be updated to include the additional

9  patents and applications that were recently obtained or filed by Miotox.  These patents and

10  applications include:

11            (a)    U.S. Patent No. 8,420,106, "Extramuscular Treatment of Traumatic-

12  Induced Migraine Headache;"

13            (b)    U.S. Patent No. 8,491,917, "Treatment of Migraine Headache with

14  Diffusion of Toxin in Non-Muscle Related Areas of the Head;"

15            (c)    U.S. Patent No. 8,617,569, "Treatment of Migraine Headache With

16  Diffusion of Toxin in Non-Muscle Related Foraminal Sites;"

17            (d)    U.S. Patent Application No. 13/478,922, "Treatment of Migraine Headache

18  With Diffusion of Toxin in Non-Muscle Related Areas of the Mouth;"

19            (e)    U.S. Patent Application No. 13/986,197, "Treatment of Traumatic-Induced

20  Migraine Headache;"

21            (f)    U.S. Patent No. 8,722,060, "Method of Treating Vertigo" (describes a

22  method of treating migraine-induced vertigo); and

23            (g)    Patent Application PCT/US2013/00131, "Treatment of Migraine

24  Headaches with Presynaptic Neurotoxin."

25       31.    These new patents and applications (collectively the "New Licensed Patents") are

26  "Improvements" relating to the treatment of migraine headaches, and are thus "Licensed Patents"

27  within the meaning of the License Agreement.  Ex. A, License Agreement §§ 1(a), (e).

28  Accordingly, they provide a basis for continued payment of Royalties to Miotox after expiration

Farella Braun + Martel LLP
35 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

- 10 -

30488\4580448.2

COMPLAINT

1   of the '468 Patent on May 9, 2014.  Pursuant to Paragraph 1(g) of the License Agreement, the

2   New Licensed Patents trigger Royalties based on Net Sales.  Allergan is required to continue

3   paying Royalties to Miotox for all sales of Botox in the United States for use in the treatment of

4   migraine headaches.

5           32.     Allergan has acknowledged that these New Licensed Patents are valid, and has

6   admitted that they are now to be incorporated into the License Agreement.  In a February 5, 2014

7   letter to Miotox, for instance, Allergan wrote, "[W]e agree that the License Agreement should be

8   amended to incorporate the New Patents . . . ."

9   **G.    Allergan's Refusal To Pay Miotox All Royalties Owed Based On The New Licensed**

10      **Patents**

11          33.     After admitting the validity of Miotox's New Licensed Patents in its February 5,

12  2014 letter, which acknowledged the requirement to pay Royalties, and extended the term of the

13  License Agreement through the patent period (20 years), Allergan disputed that it would be

14  obligated to pay Miotox Royalties based on Net Sales, i.e., all sales of Botox for use in the

15  treatment of migraine headaches.  Instead, Allergan argued – and continues to argue – that its

16  Royalty obligations apply *only* to Net Sales of a Licensed Product that is actually used for

17  migraine headache treatment in a manner covered by the New Licensed Patents.  Allergan never

18  asserted this interpretation of the License Agreement until its February 5, 2014 letter to Miotox.

19          34.     As required by the License Agreement, Allergan uses an audit to determine the

20  amount of sales of Botox used to treat migraine headaches as opposed to the treatment of other

21  indications.  In its February 5, 2014 letter, Allergan proposed to amend the License Agreement to

22  add a new provision in Section 3, as Section 3(c)(4), that would state:

23              The amount of reportable Net Sales shall be limited to the
                amount of Licensed Product sold that is actually used in a
24              manner covered by a Valid Patent Claim, as determined by the
                annual audit referred to in Section 3(c)(3).  If the audit
25              determines that a Licensed Product is not being used in a
                manner covered by a Valid Patent Claim, then the Licensed
26              Product will not be reportable for purposes of calculation of
                Net Sales.
27

28          35.     This provision proposed by Allergan is completely contrary to the express terms

Farella Braun + Martel LLP
35 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 11 -

30488\4580448.2

1   and intent of the License Agreement for several reasons, including at least the following:

2          (a)     Licensed Product and Licensed Use are not defined (and have never been

3   defined) in a way that restricts Royalties to only Botox used in a manner covered by Licensed

4   Patents. "Licensed Use" is defined as using Botox for the treatment of migraine headaches – *not*

5   Botox as used in a manner covered by a patent claim. Allergan could have originally drafted the

6   License Agreement to limit "Licensed Use" to the constrained way in which it now wants to

7   amend the Agreement. But instead, "License Use" is defined as expansively as possible, at least

8   in part because Allergan wanted to capture all future patents and applications for patents that

9   cover or are related to the use of Botox in any way to treat migraine headaches. The actual

10   manner of use is not relevant to the definition of Licensed Use.

11          (b)     Likewise, "Licensed Product" is defined as any medical product containing

12   Botox whose use is covered by a patent– *not* any medical product which is used in a manner that

13   is covered by a patent. Again, the actual manner of use is not relevant to the definition of

14   Licensed Product.

15          (c)     If "Licensed Use" was intended to change when a patent expires and a new

16   patent becomes the primary "Licensed Patent," the definition of "Licensed Use" would be

17   circular and nonsensical. "Licensed Use" means the use of a Licensed Product for the treatment

18   of migraine headaches. "Licensed Product" is Botox, the use of which is covered by any "Valid

19   Patent Claim," and "Valid Patent Claim" is any unexpired claim in a Licensed Patent for the

20   Licensed Use. These defined terms incorporate other defined terms in a circular manner. Thus,

21   "Licensed Use" cannot be dependent on what is considered a "Valid Patent Claim" or "Licensed

22   Patents" because both "Valid Patent Claim" and "Licensed Patents" incorporate the definition of

23   "Licensed Use." *See* Ex. A, License Agreement §§ 1(b), (a), (c).

24          (d)     "Licensed Patents" is specifically defined to include "Improvements." *Id.*

25   at § 1(a). "Improvements" are "any inventions, modifications, combinations, technologic

26   advances or improvements developed or acquired by LICENSOR during the term of this

27   Agreement *related to* the Licensed Use, whether patentable or not." *Id.* at § 1 (e) (emphasis

28   added). At a minimum, the New Licensed Patents are *related to* the treatment of migraine

Farella Braun + Martel LLP
15 Montgomery Street, 17th Floor
San Francisco CA 94104
(415) 954-4400

- 12 -

30488\4580448.2

COMPLAINT

1   headaches and thus automatically become Licensed Patents for which Allergan has a Royalty

2   obligation.

3         (e)     The audit provisions in Sections 3(c)(2) and 3(c)(3) of the License

4   Agreement are crafted only to segregate sales of Botox for migraine headaches from the use of

5   Botox for other indications – not to track whether Botox administered for migraine headache

6   therapy is being used in a particular manner that is specifically claimed in any patent.  There is no

7   language in these two audit provisions suggesting that patent claims are in any way relevant to the

8   audit.  Section 3(c)(3), as modified by the Amendment, provides that Miotox can elect annually

9   whether to use Allergan's internal audit or an independent audit to segregate sales of Botox used

10  to treat migraine headaches from Botox used for other indications, as described in Section 3(c)(2).

11  Consistent with the original License Agreement, it does not link the audit to specific patent claims

12  in any way.  Royalties are to be paid based on Net Sales, which is the selling price of Licensed

13  Products, not connected in any way to a specific patent claim.  The form of amendment Allergan

14  suggests in its February 5, 2014 letter is thus contrary to the express terms governing the audit as

15  contained in the License Agreement that Allergan itself prepared.

16        (f)     As a practical matter, it will be impossible to segregate administration of

17  Botox covered by, or related to, the New Licensed Patents from any other injection techniques.  It

18  will be extremely difficult to separate one kind of injection from another, and doctors are not

19  likely to accurately report or recall why or how they administered the injection to a specific

20  patient, or even which category of injection their methods fall within, since the new patents claim

21  both new indications and new injection techniques that overlap.  For example, one of the New

22  Licensed Patents covers treatment of traumatic-induced migraine headaches.  See U.S. Patent No.

23  8,420,106.  A patient might be diagnosed with traumatic-induced migraine headaches and may

24  elect to use Botox to treat those headaches.  But the doctor who administers the Botox may not be

25  aware that the underlying cause of the migraine headaches is trauma, or that doctor may not

26  properly categorize the migraine headache therapy as resulting from trauma.  The person from the

27  doctor's office reporting the manner of use could be an assistant who may not accurately attribute

28  the root of the migraine headache to trauma.  Moreover, some medical facilities may be

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 13 -                    30488\4580448.2

COMPLAINT

1    prohibited or might refuse to disclose such information.

2         (g)    Finally, if the License Agreement truly says what Allergan argues it does

3    about restricting Royalties to methods covered by these New Licensed Patents, there would be no

4    need to amend it as asserted in Allergan's letter of February 5, 2014.  Allergan's admission that

5    the License Agreement requires a new provision to restrict Royalties in the manner it desires

6    makes clear that Allergan's intent here is to unilaterally amend the License Agreement without

7    consideration and to the detriment of Miotox, thereby denying it the right to receive Royalties

8    pursuant to the basic terms of the License Agreement.

9         36.    Miotox has fulfilled all of its obligations under the License Agreement, as

10   amended.  To Miotox's knowledge, Allergan has paid all Royalties required under the License

11   Agreement through the expiration of the '468 Patent (with the exception of Royalties improperly

12   omitted from Allergan's calculation due to the methodological issues discussed below).[2]

13   Allergan expressed unequivocally to Miotox that it will not pay Royalties on all sales of Botox

14   for the treatment of migraine headaches for any sales made after May 9, 2014, based on its

15   reinterpretation of the License Agreement.  In actuality, the royalty report provided by Allergan

16   for the second quarter of 2014 demonstrates that it paid Miotox no United States Royalties after

17   May 9, 2014, a breach of Allergan's own reinterpretation of the License Agreement.  Either

18   action by Allergan constitutes a breach of the License Agreement.

19   **H.    Price Waterhouse Coopers LLP Audit**

20        37.    In accordance with the License Agreement's audit rights, Price Waterhouse

21   Coopers LLP ("PWC") was retained by Miotox to conduct an audit in 2012 to examine the

22   Royalty payments made between January 1, 2010 and December 31, 2012.  The PWC report was

23   issued on May 18, 2014.

24        38.    Allergan refused to provide key internal documents to PWC for the audit.  But,

25   PWC identified several statistical issues even without all of the documentation that materially

26   impacted the accuracy of the Net Sales calculation made by Allergan.

27
28   _____
     [2] Miotox has never had access to the books and records of Allergan and thus has no way to
     confirm that all earned Royalties have been paid.

Farella Braun + Martel LLP
33 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

30488\4580448.2

1    (a)  In the United States, PWC found that no margin of error was calculated for

2 one study, and as a result, there could be no assessment of the accuracy of the usage estimate

3 applied by Allergan. PWC also found that Allergan had not determined whether the data

4 collected and used to calculate Net Sales was representative of the population. Additionally,

5 PWC concluded that only a small number of migraine headache patients per doctor were used to

6 calculate Botox usage for migraine headaches, and these patients might not be representative of

7 the population of patients receiving Botox. Although chart pulls were made, PWC concluded that

8 no validation studies were performed to assess data accuracy. Finally, PWC identified errors in

9 applying the survey data that resulted in inaccurate Royalty calculations.

10    (b)  For Canada, Allergan had the option of using United States sales data, or at

11 a minimum, could have conducted a reliable survey to calculate Botox usage. Allergan did

12 neither. The License Agreement provides that Allergan "shall not be required to audit every

13 country but shall only be required to provide an audit of three representative countries as it relates

14 to the determination of reportable Net Sales." Ex. A, License Agreement § 3(c)(3). The

15 countries are to be selected from each of the geographical regions of North America, Europe, and

16 Asia. *Id.* If Allergan had used the United States as a reference country for Canada, Royalties due

17 to Miotox would have been $555,000 higher in 2012 and $77,000 higher in 2011. Instead,

18 Allergan used unreliable input from sales representatives to estimate Botox usage by specialty

19 and indication. Allergan had commissioned a third party market study to determine the amount

20 of Botox sales for migraine headaches in Canada. If it had applied those third party study results,

21 it would have owed over $140,000 in additional Royalties to Miotox. But Allergan elected not to

22 rely on that third party study, in favor of the unsupported information it received from sales

23 representatives. PWC concluded that the accuracy of the sales representative reports could not be

24 verified and that the data was likely subjective and not auditable. If the original third party study

25 was truly inaccurate, Allergan's only viable option was to rely on representative data from the

26 United States; the data haphazardly collected from sales representatives was not a contractually

27 authorized substitute.

28    (c)  In the United Kingdom, Allergan failed to provide supporting

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 15 -

30488\4580448.2

COMPLAINT

1  documentation demonstrating the accuracy of its estimated Net Sales.  Accordingly, PWC could

2  not assess the accuracy of the Net Sales estimates used.  Allergan applied the United Kingdom

3  data to determine sales for all of Europe and thus PWC could not determine the accuracy of the

4  Royalty calculation for the remainder of Europe either.

5       39.     Allergan is obligated under the License Agreement to calculate Royalties using

6  "procedures which provide a reasonable approximation of reportable Net Sales." Ex. A, License

7  Agreement § 3(c)(3). Allergan has not met this requirement, and has not compensated Miotox for

8  the Royalties that are owed but were not paid.  Miotox is informed and believes that Allergan has

9  not taken steps to correct these problems and that the methodologies used to calculate the

10  Royalties owed to Miotox in the United States, Canada and the United Kingdom in the future will

11  be equally flawed.

12  **I.**    **Allergan's Refusal to Pay Patent Fees**

13       40.     Allergan has also inexplicably changed its position on payment of Miotox's patent

14  filing fees.  The License Agreement unequivocally requires Allergan to pay the "out-of-pocket

15  costs, including reasonable legal expenses for the maintenance by LICENSOR of Licensed

16  Patents, including foreign filing fees which LICENSEE has requested," as well as foreign filing

17  fees for the countries identified in Schedule 1 of the Agreement.  Ex. A, License Agreement §

18  5(a).  The maintenance payments then are credited against Royalties "at a rate not to exceed Fifty

19  Percent (50%) of the royalties payable in a Quarterly Period." *Id.* at § 5(d).

20       41.     Allergan has always paid patent prosecution attorney bills directly, and advanced

21  or reimbursed the required filing fees.  Pursuant to the License Agreement, Allergan would then

22  credit any fees paid against Royalties due to Miotox, at a rate not to exceed 50%.  But recently,

23  Allergan representatives have indicated that it will deviate from past practices and no longer

24  honor the terms of the License Agreement by paying maintenance costs, legal expenses and

25  foreign filing fees.  In an e-mail dated August 29, 2014, Allergan stated, "Pursuant to section 5(a)

26  of the license agreement, Allergan is not responsible for such foreign filing costs, nor the

27  maintenance fees for foreign filings that were not requested by Allergan. "As such, I regret to

28  inform you that we will not be making the requested reimbursement to Miotox for these foreign

- 16 -

1    filings." This interpretation is contrary to the terms of the License Agreement and Allergan's past

2    practice. Allergan's sudden change in position on this simple issue is yet another example of its

3    callous treatment of Miotox.

4         42.    Over the life of these New Licensed Patents, Allergan's improper calculation of

5    Royalties, survey deficiencies and refusal to pay patent fees could cause damage to Miotox in the

6    amount of $600 million or more.

7                        **FIRST CAUSE OF ACTION**
                         **BREACH OF WRITTEN CONTRACT**
8                  **(AGAINST ALLERGAN AND ALLERGAN LIMITED)**

9         43.    Miotox re-alleges and incorporates by reference, as if fully set forth herein, the

10   allegations in paragraphs 1 to 42 above.

11        44.    The License Agreement constitutes a valid and binding contract between Miotox

12   and Allergan, to which those parties gave their mutual assent for adequate consideration.

13        45.    Miotox has fully satisfied all conditions, covenants and obligations under the

14   License Agreement, save and except for those conditions, covenants and obligations, if any,

15   whose performance has been prevented, excused or waived.

16        46.    As alleged above, Allergan has breached the License Agreement in at least three

17   ways:

18        (a)    First, Allergan has refused to pay Miotox Royalties after May 9, 2014,

19   based on all sales of Botox in the United States for use in the treatment of migraine headaches in

20   contravention of the License Agreement.

21        (b)    Second, Allergan has breached the License Agreement by improperly

22   calculating Royalties for the United States, Canada, and the United Kingdom.

23        (c)    Third, Allergan has refused to pay Miotox's out-of-pocket costs, including

24   legal expenses, for the maintenance of the Licensed Patents, including foreign filing fees.

25        47.    As a direct, foreseeable and proximate result of these breaches of the License

26   Agreement, Miotox has suffered damages in an amount to be proven at trial. WHEREFORE,

27   Miotox prays for relief as set forth hereinafter.

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 17 -

30488\4580448.2

COMPLAINT

## SECOND CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALLERGAN AND ALLERGAN LIMITED)

48.     Miotox re-alleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 to 47 above.

49.     Under California law, there is an implied covenant of good faith and fair dealing in every contract, that no party will do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

50.     The License Agreement constitutes a valid and binding contract between Miotox and  Allergan.

51.     Miotox has fully satisfied all conditions, covenants and obligations under the License Agreement, save and except for those conditions, covenants and obligations, if any, whose performance has been prevented, excused or waived.  All conditions in the License Agreement required for Allergan's performance have occurred or have been excused.

52.     After performing under the License Agreement one way for sixteen years, Allergan has inexplicably reinterpreted the Agreement at the very moment that Miotox provided it with the New Licensed Patents that will extend Allergan's protection in the worldwide market and require continuing Royalty payments to Miotox.  These New Licensed Patents will allow Allergan to enjoy an expanded market, patent protection in additional countries and patent protection for new treatment techniques.  Allergan is obtaining all of these benefits from the License Agreement while simultaneously trying to deprive Miotox of the benefits it bargained for and earned by claiming, for the first time, that the License Agreement should be viewed more restrictively.  Allergan's interpretation eliminates sales that clearly give rise to Royalties to Miotox, and requires a type of audit that has never been performed and is not addressed in the License Agreement.  Allergan's change in position is an intentional tactic to deprive Miotox of the benefits of the License Agreement.

53.     Allergan has also deprived Miotox of the benefits of the License Agreement by intentionally using flawed surveys to reduce the amount of Royalties due to Miotox in the United

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 18 -

30488\4580448.2

COMPLAINT

1   States, Canada and the United Kingdom– and refusing to provide information to PWC so it can

2   determine how deep the survey problems lie. As described above, Allergan elected to rely on

3   faulty data even when a more reliable option was available under the License Agreement. For

4   example, in Canada, Allergan chose to use unverified input from sales representatives to

5   determine Net Sales. This kind of sampling is entirely contrary to the License Agreement's intent

6   that sampling procedures should "provide a reasonable approximation of reportable Net Sales."

7   Allergan could have used the United States as a representative country, which is expressly

8   permitted by the License Agreement, or could have relied on a valid, third party study, but it

9   elected not to. Allergan intentionally employed unauthorized survey methods to deprive Miotox

10  of the benefit of the License Agreement.

11          54.     As described above, Allergan has breached the covenant of good faith and fair

12  dealing by unfairly interfering with Miotox's ability to receive the benefits of the License

13  Agreement, in refusing to pay Miotox all Royalties due after the expiration of the '468 Patent on

14  May 9, 2014. While it refuses to pay Miotox the Royalties owed, Allergan will continue to make

15  profits from selling Botox for migraine headaches and other migraine-related conditions based on

16  Miotox's intellectual property. As a direct, foreseeable and proximate result of these beaches of

17  the License Agreement, Miotox has suffered damages in an amount to be proven at trial.

18  WHEREFORE, Miotox prays for relief as set forth hereinafter.

19                          **THIRD CAUSE OF ACTION**
                                **UNJUST ENRICHMENT**
20                  **(AGAINST ALLERGAN AND ALLERGAN LIMITED)**

21          55.     Miotox re-alleges and incorporates by reference, as if fully set forth herein, the

22  allegations in paragraphs 1 to 54 above.

23          56.     As alleged above, Miotox agreed in the License Agreement to license the rights to

24  the '468 Patent, and any future patents and applications to Allergan to make, have made, use and

25  sell the Licensed Products for the Licensed Use.

26          57.     Miotox helped Allergan prolong its status as the exclusive Botox-for-migraine-

27  headache supplier in the market. The New Licensed Patents obtained by Miotox cover and relate

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 19 -

3048814580448.2

COMPLAINT

1   to the treatment of migraine headaches with botulinum toxin and all serotypes.  The existence of

2   these patents will dissuade or prevent other companies from entering the market to exploit

3   Miotox's inventions.  As a result, Allergan will, on information and belief, and for all practical

4   purposes, remain the only company primarily selling botulinum toxin for migraine headache

5   treatment.  Allergan will continue to generate substantial revenue and reap enormous profits

6   selling Botox for the treatment of migraine headaches and all migraine related conditions as

7   defined by the New Licensed Patents, regardless of whether the treatment is applied in a manner

8   covered by the New Licensed Patents, or in a manner not covered.

9        58.    Allergan has accordingly benefited, and will continue to benefit, from Miotox's

10  New Licensed Patents and will also enjoy an expanded market, and protection in additional

11  countries where no intellectual property protection previously existed.  Allergan obtained the

12  ability to profitably market Botox for migraine headaches in new territories outside of the United

13  States because Miotox secured patent protection in those countries.  To the extent that Allergan is

14  now refusing to pay Miotox all earned Royalties, these Royalties are a benefit unjustly retained at

15  Miotox's expense.

16       59.    As a proximate result of the wrongful acts alleged herein, Allergan has unjustly

17  incurred benefits at the expense of Miotox in an amount to be proven at trial.  WHEREFORE,

18  Miotox prays for relief as set forth hereinafter.

19               **FOURTH CAUSE OF ACTION**
                        **ACCOUNTING**
20       **(AGAINST ALLERGAN AND ALLERGAN LIMITED)**

21       60.    Miotox re-alleges and incorporates by reference, as if fully set forth herein, the

22  allegations in paragraphs 1 to 59 above.

23       61.    As set forth above, Miotox has a relationship with Allergan through the License

24  Agreement whereby Allergan is obligated to pay Miotox Royalties based on all sales of Botox for

25  the treatment of migraine headaches.  A dispute has arisen as to the scope of Allergan's obligation

26  to pay Royalties incurred after the expiration of the '468 Patent on May 9, 2014.

27       62.    Allergan is the only party with access to the sales information underlying the

28  Royalty calculation, which it has refused to disclose even pursuant to an Non-Disclosure

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 20 -

30488\4580448.2

COMPLAINT

1   Agreement proposed by PWC during its audit of Allergan. Accordingly, Miotox had, and will

2   have, no way to calculate the amount of Royalties due under the License Agreement, or the

3   amount of Royalties improperly withheld based on Allergan's erroneous interpretation of the

4   License Agreement.

5       63.     As a proximate result of the wrongful acts alleged herein, Miotox has suffered

6   damage, and/or is owed restitution for the benefits unjustly retained by Allergan at Miotox's

7   expense. An accounting is required to identify the balance due to Miotox. WHEREFORE,

8   Miotox prays for relief as set forth hereinafter.

9                          **FIFTH CAUSE OF ACTION**
                  **DECLARATORY RELIEF (CAL. CIV. PROC. CODE § 1060)**
10                    **(AGAINST ALLERGAN AND ALLERGAN LIMITED)**

11      64.     Miotox re-alleges and incorporates by reference, as if fully set forth herein, the

12   allegations in paragraphs 1 to 63 above.

13      65.     An actual controversy has arisen and now exists between Miotox, on the one hand,

14   and Allergan, on the other hand, concerning their respective rights and duties under the License

15   Agreement. The License Agreement calls for Royalty payments based on all sales of Botox for

16   the Licensed Use, which is any use for the treatment of migraine headaches. Allergan wrongly

17   asserts that the amount of Royalties owed to Miotox is based on the sales of Botox actually used

18   in the precise manner taught by a claim of one of the New Licensed Patents, and refuses to

19   continue to pay Miotox Royalties based on all sales for the Licensed Use.

20      66.     The License Agreement also calls for Allergan to pay out-of-pocket costs for the

21   maintenance of patents, including foreign filings. After abiding by this obligation since the

22   inception of the License Agreement, Allergan now wrongly refuses to make such payments.

23      67.     Miotox desires a declaration of the rights and duties of Allergan with respect to the

24   payment of Royalties, and a determination of the construction of the Royalty provisions of the

25   License Agreement.

26      68.     Miotox also desires a declaration of the rights and duties of Allergan with respect

27   to the costs for maintenance of filed patents, including foreign filing fees. WHEREFORE, Miotox

28   prays for relief as set forth hereinafter.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 21 -

COMPLAINT

30488\4580448.2

## PRAYER

WHEREFORE, Miotox prays for judgment against Defendants as follows:

A.    For an award of general, compensatory, consequential, and/or other special damages to compensate Miotox for the damages flowing from the causes of action described above and restitution of all benefits unjustly retained, in an exact amount to be proven at trial according to proof, in excess of the Court's jurisdictional minimum;

B.    For an accounting to identify all damages and/or restitution owed to Miotox;

C.    For a judicial determination of Defendants' rights and duties, and a declaration that Allergan must pay Royalties to Miotox based on all sales of Botox for the treatment of migraine headaches, and that Allergan must pay out-of-pocket costs for maintaining filed patents, including foreign filing fees;

D.    For an award of interest, including pre-judgment interest at the legal rate according to proof;

E.    For attorneys' fees; the costs of suit incurred herein, including court costs and expert witness fees according to proof, pursuant to the License Agreement and applicable law; and

F.    For such other and further relief as the Court deems just and proper.

Dated:  October 8, 2014                    FARELLA BRAUN + MARTEL LLP


                                           By: _____
                                                   Mark D. Petersen

                                           Attorneys for Plaintiff
                                           MIOTOX LLC

COMPLAINT

Farella Braun + Martel LLP
35 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

30488\4580448.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Miotox hereby demands a trial by jury.

Dated:  October 8, 2014

FARELLA BRAUN + MARTEL LLP

By: _____

Mark D. Petersen

Attorneys for Plaintiff
MIOTOX LLC

Farella Braun + Martel LLP
12 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

- 23 -

COMPLAINT

30488\4580448.2

# EXHIBIT A

## LICENSE AGREEMENT

This License Agreement ("the Agreement") is made this <u>30th</u> day of <u>October</u> , 19<u>98</u> , by and between on one hand, ALLERGAN, INC., a Delaware corporation, and its Affiliate ALLERGAN BOTOX LIMITED, an Irish corporation, (hereinafter collectively referred to as "LICENSEE"), and on the other hand MIOTECH, INC., a California corporation (hereinafter referred to as "LICENSOR").

### WITNESSETH:

WHEREAS, the parties entered into an option agreement dated as of July 31, 1997 (the "Option Agreement") whereby LICENSOR granted LICENSEE the option for a license of certain patent rights and related intellectual property; and

WHEREAS, LICENSEE has given notice to LICENSOR that LICENSEE has exercised its option for that license.

NOW, THEREFORE, in consideration of the premises above and the mutual promises and agreements contained herein and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound by the terms hereof, covenant and agree as follows:

1.    DEFINITIONS. For the purpose of this License Agreement, the terms set forth hereinafter shall be defined as follows:

(a)    "Licensed Patents" shall mean all patents and patent applications in the Territory presently owned or later acquired by LICENSOR or which LICENSOR has or may have a right to grant licenses, which cover the Licensed Use. Included within the definition of Licensed Patents are any continuations,

continuations-in-part, divisions, patents of addition, reexamination, reissues, renewals or extensions thereof. Also included within the definition of Licensed Patents are any patents or patent applications which claim any Improvements for the Licensed Use, which are developed by LICENSOR during the term of this Agreement. The current list of patent applications and patents is set forth in the attached Schedule 1.

(b)    "Licensed Use" shall mean the use of Licensed Product for the treatment of migraine headache.

(c)    "Valid Patent Claim" shall mean a bona fide, unexpired claim in the Licensed Patents for the Licensed Use which has not been held invalid by a final decision of a court or other governmental agency of competent jurisdiction and which has not been admitted to be invalid or unenforceable through reissue, disclaimer or reexamination.

(d)    "Licensed Product" shall mean any medical product containing Botulinum Toxin or other toxin made, used, or sold by LICENSEE, its Affiliate, or any sublicensee thereof whose use is covered by a Valid Patent Claim.

(e)    "Improvements" shall mean any inventions, modifications, combinations, technologic advances or improvements developed or acquired by LICENSOR during the term of this Agreement related to the Licensed Use, whether patentable or not.

(f)    "Affiliates" as used in this Agreement in connection with LICENSEE shall mean LICENSEE's (1) parent corporation or (2) any corporation, other legal entity, partnership or other business enterprise which qualifies under any one of the following:

(i)    greater than Fifty Percent (50%) of the voting rights with respect to the election of directors or other governing body

or members is owned or controlled, directly or indirectly, by LICENSEE.

(ii)     greater than Fifty Percent (50%) of the voting rights with respect to the election of directors or other governing body or members is owned or controlled, directly or indirectly, by any corporation, other legal entity, partnership or other business qualifying under item (i) above.

(g)     "Net Sales" shall mean the actual selling price of Licensed Product sold by LICENSEE, its Affiliate, or any sublicensee to others in countries in which Licensed Patents have been granted for the Licensed Use as reported by the sales audit of Section 3(c) (and any adjustments pursuant to Section 4(b) hereof), less bona fide trade and cash discounts, third party transportation charges, credits, rebates, allowance for returns, and less sales taxes and governmental charges applicable to sales; provided that the Licensed Product sold between LICENSEE and its Affiliates, or between LICENSEE's Affiliates, shall not be regarded as sold for computation of Net Sales receipts until sold by LICENSEE or its Affiliates to a third party other than an Affiliate, in which case the computation of Net Sales will be made based on the selling price to such third party.  Net Sales shall also include

(i)     any sublicensing fees paid to LICENSEE in connection with the grant of any sublicense hereunder by LICENSEE and

(ii)     One-half (1/2) of all Net Recoveries pursuant to Section 5(c).

LICENSEE, its Affiliates or sublicensees, shall be deemed to have sold a "Bundled Product" if a Licensed Product for the Licensed Use is sold in combination with other products or services for a single price.  Net Sales of such Bundled Product shall be calculated by multiplying the price for the Bundled Product by a fraction, the numerator of which shall be the product of the number of units of the Licensed Products sold in the Bundled Product multiplied by the price per unit of the Licensed Product and

the denominator of which shall be the sum, for all products (including Licensed Product) or services included in the Bundled Product, of the number of units sold for each product or service in the Bundled Product multiplied by the price per unit for each such product or service.

(h)   "**Person**" shall mean an individual, corporation, partnership or other entity and their Affiliates.

(i)   "**Calendar Year**" shall mean a calendar year, namely January 1 - December 31 of a given year.

(j)   "**FDA**" shall mean the U.S. Food and Drug Administration.

(k)   "**Clinical Data**" shall mean all of LICENSOR's clinical data regarding the Licensed Use, a brief summary of which is set forth in the attached Schedule 2.

(l)   "**Calendar Quarter**" shall mean that period of LICENSEE's fiscal year ending March 31, June 30, September 30 and December 31 of each Calendar Year.

2.   **GRANT**

(a)   Subject to the terms and conditions herein, LICENSOR hereby grants LICENSEE and its Affiliates a worldwide, exclusive license, with the right to grant sublicenses, to the Licensed Patents and Improvements, to make, have made, use and sell the Licensed Products for the Licensed Use in the Territory and to practice the inventions covered by the Licensed Patents and to use the Clinical Data. Any sublicenses granted by LICENSEE shall provide for the termination of the sublicense, upon termination of this Agreement under Section 6 of this Agreement.

(b)   Notwithstanding the foregoing or any other provision of this Agreement or the Option Agreement, no rights are granted to LICENSEE for the use of Botulinum Toxin or other toxins for the treatment of psoriasis or for LICENSOR's

process of manufacturing, purifying or otherwise producing Botulinum Toxin, all of which rights are expressly retained by LICENSOR together with any Improvements relating thereto.

3.    **CONSIDERATION**

(a)    Fees:

The following fees shall be payable within ten (10) business days of the occurrence of the following milestones:

(1)    upon written acceptance by FDA of the filing of an application for approval for marketing of the first Licensed Product for primary treatment of acute and/or chronic migraine headache, the sum of Five Hundred Thousand Dollars ($500,000).

(2)    upon receipt of written approval for marketing by FDA with approved claims for primary use of the first Licensed Product for the treatment of acute and/or chronic migraine headache, the sum of One and One-Half Million Dollars ($1,500,000).

(3)    no additional fees shall be due for any additional Licensed Products which are filed for approval or approved by FDA or any Licensed Product filed or approved by any corresponding agency worldwide.

(b)    Royalties:

LICENSEE shall pay to LICENSOR, subject to Section 3(c) below, the following royalties on Net Sales in any single Calendar Year:

(1)    Three Percent (3%) of Net Sales on the first One Hundred Million Dollars ($100,000,000) in any single Calendar Year; and

(2)    Four Percent (4%) of Net Sales on the next Fifty Million Dollars ($50,000,000) in any single Calendar Year (i.e., Net Sales between One Hundred Million Dollars ($100,000,000) and One Hundred Fifty Million Dollars ($150,000,000) in such Calendar Year), and

(3)    Five Percent (5%) of Net Sales on the next One Hundred Million Dollars in any single Calendar Year (i.e., Net Sales between One Hundred Fifty Million Dollars ($150,000,000) and Two Hundred Fifty Million Dollars ($250,000,000) in such Calendar Year), and

(4)    Six Percent (6%) of Net Sales on those Net Sales over Two Hundred Fifty Million Dollars ($250,000,000) in any single Calendar Year.

For purposes of illustration only:  If, in a given Calendar Year, reportable Net Sales are calculated to be One Hundred Fifty Million Dollars ($150,000,000), royalties payable under this Section 3 would equal Five Million Dollars ($5,000,000).

(c)    Sales Audit:

(1)    For purposes of this License Agreement, a Licensed Product will be deemed reportable for the purpose of calculation of Net Sales in a given country, if any one of the conditions set forth in the following subparagraphs (a), (b) or (c) exists in that country:  (a) the Licensed Product is approved by FDA (or foreign counterpart) for the primary treatment of acute and/or chronic migraine headache and used for such indication in the country where it is so approved and

sold or (b) the Licensed Product can be legally promoted by LICENSEE in a country outside the United States and used for such indication without such approval, or (c) the Licensed Product  (i) is recognized nationally in the United States by a major multistate insurance company (such as Blue Cross/Blue Shield Technology Assessment group) as the primary treatment of acute and/or chronic migraine headache and is subsequently recognized and reimbursed for such use by such insurer in the ten (10) most populous states during the relevant Calendar Year and ( ii) the conduct of the audit contemplated by this Section 3(c) is legal and does not constitute unlawful promotion by LICENSEE of an unapproved indication in the United States and (iii) either (A) LICENSEE's FDA filing described in Section 3(a) (1) has been made  or (B) LICENSEE notifies LICENSOR, in writing, of its election under Section 8(b) not to pursue such FDA approval.

(2)     A Licensed Product will not be reportable for purposes of calculation of Net Sales for any other indication (whether or not such indication is approved by the FDA or its foreign counterpart) including, but not limited to, treatment of blepharospasm, torticolis, cerebral palsy, non-headache pain, or non-migraine headaches (such as tension headache).

(3)     The foregoing amount of reportable Net Sales shall be determined by an annual audit conducted by an independent sales auditing firm using audit criteria selected by LICENSEE, with LICENSOR's consent which shall not be unreasonably withheld.  The cost of the independent auditing firm shall be shared equally by LICENSEE and LICENSOR. The primary intent of any annual sales audit is to distinguish, in LICENSEE's target audiences,  (a) the use of Licensed Products for the primary treatment of acute and/or chronic migraine from (b) the use of Licensed Product for all other indications as described in Section 3(c)(2).  If LICENSEE desires to obtain any other market research data on Licensed Product through the use of the audit, above and beyond the data related to the primary intent of the audit, LICENSEE shall pay for all incremental costs related to obtaining such additional data. LICENSEE shall not be required to audit every country but shall only be required to provide an audit of three representative countries as it

relates to the determination of reportable Net Sales. The selection of three representative countries (one from each of the geographic regions of North America, Europe, and Asia) shall be made by LICENSEE with LICENSOR's consent, which shall not be unreasonably withheld. LICENSEE may use appropriate estimating and/or sampling procedures which provide a reasonable approximation of reportable Net Sales. The auditing firm, the audit criteria, and the representative list of audit countries used by LICENSEE in a given annual audit shall be reviewed with LICENSOR prior to the initiation of the next annual audit. For any annual audit conducted by LICENSEE, the auditor, audit criteria, or representative audit countries consented to by LICENSOR shall not be used by LICENSOR as the basis for any dispute of such audit.

     (d)    <u>Credits</u>:

     The milestone payments referred to in Section 3(a) above, in aggregate, shall be fully creditable against the royalties due under Section 3(b) above at a rate not to exceed Fifty Percent (50%) of the royalties payable in each Calendar Quarter. LICENSOR's share of the costs related to each annual sales audit shall also be fully and immediately credited against the royalties due under Section 3(b) above.

     (e)    <u>Sublicense</u>:

     LICENSEE shall forward to LICENSOR a copy of each fully executed sublicense agreement within thirty (30) days of the execution of such agreement, and further agrees to forward to LICENSOR, along with the royalty reports of LICENSEE to LICENSOR under Section 4 of this Agreement, a copy of such reports received by LICENSEE from its sublicensees as shall be pertinent to a royalty accounting to LICENSOR by LICENSEE for activities under the sublicenses.

    4.    <u>ACCOUNTING AND RECORDS</u>

     (a)    Within ninety (90) days after each Calendar Year (or after such additional reasonable period (not to exceed an additional 60 days) as may be required

to complete the audit provided in Section 3(c) above in respect of which payments are due under Section 3), LICENSEE shall prepare and send to LICENSOR the royalty payment due for that period, together with a report setting forth Net Sales of the Licensed Product by LICENSEE and its Affiliates and sublicensees during such Calendar Year, which report shall contain a computation of the payments due hereunder. LICENSEE shall be entitled to make all payments by corporate check. Notwithstanding the foregoing, if within ninety days after the end of the relevant Calendar Year the audit provided in Section 3(c) above is complete with respect to one or more specific countries, then the royalty payment referenced in this Section and accompanying report shall not be delayed, and shall be delivered by LICENSEE to LICENSOR with respect to those countries where the audit has been completed, and shall be supplemented as soon as possible thereafter by a complete report and any additional royalties due with respect to countries where the audit has not been completed. Payment of royalties to LICENSOR for all four (4) Calendar Quarters shall be made within sixty (60) days of the end of each Calendar Quarter based on pro-rata reasonable estimates of the expected royalties due for that Calendar Year. A final royalty payment for the Calendar Year shall reconcile any shortfall between estimated and actual royalty payments made or due for such Calendar Year. Such final payment shall be made within 150 days of the end of the Calendar Year. Any overpayment revealed at the end of the Calendar Year shall be deducted from the following Calendar Quarter royalty payment.

(b)     LICENSEE shall keep accurate records in respect of all Net Sales and shall maintain such records for a period of not less than three (3) years from the date of its report to LICENSOR under Section 4 (a) hereof. LICENSOR shall have the right, at its sole cost and expense, not more than once each year, to have LICENSEE's records and the records of the sales audits pursuant to Section 3(c) hereof reviewed at times which are reasonably convenient to LICENSEE, using a certified public accountant. In addition, LICENSOR may conduct its own sales audit at its own expense if it believes LICENSEE's sales audit for a given Calendar Year is inaccurate. The parties agree to arbitrate any dispute where the difference between the audits of

LICENSOR and LICENSEE is greater than ten percent (10%) of reportable Net Sales in the aggregate resulting therefrom, which cannot be satisfactorily resolved by the parties within two (2) months, under the Commercial Rules of the American Arbitration Association in San Francisco, California, before a single arbitrator selected in accordance with those Commercial Rules. The arbitrator shall award the prevailing party in the arbitration its reasonable attorneys fees together with the cost of the arbitration.

(c)     At the termination of this Agreement, LICENSEE shall render a final report to LICENSOR within ninety (90) days after the end of the Calendar Year in which such termination occurs and payments shall be made to LICENSOR for the portion of the year ending at the date of termination.

5.     PATENT MATTERS

(a)     Maintenance:   LICENSEE agrees to pay out-of-pocket costs, including reasonable legal expenses for the maintenance by LICENSOR of Licensed Patents, including foreign filings which LICENSEE has requested, and foreign filings in the countries identified in Schedule 1 to this Agreement incurred during the term of this Agreement.

(b)     Infringement of Third Party Patents:   LICENSEE shall notify LICENSOR of any claim that the sale of a Licensed Product for the Licensed Use by LICENSEE constitutes infringement of a third party patent claiming a method of treatment of migraine headache.  LICENSEE, with the cooperation of LICENSOR, may take whatever steps it deems advisable to defend against and/or settle the claim.

(c)     Patent Infringement by Third Parties:   Each of the parties shall notify the other of any infringement of Licensed Patents by a third party.  LICENSEE, with the cooperation of LICENSOR, may take whatever steps it deems advisable to end said infringement.  Any recoveries of damages for past infringement made by LICENSEE shall reduce any credits allowed under Section 5(d).  Any recoveries of

damages for past infringement by LICENSEE above the reasonable expenses incurred in prosecuting or settling any claim of infringement ("Net Recoveries") shall be divided equally between LICENSEE and LICENSOR. In the event that LICENSEE elects not to sue for infringement of the Licensed Patents, then LICENSOR shall have the right to sue for infringement of the Licensed Patents, at its sole expense, and may retain any recovery of damages for past infringement in such litigation or settlement thereof.

(d)   Reimbursements:   Reimbursements made to LICENSOR pursuant to Section 5(a) and one-half of all reasonable expenses incurred in defending, prosecuting or settling any claims pursuant to Sections 5(b) and 5(c) shall be creditable against royalties due under Section 3(b) above at a rate not to exceed Fifty Percent (50%) of the royalties payable in Quarterly Period.

6.   TERM AND TERMINATION

(a)   This Agreement shall become effective on the date of execution of the parties and unless earlier terminated as provided in Section 6 below, shall remain in effect as to any Licensed Product covered by any Licensed Patents for the Licensed Use, until the expiration of such Licensed Patents or at the earliest date on which at least one Valid Patent Claim therein does not exist.

(b)   This Agreement may be terminated by one party giving notice to the other parties of its intent to terminate, while stating with specificity the grounds therefor, in the event that a party fails to perform or otherwise breaches any material obligations hereunder. The party so notified shall have sixty (60) days after receipt of the notice to cure the breach or seek legal redress. In no event shall such notice of intention to terminate be deemed to waive any right to damages or any other remedy which the party giving the notice may have as a consequence of such failure or such breach.

(c)   LICENSEE shall have the unilateral right to terminate this Agreement without cause or penalty on six (6) months notice at any time prior to

filing an application with the FDA for approval in the United States of the marketing of the Licensed Product for the Licensed Use. Upon such termination, LICENSEE shall assign to LICENSOR the rights to all clinical data developed by LICENSEE pursuant to this License Agreement and no further royalties or milestone fees (if any had been payable under Section 3 prior to termination) shall be payable to LICENSOR.

(d)     In the event that LICENSEE becomes insolvent, makes an assignment of its rights under this Agreement for the benefit of its creditors, files a petition in bankruptcy or similar insolvency law, or has such a petition filed against it which is not dismissed within sixty (60) days, or notifies LICENSOR of its intention to file a petition in bankruptcy or of a third party's intention to file an involuntary petition in bankruptcy against it, LICENSOR may terminate this Agreement immediately.  The parties recognize that this Agreement is a non-delegable contract under Bankruptcy Code § 365(c)(1)(A) and that it may not be assumed or assigned by LICENSEE in bankruptcy without the express written consent of LICENSOR.

7.     WARRANTIES, DISCLAIMER, INDEMNITY

(a)     LICENSOR represents and warrants that it owns the entire right, title and interest in the Licensed Patents and has the right to provide LICENSEE with the Clinical Data and has full power and authority to enter into this Agreement.

(b)     LICENSEE represents and warrants that it has full power and authority to enter into this Agreement.

(c) ·  While nothing in this Agreement shall be construed as a warranty that Licensed Patents are valid or enforceable or that their exercise does not infringe any patent rights of third parties, LICENSOR hereby represents it has no knowledge and that no claims have been made from which it can be inferred that

√ that, except as otherwise disclosed to LICENSEE prior to the signing of this License Agreement,

A/IB/Alicense7/97                          12                          7/30/97

Licensed Patents are or may be invalid or that their exercise would or might infringe Patent Rights of third parties.

(d)   LICENSEE shall hold LICENSOR harmless from any product liability claims against LICENSOR resulting from acts by LICENSEE relating to the sale or use of the Licensed Products for the Licensed Use.

8.   **PERFORMANCE**

(a)   Until LICENSEE sends a notice of termination of this License Agreement under Section 6(c), LICENSEE shall (1) pursue FDA approval of the Licensed Product for the Licensed Use, consistent with LICENSEE's reasonable commercial practices, and (2) upon FDA (or its foreign counterpart) approval, to legally commercialize the Licensed Product for the Licensed Use, consistent with LICENSEE's reasonable commercial practices and independent business judgment.

(b)   In the event LICENSEE elects not to actively pursue FDA approval of the Licensed Product for the Licensed Use at any time, LICENSOR's sole and exclusive remedy for that action is that LICENSEE's obligation to pay royalties on reportable Net Sales under Section 3 will begin and continue for the term of the Agreement.

(c)   LICENSEE shall provide written annual reports on its product development progress and efforts to commercialize the Licensed Products for the Licensed Use, and these reports shall be delivered within sixty (60) days of the end of each Calendar Year.  These progress reports shall include, but not be limited to: status of clinical development and status of applications for regulatory approvals and sublicensing, during the preceding Calendar Year for the Licensed Product for the Licensed Use.

9.   **MISCELLANEOUS**

(a)   Assignment. This Agreement shall be binding upon the parties hereto and their respective successors and assigns. The rights and obligations of

each party under this Agreement shall not be assigned or otherwise transferred without the prior written consent of the other parties, which consent shall not be unreasonably withheld, except that (i) a party may assign any or all of its rights or obligations under this Agreement to any of its Affiliates, which assignment shall not release such party from any of its obligations under this Agreement; and (ii) a party may assign this Agreement to any Person in connection with the transfer or sale of all or of that portion of its business relating to the Licensed Product or the merger or consolidation of LICENSEE with or into any Person, so long as such Person shall assume the obligations hereunder of such party. Any transfer, sale, assignment, pledge or encumbrance in violation of this Section 9 (a) shall be void.

(b)   <u>Notice</u>. Notice under this Agreement shall be provided as follows: Notices shall be in writing, and shall be effective (1) on the day sent via facsimile telecopier if sent during normal business hours of the recipient, and otherwise on the next business day of the recipient; (2) on the day actually delivered when sent by Federal Express or similar overnight courier service with tracking capability; or (3) three (3) business days after deposit in the U.S. Mail, first-class registered mail post prepaid. The addresses and facsimile numbers for notices shall be as follows, as or designated by the parties in future notices sent pursuant to this Section. Such addresses may be altered by written notice:

In the Case of LICENSOR:

        Miotech, Inc.
        Attn:  Dr. William Binder
        9201 Sunset Boulevard, Suite 809
        Los Angeles, California 90069

with a copy to:

        Attn:  Dean M. Gloster
        Farella Braun & Martel LLP
        235 Montgomery Street
        San Francisco, California 94104

In the Case of LICENSEE:

> Allergan, Inc.
> 2525 Dupont Drive
> Irvine, California 92612-1599
> Attn: General Counsel

> Allergan Botox Limited
> Castlebar Road, County Mayo
> Ireland
> Attn: Francis R. Tunney, Jr., Secretary

(c)     Integration. This License Agreement constitutes the entire agreement and understanding of the parties relating to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, whether oral or written relating to the subject matter hereof, except the related Option Agreement referred to above and the Confidential Disclosure Agreement between Allergan and IBA dated March 22, 1996.

(d)     Waiver, Governing Law, etc. Any terms of this Agreement may be amended, modified or waived only with the prior written consent of the party against whom enforcement of such amendment, modification or waiver is sought. This Agreement shall be governed by and construed in accordance with the laws of the State of California. The headings herein are for convenience only and shall not be deemed to limit or otherwise affect the construction hereof. If any provision of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other provisions of this Agreement shall not in any way be affected or impaired. This Agreement may be executed in three or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. In the event of any dispute over the interpretation or enforcement of this Agreement, in addition to any other recovery, the prevailing party in such a dispute shall be awarded its reasonable attorneys' fees and costs,

including reasonable expert witness fees and court costs or the costs of any arbitration.

      (e)   <u>Relationship of Parties</u>.  None of the parties nor its agents and employees, shall under any circumstance be deemed an agent or representative of any other party and none shall have authority to act for and/or bind the other in any way, or represent that it is in any way responsible for acts of the other.  This Agreement does not establish a joint venture, agency or partnership between the parties.

      (f)   <u>Public Disclosure</u>.  Except for such public disclosure as is deemed necessary, in the reasonable judgment of a party, to comply with applicable laws, no announcement, news release, public statement, publication, or presentation relating to the existence of this Agreement, the terms and conditions of this Agreement, or either party's performance hereunder (collectively, a "Publication") will be made without the prior consent of the other party, which shall not be unreasonably withheld.  The parties agree that they will use reasonable efforts to coordinate the initial announcement or press release, if any, relating to the existence of this Agreement so that any such initial announcement is made contemporaneously if both parties elect to make such announcement.

IN WITNESS WHEREOF, the parties have by their duly authorized representatives hereunto set their hands the day and year first above written.

**ALLERGAN BOTOX LIMITED**

By: _Francis R. Tunney_

Name: ___Francis R, Tunney, Jr.___

Title: ___Secretary___

Date: _____

**ALLERGAN, INC.**

By: _Lester J. Kaplan_

Name: ___Lester J. Kaplan, Ph.D.___

Title: ___Corporate Vice President___
___Science and Technology___

Date: _____

**MIOTECH, INC.**

By: _William J. Binder MD_

Name: _WILLIAM J. BINDER, M.D._

Title: _CEO / MIOTECH, INC._

Date: _11/14/98_

<u>Schedule 1</u>

**Licensed Patents**

(See attached single page)

## Schedule 1

| COUNTRY | SERIAL NO. | DATE FILED | STATUS |
|---|---|---|---|
| United States | 08/588,654[†] | January 19, 1996 | Allowed (Issue Fee Paid Feb. 13, 1997) |
| Canada | 2,190,011[*] | November 8, 1996 | Pending (examination requested) |
| Japan | Hei-7-529042/1995[*] | November 11, 1996 | Pending (examination not yet requested) |
| EPO (all 16 countries designated) | 95918353.4[*] | November 8, 1996 | Pending (examination requested) |

[†] Continuation of U.S. Ser. # 08/343,331, filed November 21, 1994 (now abandoned), which is a continuation-in-part of U.S. Ser. # 08/240,973, filed May 9, 1994 (now abandoned).

[*] National phase of PCT/95/05422 filed May 2, 1995, which is based on U.S. Ser. # 08/240,973, filed May 9, 1994 (now abandoned).

NY3:14335.01

Schedule 2

## Clinical Data Summary

(See attached five (5) pages)

# CLINICAL DATA SUMMARY

## USE OF BOTULINUM TOXIN IN MIGRAINE THERAPY

The following data analysis was extracted from a random sampling of a patient population with the results of information submitted by five physicians based upon his own criteria of efficacy and response to treatment. Initially, each physician was asked to make his own observations based upon preliminary information provided and to assess his own clinical outcomes with no formal reporting vehicle.

Patients were not formally recruited for a specific study. There were no set exclusion criteria, clinical end points or formal protocols that one would normally utilize in a formal study. Each physician made his determination of clinical response from each treatment rendered to a patient (varying in dose and sites of injection). The conclusions were based on improvement of symptoms determined by patient interviews. In some cases, particularly in the early stages of the investigation, the dosing varied. There was no attempt to bias the results and no patients were excluded because of unfavorable or associated conditions that had the potential of producing negative outcomes.

In spite of the limitations of protocol design or uniformity in data reporting, we were able to obtain clinically significant numbers and the investigative physicians have uniformly come to similar conclusions: that the treatment has been effective in treating migraine headaches both acutely and prophylactically with no significant side effects or complications.

The following is summary data as analyzed by a certified statistician.

The data was examined by using parametric and non-parametric tests. The total sample analysis was run first by collapsing the data into categories of benefit and no benefit after eliminating those patients with inadequate or questionable follow up data. What follows is a description of the results that are presented on the accompanying tables using parametric statistics on the total patient sample.

Statistical Analysis:

Differences between gender and age and age at onset of migraines were compared using Student's t-tests. Student's t-tests were used also to assess the differences for mean dosage and duration of benefit between injections given prophylactically or in an acute phase. Analyses of variance models were used to assess the difference between benefit from treatment and mean dosage and mean duration of benefit. A Fisher's exact test was

used to assess the difference between benefit from injections and injections given prophylactically or in an acute phase. Pearson's correlations were used to assess the relationships between mean dosage, mean duration of benefit, number of injections, age and age of onset. Data was entered into SAS and SAS/STAT was used for all analyses. An alpha of 0.05 was used in all statistical comparisons.

## RESULTS:

316 patients participated in this study (105 females and 11 males). (See table 1). Their mean age was 43.8 (sd=11.9). Patients received from 1 to 7 treatments with an average of 2 (sd=1.4, n=115). The mean dose per patient was 25.7 units (sd=14.3, n=91). Of those patients with follow up data, 95 (89.6%) were found to benefit from the treatments, and 11 (10.4%) did not benefit. Of those patients that did benefit the mean duration of benefit was 3.6 months (sd=2.4, n=59) and 2.9 months (sd=1.6, n=30). No difference was found between benefit and injections given prophylactically or in an acute phase. (See table 2) No differences were found between mean dosage or duration of benefit and injections given prophylactically or in an acute phase. (See table 3) No statistically significant difference was found between mean dosage, mean duration of benefit, number of injections, age and age of onset. (See Table 4)

## TABLE 1:
MEANS, STANDARD DEVIATIONS FOR AGE AT TREATMENT OF MIGRAINE BY GENDER:

|  | FEMALE | | | MALE | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
|  | N | Mean | Std | N | Mean | Std | N | Mean | Std |
| AGE | 105 | 43.3 | 12.0 | 11 | 47.8 | 11.3 | 116 | 43.8 | 11.9 |

JUN-25-97 WED 11:07    WILLIAM H KIMBALL INC    FAX NO. 510 253 1821    P.05
WILLIAM J BINDER, MD    PAGE 04

**TABLE 2**
FREQUENCY AND PERCENT OF PATIENTS BENEFITING FROM INJECTIONS BY
TYPE OF HEADACHE INTERVENTION:

|  | PROPHYLACTIC | | ACUTE | | TOTAL | |
|---|---|---|---|---|---|---|
|  | N | % | N | % | N | % |
| BENEFIT | 78 | 90.5 | 19 | 86.4 | 95 | 89.6 |
| NO BENEFIT | 8 | 9.5 | 3 | 13.6 | 11 | 10.4 |

**TABLE 3**
MEAN AND STANDARD DEVIATIONS FOR DOSAGE AND DURATION OF BENEFIT
FOR PATIENTS WHO BENEFITED FROM INJECTIONS BY TYPE OF MIGRAINE
INTERVENTION:

|  | PROPHYLACTIC | | | ACUTE | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
|  | N | Mean | Std | N | Mean | Std | N | Mean | Std |
| DOSAGE | 70 | 25.9 | 14.4 | 15 | 24.5 | 12.8 | 91 | 25.7 | 14.3 |
| DURATION | 75 | 3.4 | 2.3 | 15 | 2.7 | 1.1 | 94 | 3.3 | 2.1 |

TABLE 4
CORRELATIONS BETWEEN DOSE, DURATION OF BENEFIT, NUMBER OF
INJECTIONS AND AGE:

| | MEAN DOSAGE | MEAN DURATION OF BENEFIT | NO. OF INJECTIONS | AGE |
|---|---|---|---|---|
| MEAN DOSAGE | | 0.03* N=75 | -0.11* N=90 | -0.11+ N=91 |
| MEAN DURATION OF BENEFIT | | | -0.01+ N=93 | 0.05 N=94 |
| NUMBER OF INJECTIONS | | | | 0.15* N=115 |
| AGE | | | | |

*p < 0.10

A significant difference was found between benefit and age of the patient for patients in
an acute episode during treatment (p<0.05). Those who benefited from the treatment
were older (mean=39.7+/- 10.8) than those not benefiting (mean=29.0+/-4.4). No
difference was seen in the prophylactic group.

Complication Rates: There were no serious side effects or complications associated with
the administration of the toxin. There was noted to be one case of transient ptosis, but no
reported cases of diplopia, no facial nerve or expression problems, no keratopathy,
idiosyncratic or allergic reactions. Some patients reported pain, ecchymosis or transient
bleeding at the injection site.

In the post hoc analysis, we examined whether the following variables correlated to response to
therapy: Dose, Sex, Duration and Age. When comparing the patients receiving benefit from

those who did not receive benefit, there was no statistically significant difference between sex
and dose. However, a statistically significant difference between age at treatment and response
to therapy was observed (p<.05).

## SUMMARY

Overall, our general impression of duration of action & dosage over our recent experience
(within the past 6-9 months) have indicated an even more consistent response at a dose of
approximately 40 units. At these doses, recent data suggest a response rate greater than 90% for
prophylactic treatment as well as acute treatment. In the acute treatments, complete relief was
found to occur within 1 hour and 15 minutes in most patients. At this dose range the recent data
suggest average duration of action to last between 3 - 4 months. In addition to the relief of
migraine pain, the accompanying symptoms such as nausea and vomiting, phonophobia,
photophobia and visual disturbances were similarly alleviated.

Although this was not a controlled study, the data gathered from this open treatment experience
showed that botulinum toxin A was effective in mitigating migraine headaches and shows
promise in treating patients both acutely and prophylactically. The significant basis of efficacy
will have to be determined in a double blind placebo controlled study.

# EXHIBIT B

## AMENDMENT NO. 1 TO
## LICENSE AGREEMENT

This Amendment No. 1 to License Agreement (the "Amendment") is entered into as of September 25, 2001, by and between Allergan, Inc., a Delaware Corporation and its affiliate Allergan Botox Limited, an Irish Corporation (collectively "LICENSEE"), on the one hand, and Miotech, Inc., a California Corporation ("MIOTECH") and Miotox LLC, a California Limited Liability Company ("MIOTOX", or "LICENSOR").

WHEREAS, LICENSEE and MIOTECH entered into an option agreement dated as of July 31, 1997 (the "Option Agreement") whereby MIOTECH granted LICENSEE the option for a license of certain patent rights and related intellectual property, including Improvements (the "Rights"); and

WHEREAS, a License Agreement was executed by LICENSEE and MIOTECH effective October 30, 1998 pursuant to which MIOTECH licensed the Rights to LICENSEE; and

WHEREAS, MIOTECH has informed LICENSEE that it contributed and assigned said Rights, together with its rights and obligations under the Option Agreement, to MIOTOX, a limited liability company of which MIOTECH is the managing member; and

WHEREAS, MIOTECH and MIOTOX now represent and warrant to LICENSEE that the License Agreement mistakenly indicated that the Rights were owned by MIOTECH when the License Agreement should have indicated that the Rights were owned by, and licensed to LICENSEE by, MIOTOX; and

WHEREAS, MIOTECH and MIOTOX now wish to amend the License Agreement to reflect the identity of the LICENSOR as MIOTOX and not MIOTECH, and to make certain other amendments and corrections to the terms of the License, all in accordance with the principles set forth in Revenue Ruling 69-482, 1969-2 C.B. 164.

NOW, THEREFORE, the parties agree as follows:

1. Amendment. The License Agreement is hereby amended as follows:

    A.   Identity of Licensor. The LICENSOR under the License Agreement is MIOTOX.

    B.   Amendment to Section 1(a) of the License Agreement. Section 1(a) of the License Agreement is amended by adding the following paragraph after the existing paragraph:

      "Also included within the definition of Licensed Patents are any patents or patent applications which claim any Improvements for the Licensed Use, which are developed by LICENSOR during the term of this Agreement."

    C.   Amendment to Section 1(g) of the License Agreement. Section 1(g) of the License Agreement is amended by adding the word "Licensed" before the word "Products" in the second-from-last line on page 3 of the executed License Agreement.

D.    Addition of New Section 1(m) of the License Agreement.    The following Section 1(m) is added to the License Agreement:

"(m)    'Territory' shall mean world-wide'."

E.    Amendment to Section 3(a) of the License Agreement.   The $500,000 milestone payment referenced in Section 3(a)(1) of the License Agreement and the $1,500,000 milestone payment referenced in Section 3(a)(2) of the License Agreement shall not be due at the times indicated, but instead shall be due and payable to LICENSOR within ten (10) business days after the effective date of this Amendment. For the avoidance of doubt, this $2 Million payment is to be 100% creditable against any royalties that may come due under Section 3(b) of the License Agreement as provided in Section 3(d).

F.    Amendment to Section 3(c)(1) of the License Agreement.   Section 3(c)(1) of the License Agreement is deleted and replaced with the following provision:

"(1) For purposes of this License Agreement, a Licensed Product will be deemed reportable for the purpose of calculation of Net Sales:

(A) with respect to a country other than the United States, commencing on the earliest of (i) the Licensed Product's approval by that country's governmental agencies responsible for approving the Licensed Product for the primary treatment of acute and/or chronic migraine headache, or (ii) such time as the Licensed Product can be legally promoted by LICENSEE in such country for primary treatment of acute and/or chronic migraine headache and used for such indication without such approval.

(B) with respect to the United States, commencing on the earlier of (i) the date on which the Licensed Product is approved by the FDA for the primary treatment of acute and/or chronic migraine headache in the United States or (ii) January 1, 2004."

G.    Amendment to Section 3(c)(3) of the License Agreement.   Section 3(c)(3) of the License Agreement is amended to add the following paragraph immediately after the last sentence of Section 3(c)(3):

"Notwithstanding any other provision of this Section 3(c)(3) or of this License Agreement, for Net Sales in the United States after January 1, 2004 but before the Licensed Product is approved by the FDA for the primary treatment of acute and/or chronic migraine headache and used for such indication in the United States, the preceding independent annual audit procedure will not be used. Instead, for such Net Sales, LICENSEE'S internal annual audit results (compiled by LICENSEE in the ordinary course of LICENSEE'S business at the end of each calendar year and funded by LICENSEE) showing the use in the United States of Licensed Products for the primary treatment of acute and/or chronic migraine shall be the sole data source in determining reportable Net Sales (and any audit of Net Sales by LICENSOR pursuant to Article IV of the License shall be limited to reviewing Allergan's books and records regarding its internal annual audit results

relating to the use of Botox® .  LICENSOR shall designate an independent auditing firm to review LICENSEE's internal audit results, which independent auditor shall be provided by LICENSEE with information regarding the use of Botox® for headache treatments for the relevant audit period, but the independent auditor shall keep such information confidential and shall only provide LICENSOR with the results of Allergan's internal audit for the use of Botox® for the treatment of acute and/or chronic migraine headache.  Royalties paid in 2004 shall be based upon LICENSEE's reasonable estimate of sales in 2004, based on the 2003 and earlier data in accordance with Section 4(a) of the License Agreement.  Upon the earlier of (a) the FDA's approval of the Licensed Product in the United States for the primary treatment of acute and/or chronic migraine headache, or (b) January 1, 2006, LICENSOR may thereafter elect annually either (i) continue to utilize LICENSEE'S internal annual audit for the determination of Net Sales in the United States, or (ii) utilize the independent annual audit procedures referenced in the first paragraph of this Section 3(c)(3) for Net Sales in the United States.  LICENSOR shall be provided LICENSEE's internal annual audit data without cost to LICENSOR, but shall share in the cost of any independent audit as provided in Section 3(c)3.

H.   Definition of "Primary Treatment".  Where the term "primary treatment" occurs in the License Agreement or this Amendment, it is meant that the primary purpose for the administration of botulinum toxin to a patient is for the treatment of acute and/or chronic migraine headaches.

I.   Revised Schedule 1 to License Agreement (Licensed Patents).  The revised Schedule 1 (Licensed Patents) attached to this Amendment shall be substituted for Schedule 1 currently attached to the License Agreement.

J.   Amendment to Section 5(a).  Section 5(a) of the License Agreement is amended to add the following after the last sentence:

"In addition, LICENSOR will provide LICENSEE with reasonable access to Licensor's patent counsel to fully discuss the progress of the Licensed Patents. LICENSOR shall also provide LICENSEE adequate opportunity to discuss claim language LICENSEE believes is important to protect its commercial interests and LICENSOR shall use reasonable efforts to accommodate such requests for claims language which LICENSEE wishes to have in the Licensed Patents."

2.  Confirmation and Release.  LICENSOR conclusively confirms and acknowledges that LICENSEE has adequately performed all obligations of the Option Agreement of July 31, 1997, the Confidential Disclosure Agreement of March 22, 1996 and the License Agreement to date, is not in breach of any of the foregoing agreements in any respect, and releases, on behalf of LICENSOR and each of its agents, representatives, parents, subsidiaries, affiliates, and partners, any and all claims any of them had, have or could have asserted against LICENSEE or any of its agents, representatives, parents, subsidiaries and/or affiliates relating in any way to any actions or omissions of LICENSEE from the beginning of time to the date of this Amendment.

3. Review of Clinical Programs. MIOTECH and MIOTOX acknowledge and agree that they have reviewed to their satisfaction Allergan's current clinical programs for Botox for migraine indication and, further acknowledge and agree that such clinical programs are satisfactory under Section 8(a). Furthermore, MIOTECH and MIOTOX acknowledge and agree that LICENSEE has the right, at any time, to cease actively pursuing FDA approval of the Licensed Product for the Licensed Use as provided in the License Agreement. MIOTECH and MIOTOX acknowledge and agree that at no time in the future will any actions or inactions by LICENSEE in connection with clinical programs for Botox® form the basis for any claim of breach of the License or this Amendment by LICENSOR.

4. Warranties. Section 7(c) of the License Agreement is hereby deleted and replaced with the following representation and warranty:

While nothing in this Agreement shall be construed as a warranty that Licensed Patents are valid or enforceable or that their exercise does not infringe any patent rights of third parties, LICENSOR hereby represents it has no knowledge that, and that no claims have been made from which it can be inferred that, the Licensed Patents are or may be invalid or that their exercise would or might infringe Patent Rights of third parties.

5. Reaffirmation of License Agreement. Except as expressly set forth herein, the License Agreement is not amended, modified or altered by this Amendment and the License Agreement and the obligations and rights of the parties thereunder are hereby ratified and confirmed by LICENSEE and LICENSOR in all respects.

6. MIOTECH/MIOTOX Covenants; Consent of ALLERGAN. MIOTECH and MIOTOX represent and warrant to ALLERGAN that MIOTECH has assigned its rights to MIOTOX including an assignment of Licensed Patents as attached hereto in Schedule 2 and shall immediately record the assignment in the United States Patent and Trademark Office and provide LICENSEE copies of the same. LICENSEE hereby consents to such assignment. MIOTECH and MIOTOX each represent and reaffirm that all Improvements (as defined in the License Agreement) were and are included in the assignment of rights from MIOTECH to MIOTOX as described in the above recitals. MIOTECH and MIOTOX further represent and warrant that Licensed Patents have not been assigned to any third party at any time.

7. <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which shall constitute an original but all of which shall be but one and the same Agreement.

Allergan, Inc

By: _____

Name: GEORGE LASETKAY

Title: CVP  CORPORATE DEVELOPMENT

Allergan Botox Limited

By: _____

Name: RUTH STEINHOLTZ

Title: DIRECTOR

Miotox LLC

By: Miotech Inc, Its Managing Member

By: _____

    William Binder, President

Miotech, Inc.

By: _____

    William Binder, President

7.   Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall constitute an original but all of which shall be but one and the same Agreement.

Allergan, Inc

By: _____

Name: GEORGE LASEZKAY

Title: CVP CORPORATE DEVELOPMENT

Allergan Botox Limited

By: _____

Name: _____

Title: _____

APPROVED AS TO FORM
DOUGLAS S. INGRAM
LEGAL DEPARTMENT

Miotox LLC

By:  Miotech, Inc, Its Managing Member

By: _____
           William Binder, President

Miotech, Inc.

By: _____
           William Binder, President

Schedule 1

Licensed Patents

| COUNTRY | SERIAL NO. | DATE FILED | STATUS |
|---|---|---|---|
| United States | 08/588,654[1] | January 19, 1996 | U.S. patent 5,714,468 issued on February 3, 1998. Certificate of correction issued June 27, 2000 |
| Canada | 2,190,011· | November 8, 1996 | (1) Notice of Allowance for 27 claims issued May 12, 2000 in application 2,190,011.<br><br>(2) Divisional application _____ filed , _____, 2000. |
| Japan | Hei-7-529042/1995· | November 11, 1996 | Japanese patent 3066079 issued May 12, 2000. |
| EPO | 95918353.4· | November 8, 1996 | (1) Pending in 16 designated countries.<br><br>(2) Divisional application number _____, filed _____, 2000.· |
| South Africa | 95/3741 | May 9, 1995 | South African patent 95/3741 issued January 29, 1997 with 42 claims. |

---

[1]      Continuation of U.S. Serial Number 08/343,331, filed November 21, 1994 (now abandoned), which is a continuation in part of U.S. Serial Number 08/240,973, filed May 9, 1994 (now abandoned).

·      National or regional phase of PCT/US95/05422, filed May 2, 1995, which is based upon U.S. Serial Number 08/240,973, filed May 9, 1994 (now abandoned)