JEFFREY T. THOMAS, SBN 106409
  jtthomas@gibsondunn.com
ANNE Y. BRODY, SBN 252279
  abrody@gibsondunn.com
SEAN S. TWOMEY, SBN 279527
  stwomey@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

Attorneys for Defendants ALLERGAN, INC.
and ALLERGAN BOTOX LIMITED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MIOTOX LLC, a California Limited Liability Company,<br><br>               Plaintiff,<br><br>    vs.<br><br>ALLERGAN, INC., a Delaware Corporation; ALLERGAN BOTOX LIMITED, an Irish Corporation, and DOES 1-25 inclusive,<br><br>               Defendants. | CASE NO. 2:14-cv-8723<br><br>**DEFENDANTS ALLERGAN, INC., AND ALLERGAN BOTOX'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT** |

Defendants and Counterclaimants Allergan, Inc. and Allergan BOTOX[1] (collectively, "Allergan"), by and through their undersigned counsel, respectfully submit this Answer and Defenses to the Complaint of Plaintiff Miotox LLC ("Miotox"), and these Counterclaims against Plaintiff and Counterclaim-Defendant Miotox.

---

[1] In 2012, Allergan Botox Limited changed its name to Allergan BOTOX.

## ANSWER TO THE COMPLAINT

1.      Venue is proper in this Court because Miotox is headquartered in Beverly Hills, California.  As a result, the October 30, 1998 License Agreement between Miotox,[2] Allergan, and Allergan Limited ("License Agreement") is to be performed in this county, the obligation to pay Miotox under the License Agreement arises in this county, and the breach of the License Agreement occurred in this county.  Cal. Civ. Proc. Code § 395.5.

**ANSWER: Paragraph 1 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  To the extent that paragraph 1 (and footnote 1) purport to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

2.      Miotox is a California Limited Liability Company, with its principal place of business in Beverly Hills, California.

**ANSWER: Allergan admits the allegations contained in paragraph 2.**

3.      Allergan is a Delaware Corporation with its principal place of business in Irvine, California.

**ANSWER: Allergan admits the allegations contained in paragraph 3.**

4.      Upon information and belief, Allergan Limited is an Irish Company, and a subsidiary of Allergan.  The personal jurisdiction of this Court over Allergan Limited in this case is proper because, on information and belief, Allergan Limited, through various commercial arrangements, has engaged in continuous and systematic activities within the State of California by *inter alia,* placing products in the stream of commerce

---

[2] The License Agreement was originally signed by Miotech Inc.  As explained below, Miotox was later substituted as the contracting entity.

directed at California, with the knowledge and/or understanding that such products would be sold in the State of California.

> **ANSWER: Paragraph 4 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations. Allergan also denies the allegations contained in paragraph 4 insofar as they refer to Allergan BOTOX's former corporate title. In 2012, Allergan Botox Limited changed its name to Allergan BOTOX.**

5.      Miotox is ignorant of the true names or capacities of the Defendants sued herein under the fictitious names Does 1-25, inclusive. Miotox will amend this Complaint to allege their true names and capacities when ascertained. Miotox is informed and believes, and on that basis alleges, that each Defendant sued herein by such fictitious names is in some manner responsible for the events or happenings described in this Complaint, and that Miotox's damages as herein alleged were proximately caused by such Defendants.

> **ANSWER: Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations in paragraph 5, and thus denies the allegations.**

6.      At all times herein mentioned Defendants Does 1 through 12 were the agents, servants, and employees of their codefendants, and in doing the things alleged below were acting in the scope of their authority as such agents, servants, and employees, and with the permission and consent of their codefendants.

> **ANSWER: Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations in paragraph 6, and thus denies the allegations.**

7.      Miotox brings this action to recover damages for breaches of its 1998 License Agreement with Allergan and Allergan Limited (collectively "Allergan" or "Licensee"). The License Agreement requires Allergan to pay Miotox a Royalty for every sale of Botox used to treat migraine headaches. The parties have operated under

this License Agreement for sixteen years and Allergan paid Royalties consistent with these terms.  As of May 9, 2014, when the original patent claiming Miotox's invention expired, Allergan proposed to change its longstanding practice, arguing for the first time that Miotox is only entitled a Royalty for Botox used in the precise manner claimed in an unexpired Miotox patent.  Miotox has obtained several new patents recently that cover and are related to the administration of Botox for migraine headache treatment.  Instead of embracing the new patents that will provide prolonged exclusivity, Allergan instead "reinterpreted" the License Agreement, claiming that Miotox is now only entitled to a Royalty when Botox is administered in the exact manner described in one of those new patents.  Now that Miotox has received the first Royalty payment after expiration of the patent, it is apparent that Allergan is not paying Royalties on United States sales at all— a breach under even its own interpretation.  Allergan's failures to comply with material terms of the License Agreement entitle Miotox to damages in an amount that could exceed $600 million and a declaration of Allergan's obligations under that Agreement.

**ANSWER: Paragraph 7 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  Allergan admits the parties entered into a License Agreement with an effective date of October 30, 1998.  To the extent that paragraph 7 purports to summarize, describe, or make allegations concerning the License Agreement or any patents, Allergan states that the License Agreement and those patents speak for themselves, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan denies the remaining allegations in paragraph 7.**

8.      In 1992, Doctor William J. Binder ("Dr. Binder") developed a novel therapy for the treatment of migraine headaches.  He discovered that more than 90 percent of patients treated with his therapy experienced a significant reduction in the

symptoms and frequency of migraine headaches.  His method calls for the administration of presynaptic neurotoxins, such as botulinum toxin A ("Botox"), to areas like the face, neck and back, to reduce or prevent the pain associated with migraine headaches.  Dr. Binder filed patent applications in 1994 and 1996, claiming his invention.  U.S. Patent No. 5,714,468 (the '468 Patent) was issued to Dr. Binder on February 3, 1998, titled "Method For Reduction Of Migraine Headache Pain." The '468 Patent expired on May 9, 2014.

> **ANSWER: To the extent that paragraph 8 purports to summarize, describe, or make allegations concerning any patents, Allergan states that those patents speak for themselves, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan admits that the '468 patent had a limited term and has now expired.  Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the remaining allegations in paragraph 8, and thus denies the allegations.**

9.     Dr. Binder formed Miotech, Inc. ("Miotech") in 1994 to promote his invention.  He was intent on finding a supplier of botulinum toxin, completing formal clinical trials, and acquiring funding.

> **ANSWER: Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations in paragraph 9, and thus denies the allegations.**

10.     In June 1997, Allergan and Miotech, signed an Option Agreement granting Allergan the right to acquire an exclusive license to make, have made, use and sell any medical product containing botulinum toxin for the treatment of migraine headaches.  As part of the plan to begin testing to obtain FDA approval, the Option Agreement provided, *inter alia,* that Allergan would consult with Miotech about the proposed clinical protocol for human testing of botulinum toxin.  At the time of

Gibson, Dunn & Crutcher LLP

negotiation, Miotech understood that the parties expected that Phase II and Phase III FDA studies would last no more than four years.

> **ANSWER: To the extent that paragraph 10 purports to summarize, describe, or make allegations concerning the Option Agreement, Allergan states that the Option Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan admits the parties entered into an Option Agreement in June of 1997.  Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the remaining allegations in paragraph 10, and thus denies the allegations.**

11.     On October 30, 1998, Allergan exercised the option right by signing a License Agreement with Miotech (sometimes called "Licensor") which gave them all rights to Miotech's Botox-for-migraine headache patents.  The License Agreement is attached hereto as Exhibit A and incorporated herein by this reference.

> **ANSWER: Allergan admits the parties entered into a License Agreement with an effective date of October 30, 1998.  To the extent that paragraph 11 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

12.     Dr. Binder formed Miotox in 1998, with Miotech as its general partner.  Miotech subsequently assigned its patent rights to Miotox and the License Agreement was amended, as discussed below.  Accordingly, this Complaint will refer to "Miotox" to represent either Miotox or Miotech.

> **ANSWER: To the extent that paragraph 12 purports to summarize, describe, or make allegations concerning the License Agreement and amendments thereto, Allergan states that the License Agreement speaks for**

Gibson, Dunn & Crutcher LLP

**itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations. Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the remaining allegations in paragraph 12, and thus denies the allegations.**

13.     The License Agreement provides Allergan a license to all patents or inventions owned by Miotox that cover or are related to the treatment of migraine headaches with Botox.  It also requires that Allergan pay Royalties to Miotox for all units of Botox sold for the treatment of migraine headaches, in countries where Miotox has obtained patents covering or relating to Botox for migraine headache therapy.

**ANSWER: To the extent that paragraph 13 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

14.     Specifically, the License Agreement provides the following broad license to Allergan:

> LICENSOR [Miotox] hereby grants LICENSEE [Allergan] and its Affiliates a worldwide, exclusive license, with the right to grant sublicenses, to the Licensed Patents and Improvements, to make, have made, use and sell the Licensed Products for the Licensed Use in the Territory and to practice the inventions covered by the Licensed Patents and to use the Clinical Data.

Ex. A, License Agreement § 2(a).  "Licensed Patents" include "all patents and patent applications in the Territory presently owned or later acquired by LICENSOR . . . which cover the Licensed Use."  *Id.* at § 1(a).  "Licensed Patents" includes patents that claim "Improvements" for the Licensed Use, which means "inventions, modifications, combinations, technologic advances or improvements developed or acquired by

1   LICENSOR during the term of this Agreement related to the Licensed Use, whether

2   patentable or not." *Id.* at §§ 1(a), (e).

3         **ANSWER: To the extent that paragraph 14 purports to summarize,**

4   **describe, or make allegations concerning the License Agreement, Allergan**

5   **states that the License Agreement speaks for itself, and further that such**

6   **summaries, descriptions, and allegations are incomplete and therefore**

7   **inaccurate, and accordingly denies the allegations.**

8        15.    "Licensed Use" is defined in the License Agreement as broadly as

9   possible: "the use of Licensed Product for the treatment of migraine headache." *Id.* at

10  § 1 (b).  A "Licensed Product" is "any medical product containing Botulinum Toxin or

11  other toxin made, used, or sold by LICENSEE, its Affiliate, or any sublicensee thereof

12  whose use is covered by a Valid Patent Claim." *Id.* at § 1(d).  "Valid Patent Claim" is

13  given a broad definition: any "bona fide, unexpired claim in the Licensed Patents for

14  the License Use . . . ." *Id.* at § 1(c).

15        **ANSWER: To the extent that paragraph 15 purports to summarize,**

16  **describe, or make allegations concerning the License Agreement, Allergan**

17  **states that the License Agreement speaks for itself, and further that such**

18  **summaries, descriptions, and allegations are incomplete and therefore**

19  **inaccurate, and accordingly denies the allegations.**

20       16.    In consideration for the license granted to Allergan, the License

21  Agreement provides that Fees and Royalties shall be paid to Miotox.  Most relevant

22  here are Royalties.  Allergan fulfills its obligation to pay Miotox Royalties by

23  remitting payment to Miotox's office.  Royalties are based on the Net Sales of the

24  Licensed Product.  *Id.* at § 3(b).  "Net Sales" means "the actual selling price of

25  Licensed Product sold by LICENSEE, its Affiliate, or any sublicensee to others in

26  countries in which Licensed Patents have been granted for the Licensed Use . . . ." at

27  § 1(g).  Botox sold for use in treating non-migraine headache conditions, however, is

28  to be excluded from the Net Sales calculation.  The License Agreement has a sales

audit provision which calls for the segregation of Licensed Product used to treat other indications from Licensed Product used to treat migraine headaches:

> A Licensed Product will not be reportable for purposes of calculation of Net Sales for any other indication ... including, but not limited to, treatment of blepharospasm, torticolis, cerebral palsy, non-headache pain, or non-migraine headaches (such as tension headache).

*Id.* at § 3(c)(2). It then states that the amount of reportable Net Sales shall be calculated through an annual audit. *Id.* at § 3(c)(3). Allergan is required to use "procedures which provide a reasonable approximation of reportable Net Sales." *Id.* The "primary intent" of such audit "is to distinguish, in LICENSEE's target audiences, (a) the use of Licensed Products for the primary treatment of acute and/or chronic migraine headache from (b) the use of Licensed Product for all other indications as described in Section 3(c)(2)." *Id.* The audit is not tied to any specific patent language, and there is no provision allowing the audit to change when a patent expires or additional patents are added to the License Agreement.

**ANSWER: To the extent that paragraph 16 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

17. The '468 Patent qualifies as a "Licensed Patent" for the "Licensed Use;" Allergan has never disputed this. Therefore through at least the expiration of that patent on May 9, 2014, Royalties were due under the License Agreement based on the Net Sales of Botox in the United States for the treatment of migraine headaches. *See id.* at §§ 1(b), (g), 3(b). Miotox is informed and believes that Allergan paid all Royalties based on the '468 Patent incurred through May 9, 2014 (except as otherwise alleged herein).

**ANSWER: Paragraph 17 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations. To the extent that paragraph 17 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations. Allergan admits that all royalties due based on the '468 patent were paid in full. Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the remaining allegations in paragraph 17, and thus denies the allegations.**

18.    The current dispute is about Royalties due after May 9, 2014, when the '468 Patent expired. As is common in the industry, the License Agreement is drafted to incent Miotox, through Dr. Binder, to develop related therapies to extend the exclusivity period on migraine headache treatment beyond the life of the '468 Patent. If Miotox could obtain new patents for the treatment of migraine headaches using Botox, those new patents would extend beyond the period covered by the original '468 Patent. This creates new barriers for other companies to enter the market, allowing Allergan additional years of exclusivity on sales of Botox therapy for migraine headaches.

**ANSWER: Paragraph 18 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations. To the extent that paragraph 18 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations. Allergan denies the remaining allegations in paragraph 18.**

19.     The License Agreement reflects this goal.  It licenses *all* Licensed Patents and Improvements to Allergan.  Thus, any patents, patent applications, continuations, inventions, modifications, or technological advances, whether patentable or not, owned at the time *or later acquired* by Miotox, that cover, or are related to, the treatment of migraine headaches with Botox, are assigned to Allergan.  *Id.* at §§ 1(a), (b), (e), and 2(a).  In exchange for such a broad license, Allergan agreed to pay Miotox Royalties based on Net Sales of *any* Licensed Product sold by Allergan, in countries where Licensed Patents covering or relating to the Licensed Use have issued, for the term of the License Agreement.  Only sales of the Licensed Product used for treatment of other indications, specifically described and defined in the License Agreement (and further reinforced by the audits and audit procedures), are excluded.  *Id.* §§ 1(g), 3(c)(2).  It also requires Allergan to pay the "out-of-pocket costs, including reasonable legal expenses for the maintenance by LICENSOR of Licensed Patents, including foreign filing fees which LICENSEE has requested," as well as foreign filing fees for the countries identified in Schedule I of the Agreement.  *Id.* at § 5(a).  This requirement makes sense because all patent filings are done for the ultimate benefit of Allergan.  *Id.* The maintenance payments then are credited against Royalties "at a rate not to exceed Fifty Percent (50%) of the royalties payable in a Quarterly Period."  *Id.* at § 5(d).  The License Agreement does not provide an end date; rather it remains "in effect as to any Licensed Product covered by any Licensed Patents for the Licensed Use, until the expiration of such Licensed Patents or at the earliest date on which at least one Valid Patent Claim therein does not exist."  *Id.* at § 6(a).  In other words, the License Agreement remains in effect for as long as any Miotox patents covering, or related to, the treatment of migraine headaches exist.  *Id.*

**ANSWER: To the extent that paragraph 19 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such**

1   **summaries, descriptions, and allegations are incomplete and therefore**

2   **inaccurate, and accordingly denies the allegations.**

3       20.     Finally, if a dispute over its terms arises, the License Agreement provides

4   that the prevailing party will be compensated for pursuing enforcement.  The License

5   Agreement states that "[i]n the event of any dispute over the interpretation or

6   enforcement of this Agreement, in addition to any other recovery, the prevailing party

7   in such a dispute shall be awarded its reasonable attorneys' fees and costs, including

8   reasonable expert witness fees and court costs or the costs of any arbitration." *Id.*

9   § 9(d).

10      **ANSWER: To the extent that paragraph 20 purports to summarize,**

11      **describe, or make allegations concerning the License Agreement, Allergan**

12      **states that the License Agreement speaks for itself, and further that such**

13      **summaries, descriptions, and allegations are incomplete and therefore**

14      **inaccurate, and accordingly denies the allegations.**

15      21.     As part of the arrangement between Allergan and Miotox, Allergan

16  undertook responsibility for completing the clinical trials required to obtain FDA

17  approval of Dr. Binder's therapy.  Both the Option Agreement and the License

18  Agreement were executed before this FDA approval process had begun, so at that time,

19  neither Allergan nor Miotox knew exactly what methods of administration the

20  approval would cover.  Royalties were due on all migraine headache sales of Botox

21  even though approval had not yet been obtained.  The License Agreement was

22  intentionally drafted broadly to ensure that it licensed any and all patents related to

23  Botox administered for the treatment of migraine headaches, and a Royalty was to be

24  paid anytime Botox was administered for the treatment of migraine headaches,

25  regardless of what kind of approval was granted by the FDA.

26      **ANSWER: Paragraph 21 alleges legal conclusions to which no response is**

27      **required, and on that ground, Allergan denies these allegations.  Allergan**

28      **admits it took responsibility for clinical trials related to the use of Botox for**

1    **the treatment of migraine headaches.  To the extent that paragraph 21**

2    **purports to summarize, describe, or make allegations concerning the**

3    **License Agreement or Option Agreement, Allergan states that the License**

4    **Agreement and Option Agreement speak for themselves, and further that**

5    **such summaries, descriptions, and allegations are incomplete and therefore**

6    **inaccurate, and accordingly denies the allegations.**

7         22.    As described above, the Option Agreement specifically provided that

8    Allergan should work with Miotox to develop the clinical protocol for human testing.

9    Dr. Binder, as the inventor and a highly respected medical professional, had superior

10   knowledge of the best methods of Botox administration to treat migraine headaches

11   most effectively, and ideas about the best way to structure the FDA studies and trials.

12        **ANSWER: To the extent that paragraph 22 purports to summarize,**

13        **describe, or make allegations concerning the Option Agreement, Allergan**

14        **states that the Option Agreement speaks for itself, and further that such**

15        **summaries, descriptions, and allegations are incomplete and therefore**

16        **inaccurate, and accordingly denies the allegations.  Allergan lacks sufficient**

17        **knowledge and/or information to form a basis for admitting or denying the**

18        **remaining allegations in paragraph 22, and thus denies the allegations.**

19        23.    Allergan ignored the Option Agreement's requirements, and unilaterally

20   decided to conduct the Phase II tests with altered doses of Botox, submitting a testing

21   protocol to the FDA without input from Dr. Binder.  The procedures outlined in the

22   testing protocol were not the best methods, and in February 1998, Dr. Binder protested,

23   requesting that Allergan withdraw the proposed protocol because it was unlikely to

24   achieve positive results.  Dr. Binder further requested that Allergan design a new,

25   supplemental protocol to the one submitted by Allergan, and he outlined in detail why

26   the clinical trials as proposed by Allergan would likely fail.  Allergan refused to heed

27   Dr. Binder's advice, and in fact, the results were not as strong as Allergan and Miotox

28   had hoped or expected.  As a result, the trial that originally began in 1998/99 and

Gibson, Dunn &
Crutcher LLP

1   ended in 2000 failed, and Allergan had to start over with the Phase II trials in 2001/02,

2   based on Dr. Binder's suggested protocol and recommendations.  After a long delay, a

3   new protocol was developed and submitted to the FDA similar to the one Dr. Binder

4   had originally recommended.  Based on this protocol, Botox was approved on October

5   15, 2010 for the treatment of adult patients with *chronic* migraine headaches.

6   **ANSWER: Allergan admits that Phase II clinical trials were conducted in**

7   **both the 1998-2000 and 2000-2001 timeframes, and that FDA approval was**

8   **received in October 2010.  To the extent that paragraph 23 purports to**

9   **summarize, describe, or make allegations concerning a testing protocol**

10  **submitted to the FDA, Allergan states that the testing protocol speaks for**

11  **itself, and further that such summaries, descriptions, and allegations are**

12  **incomplete and therefore inaccurate, and accordingly denies the allegations.**

13  **Allergan denies the remaining allegations in paragraph 23.**

14  24.    The '468 Patent provided exclusivity for Miotox and Allergan for only a

15  limited period of time.  The delay in the FDA approval process meant that broad

16  marketing of Dr. Binder's invention was delayed while the clock on the '468 Patent

17  was ticking.  Due to Allergan's mistakes and failures, Miotox missed the opportunity

18  to obtain Royalties on sales of Botox for migraine headaches during an earlier period,

19  and the ramp-up period for sales of Botox for migraine headaches was delayed. In

20  addition, while FDA approval was pending, competing forms of botulinum toxin type

21  A were in the process of being approved for sale in the United States, such as Dysport

22  manufactured by Ipsen, and Xeomin which is manufactured by Merz Pharmaceuticals.

23  **ANSWER: Allergan admits the '468 patent had a limited term and has now**

24  **expired.  Allergan further admits that third parties have sought approval of**

25  **botulinum toxin products.   Allergan denies the remaining allegations in**

26  **paragraph 24.**

27  25.    Miotox and Allergan eventually reached an agreement over Allergan's

28  failure to properly conduct the FDA trials in 2001.  That agreement is captured in the

1   Amendment discussed below.  There is no way to know, however, how much

2   Allergan's failure delayed the establishment of this market, or what the full impact was

3   on Miotox.

4       **ANSWER: To the extent that paragraph 25 purports to summarize,**

5       **describe, or make allegations concerning the License Agreement and**

6       **amendments thereto, Allergan states that the License Agreement speaks for**

7       **itself, and further that such summaries, descriptions, and allegations are**

8       **incomplete and therefore inaccurate, and accordingly denies the allegations.**

9       **Allergan lacks sufficient knowledge and/or information to form a basis for**

10      **admitting or denying the remaining allegations in paragraph 25, and thus**

11      **denies the allegations.**

12      26.    Miotech, Miotox and Allergan entered into Amendment No. 1 to the

13   License Agreement on September 25, 2001 (the "Amendment").  *See* Exhibit B,

14   attached hereto and incorporated herein by this reference.  The Amendment clarifies

15   that the identity of the Licensor is Miotox, and revises the sales audit provisions in

16   Section 3(c)(3) of the License Agreement.  The Amendment explains that Miotech

17   assigned its patent rights to Miotox and revises the terms of the License Agreement to

18   reflect Miotox as the relevant licensing entity.  Ex. B, Amendment at § 1(A).

19      **ANSWER: To the extent that paragraph 26 purports to summarize,**

20      **describe, or make allegations concerning the License Agreement and**

21      **amendments thereto, Allergan states that the License Agreement speaks for**

22      **itself, and further that such summaries, descriptions, and allegations are**

23      **incomplete and therefore inaccurate, and accordingly denies the allegations.**

24      27.    The Amendment also clarifies that the Territory is worldwide.  *Id,* at § I

25   (D).

26      **ANSWER: To the extent that paragraph 27 purports to summarize,**

27      **describe, or make allegations concerning the License Agreement and**

28      **amendments thereto, Allergan states that the License Agreement speaks for**

**itself, and further that such summaries, descriptions, and allegations are**
**incomplete and therefore inaccurate, and accordingly denies the allegations.**

28.     Finally, the Amendment inserts a paragraph after Section 3(c)(3) allowing Miotox to elect whether to use an independent audit or Allergan's internal audit to segregate sales under Section 3(c)(3) to identify Net Sales in the United States, providing in relevant part:

> Upon the earlier of (a) the FDA's approval of the Licensed Product in the United States for the primary treatment of acute and/or chronic migraine headache, or (b) January 1, 2006, LICENSOR may thereafter elect annually either (i) continue to utilize LICENSEE'S internal annual audit for the determination of Net Sales in the United States, or (ii) utilize the independent annual audit procedures referenced in the first paragraph of this Section 3(c)(3) for Net Sales in the United States.  LICENSOR shall be provided LICENSEE'S internal annual audit data without cost to LICENSOR, but shall share in the cost of any independent audit as provided in Section 3(c)3 [sic].

*Id.* at I (G).

**ANSWER: To the extent that paragraph 28 purports to summarize,**
**describe, or make allegations concerning the License Agreement and**
**amendments thereto, Allergan states that the License Agreement speaks for**
**itself, and further that such summaries, descriptions, and allegations are**
**incomplete and therefore inaccurate, and accordingly denies the allegations.**

29.     Even as amended, the intent of Section 3(c)(3) of the License Agreement is clearly to segregate migraine headache treatment from non-migraine headache treatment; it does not consider any other factors, such as the scope of FDA approval or whether treatment is administered according to any specific patent claim.  As long as Botox is used to treat any type of migraine headache by any method of administration, Miotox is entitled to a royalty- it's as simple as that.

**ANSWER: To the extent that paragraph 29 purports to summarize, describe, or make allegations concerning the License Agreement and amendments thereto, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

30.     Botox was finally approved by the FDA for the treatment of chronic migraine headaches on October 15, 2010.  Following that approval, Dr. Binder continued to develop novel migraine headache therapies, filing several patent applications in 2012.  Miotox notified Allergan in late 2013 that Schedule 1 to the License Agreement should be updated to include the additional patents and applications that were recently obtained or filed by Miotox.  These patents and applications include:

(a)     U.S. Patent No. 8,420,106, "Extramuscular Treatment of Traumatic-Induced Migraine Headache;"

(b)     U.S. Patent No. 8,491,917, "Treatment of Migraine Headache with Diffusion of Toxin in Non-Muscle Related Areas of the Head,"

(c)     U.S. Patent No. 8.617,569, "Treatment of Migraine Headache With Diffusion of Toxin in Non-Muscle Related Foramina] Sites;"

(d)     U.S. Patent Application No. 13/478,922, "Treatment of Migraine Headache With Diffusion of Toxin in Non-Muscle Related Areas of the Mouth;"

(e)     U.S. Patent Application No. 13/986,197, "Treatment of Traumatic-Induced Migraine Headache;"

(f)     U.S. Patent No. 8,722,060, "Method of Treating Vertigo" (describes a method of treating migraine-induced vertigo); and

(g)     Patent Application PCT/US2013/00131, "Treatment of Migraine Headaches with Presynaptic Neurotoxin."

**ANSWER: Allergan admits Botox was approved for treatment of migraine headache in October 2010.  Allergan further admits that Miotox is**

**attempting to add the patents and patent applications referenced by Miotox in paragraph 30 as "Licensed Patents" under the license agreement. Allergan denies the remaining allegations in paragraph 30.**

31.     These new patents and applications (collectively the "New Licensed Patents") are "Improvements" relating to the treatment of migraine headaches, and are thus "Licensed Patents" within the meaning of the License Agreement. Ex. A, License Agreement §§ 1(a), (e).  Accordingly, they provide a basis for continued payment of Royalties to Miotox after expiration of the '468 Patent on May 9, 2014.  Pursuant to paragraph 1(g) of the License Agreement, the New Licensed Patents trigger Royalties based on Net Sales.  Allergan is required to continue paying Royalties to Miotox for all sales of Botox in the United States for use in the treatment of migraine headaches.

**ANSWER: To the extent that paragraph 31 purports to summarize, describe, or make allegations concerning any patents or the License Agreement, Allergan states that the patents and the License Agreement speak for themselves, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.**

32.     Allergan has acknowledged that these New Licensed Patents are valid, and has admitted that they are now to be incorporated into the License Agreement.  In a February 5, 2014 letter to Miotox, for instance, Allergan wrote, "[W]e agree that the License Agreement should be amended to incorporate the New Patents . . . ."

**ANSWER: Allergan admits it offered to amend the License Agreement if Miotox agreed to royalty terms consistent with that Agreement.  Allergan denies the remaining allegations in paragraph 32.**

33.     After admitting the validity of Miotox's New Licensed Patents in its February 5, 2014 letter, which acknowledged the requirement to pay Royalties, and extended the term of the License Agreement through the patent period (20 years),

Gibson, Dunn & Crutcher LLP

1   Allergan disputed that it would be obligated to pay Miotox Royalties based on Net

2   Sales, i.e., all sales of Botox for use in the treatment of migraine headaches.  Instead,

3   Allergan argued — and continues to argue — that its Royalty obligations apply *only* to

4   Net Sales of a Licensed Product that is actually used for migraine headache treatment

5   in a manner covered by the New Licensed Patents.  Allergan never asserted this

6   interpretation of the License Agreement until its February 5, 2014 letter to Miotox.

7   **ANSWER: Allergan admits that it has stated it is not obligated at this time**

8   **to pay royalties on all sales of Botox that result in Botox being used for the**

9   **treatment of migraine headache.  Allergan denies the remaining allegations**

10  **in paragraph 33.**

11  34.     As required by the License Agreement, Allergan uses an audit to

12  determine the amount of sales of Botox used to treat migraine headaches as opposed to

13  the treatment of other indications.  In its February 5, 2014 letter, Allergan proposed to

14  amend the License Agreement to add a new provision in Section 3, as Section 3(c)(4),

15  that would state:

16  The amount of reportable Net Sales shall be limited to the amount of Licensed

17  Product sold that is actually used in a manner covered by a Valid Patent Claim, as

18  determined by the annual audit referred to in Section 3(c)(3).  If the audit determines

19  that a Licensed Product is not being used in a manner covered by a Valid Patent Claim,

20  then the Licensed Product will not be reportable for purposes of calculation of Net

21  Sales.

22  **ANSWER: To the extent that paragraph 34 purports to summarize,**

23  **describe, or make allegations concerning the License Agreement, Allergan**

24  **states that the License Agreement speaks for itself, and further that such**

25  **summaries, descriptions, and allegations are incomplete and therefore**

26  **inaccurate, and accordingly denies the allegations.  Allergan admits the**

27  **remaining allegations in paragraph 34.**

28

Gibson, Dunn &
Crutcher LLP

35.    This provision proposed by Allergan is completely contrary to the express terms and intent of the License Agreement for several reasons, including at least the following:

(a)    Licensed Product and Licensed Use are not defined (and have never been defined) in a way that restricts Royalties to only Botox used in a manner covered by Licensed Patents.  "Licensed Use" is defined as using Botox for the treatment of migraine headaches *not* Botox as used in a manner covered by a patent claim. Allergan could have originally drafted the License Agreement to limit "Licensed Use" to the constrained way in which it now wants to amend the Agreement.  But instead, "License Use" is defined as expansively as possible, at least in part because Allergan wanted to capture all future patents and applications for patents that cover or are related to the use of Botox in any way to treat migraine headaches.  The actual manner of use is not relevant to the definition of Licensed Use.

(b)    Likewise, "Licensed Product" is defined as any medical product containing Botox whose use is covered by a patent- *not* any medical product which is used in a manner that is covered by a patent.  Again, the actual manner of use is not relevant to the definition of Licensed Product.

(c)    If "Licensed Use" was intended to change when a patent expires and a new patent becomes the primary "Licensed Patent," the definition of "Licensed Use" would be circular and nonsensical.  "Licensed Use" means the use of a Licensed Product for the treatment of migraine headaches.  "Licensed Product" is Botox, the use of which is covered by any "Valid Patent Claim," and "Valid Patent Claim" is any unexpired claim in a Licensed Patent for the Licensed Use.  These defined terms incorporate other defined terms in a circular manner.  Thus, "Licensed Use" cannot be dependent on what is considered a "Valid Patent Claim" or "Licensed Patents" because both "Valid Patent Claim" and "Licensed Patents" incorporate the definition of "Licensed Use."  *See* Ex. A, License Agreement §§ 1(b), (a), (c).

(d)     "Licensed Patents" is specifically defined to include "Improvements." *Id.* at § 1(a).  "Improvements" are "any inventions, modifications, combinations, technologic advances or improvements developed or acquired by LICENSOR during the term of this Agreement *related to* the Licensed Use, whether patentable or not." *Id.* at § 1 (e) (emphasis added).  At a minimum, the New Licensed Patents are *related to* the treatment of migraine headaches and thus automatically become Licensed Patents for which Allergan has a Royalty obligation.

(e)     The audit provisions in Sections 3(c)(2) and 3(c)(3) of the License Agreement are crafted only to segregate sales of Botox for migraine headaches from the use of Botox for other indications — not to track whether Botox administered for migraine headache therapy is being used in a particular manner that is specifically claimed in any patent.  There is no language in these two audit provisions suggesting that patent claims are in any way relevant to the audit.  Section 3(c)(3), as modified by the Amendment, provides that Miotox can elect annually whether to use Allergan's internal audit or an independent audit to segregate sales of Botox used to treat migraine headaches from Botox used for other indications, as described in Section 3(c)(2).  Consistent with the original License Agreement, it does not link the audit to specific patent claims in any way.  Royalties are to be paid based on Net Sales, which is the selling price of Licensed Products, not connected in any way to a specific patent claim.  The form of amendment Allergan suggests in its February 5, 2014 letter is thus contrary to the express terms governing the audit as contained in the License Agreement that Allergan itself prepared.

(f)     As a practical matter, it will be impossible to segregate administration of Botox covered by, or related to, the New Licensed Patents from any other injection techniques.  It will be extremely difficult to separate one kind of injection from another, and doctors are not likely to accurately report or recall why or how they administered the injection to a specific patient, or even which category of injection their methods fall within, since the new patents claim both new indications and new

1   injection techniques that overlap.  For example, one of the New Licensed Patents

2   covers treatment of traumatic-induced migraine headaches.  *See* U.S. Patent No.

3   8,420,106.  A patient might be diagnosed with traumatic-induced migraine headaches

4   and may elect to use Botox to treat those headaches.  But the doctor who administers

5   the Botox may not be aware that the underlying cause of the migraine headaches is

6   trauma, or that doctor may not properly categorize the migraine headache therapy as

7   resulting from trauma.  The person from the doctor's office reporting the manner of

8   use could be an assistant who may not accurately attribute the root of the migraine

9   headache to trauma.  Moreover, some medical facilities may be prohibited or might

10  refuse to disclose such information.

11      (g)   Finally, if the License Agreement truly says what Allergan argues it does

12  about restricting Royalties to methods covered by these New Licensed Patents, there

13  would be no need to amend it as asserted in Allergan's letter of February 5, 2014.

14  Allergan's admission that the License Agreement requires a new provision to restrict

15  Royalties in the manner it desires makes clear that Allergan's intent here is to

16  unilaterally amend the License Agreement without consideration and to the detriment

17  of Miotox, thereby denying it the right to receive Royalties pursuant to the basic terms

18  of the License Agreement.

19      **ANSWER: Paragraph 35 alleges legal conclusions to which no response is**

20  **required, and on that ground, Allergan denies these allegations.  To the**

21  **extent that paragraph 35 purports to summarize, describe, or make**

22  **allegations concerning the License Agreement, Allergan states that the**

23  **License Agreement speaks for itself, and further that such summaries,**

24  **descriptions, and allegations are incomplete and therefore inaccurate, and**

25  **accordingly denies the allegations.**

26      36.   Miotox has fulfilled all of its obligations under the License Agreement, as

27  amended.  To Miotox's knowledge, Allergan has paid all Royalties required under the

28  License Agreement through the expiration of the '468 Patent (with the exception of

1    Royalties improperly omitted from Allergan's calculation due to the methodological

2    issues discussed below).[3]  Allergan expressed unequivocally to Miotox that it will not

3    pay Royalties on all sales of Botox for the treatment of migraine headaches for any

4    sales made after May 9, 2014, based on its reinterpretation of the License Agreement.

5    In actuality, the royalty report provided by Allergan for the second quarter of 2014

6    demonstrates that it paid Miotox no United States Royalties after May 9, 2014, a

7    breach of Allergan's own reinterpretation of the License Agreement.  Either action by

8    Allergan constitutes a breach of the License Agreement.

9        **ANSWER: Allergan admits that all royalty payments due based on the '468**

10       **patent have been paid.  Allergan further admits it has stated that Miotox's**

11       **current expressed interpretation of the License Agreement is incorrect.**

12       **Allergan denies the remaining allegations in paragraph 36.**

13       37.    In accordance with the License Agreement's audit rights, Price

14   Waterhouse Coopers LLP ("PWC") was retained by Miotox to conduct an audit in

15   2012 to examine the Royalty payments made between January 1, 2010 and December

16   31, 2012.  The PWC report was issued on May 18, 2014.

17       **ANSWER: Allergan lacks sufficient knowledge and/or information to form**

18       **a basis for admitting or denying the allegations in paragraph 37, and thus**

19       **denies the allegations.**

20       38.    Allergan refused to provide key internal documents to PWC for the audit.

21   But, PWC identified several statistical issues even without all of the documentation

22   that materially impacted the accuracy of the Net Sales calculation made by Allergan.

23           (a)    In the United States, PWC found that no margin of error was

24   calculated for one study, and as a result, there could be no assessment of the accuracy

25   of the usage estimate applied by Allergan.  PWC also found that Allergan had not

26

27   _____

28   [3]  Miotox has never had access to the books and records of Allergan and thus has no
     way to confirm that all earned Royalties have been paid.

determined whether the data collected and used to calculate Net Sales was representative of the population.  Additionally, PWC concluded that only a small number of migraine headache patients per doctor were used to calculate Botox usage for migraine headaches, and these patients might not be representative of the population of patients receiving Botox.  Although chart pulls were made, PWC concluded that no validation studies were performed to assess data accuracy.  Finally, PWC identified errors in applying the survey data that resulted in inaccurate Royalty calculations.

(b)     For Canada, Allergan had the option of using United States sales data, or at a minimum, could have conducted a reliable survey to calculate Botox usage.  Allergan did neither.  The License Agreement provides that Allergan "shall not be required to audit every country but shall only be required to provide an audit of three representative countries as it relates to the determination of reportable Net Sales." Ex. A, License Agreement § 3(c)(3).  The countries are to be selected from each of the geographical regions of North America, Europe, and Asia. *Id.*  If Allergan had used the United States as a reference country for Canada, Royalties due to Miotox would have been $555,000 higher in 2012 and $77,000 higher in 2011.  Instead, Allergan used unreliable input from sales representatives to estimate Botox usage by specialty and indication.  Allergan had commissioned a third party market study to determine the amount of Botox sales for migraine headaches in Canada.  If it had applied those third party study results, it would have owed over $140,000 in additional Royalties to Miotox.  But Allergan elected not to rely on that third party study, in favor of the unsupported information it received from sales representatives.  PWC concluded that the accuracy of the sales representative reports could not be verified and that the data was likely subjective and not auditable.  If the original third party study was truly inaccurate, Allergan's only viable option was to rely on representative data from the United States; the data haphazardly collected from sales representatives was not a contractually authorized substitute.

(c)     In the United Kingdom, Allergan failed to provide supporting documentation demonstrating the accuracy of its estimated Net Sales.  Accordingly, PWC could not assess the accuracy of the Net Sales estimates used.  Allergan applied the United Kingdom data to determine sales for all of Europe and thus PWC could not determine the accuracy of the Royalty calculation for the remainder of Europe either.

**ANSWER: To the extent that paragraph 38 purports to summarize, describe, or make allegations concerning a PwC report, Allergan states that the PwC report speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations. Allergan denies the remaining allegations in paragraph 38.**

39.     Allergan is obligated under the License Agreement to calculate Royalties using "procedures which provide a reasonable approximation of reportable Net Sales." Ex. A, License Agreement § 3(c)(3).  Allergan has not met this requirement, and has not compensated Miotox for the Royalties that are owed but were not paid.  Miotox is informed and believes that Allergan has not taken steps to correct these problems and that the methodologies used to calculate the Royalties owed to Miotox in the United States, Canada and the United Kingdom in the future will be equally flawed.

**ANSWER: To the extent that paragraph 39 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations about what Miotox is informed of and believes in paragraph 39, and thus denies the allegations.  Allergan denies the remaining allegations in paragraph 39.**

Gibson, Dunn &
Crutcher LLP

40.     Allergan has also inexplicably changed its position on payment of Miotox's patent filing fees.  The License Agreement unequivocally requires Allergan to pay the "out-of-pocket costs, including reasonable legal expenses for the maintenance by LICENSOR of Licensed Patents, including foreign filing fees which LICENSEE has requested," as well as foreign filing fees for the countries identified in Schedule 1 of the Agreement.  Ex. A, License Agreement § 5(a).  The maintenance payments then are credited against Royalties "at a rate not to exceed Fifty Percent (50%) of the royalties payable in a Quarterly Period."  *Id.* at § 5(d).

**ANSWER: To the extent that paragraph 40 purports to summarize, describe, or make allegations concerning communications between Allergan and Miotox or the License Agreement, Allergan states that the communications and the License Agreement speak for themselves, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan denies the remaining allegations in paragraph 40.**

41.     Allergan has always paid patent prosecution attorney bills directly, and advanced or reimbursed the required filing fees.  Pursuant to the License Agreement, Allergan would then credit any fees paid against Royalties due to Miotox, at a rate not to exceed 50%.  But recently, Allergan representatives have indicated that it will deviate from past practices and no longer honor the terms of the License Agreement by paying maintenance costs, legal expenses and foreign filing fees.  In an e-mail dated August 29, 2014, Allergan stated, "Pursuant to section 5(a) of the license agreement, Allergan is not responsible for such foreign filing costs, nor the maintenance fees for foreign filings that were not requested by Allergan.  "As such, I regret to inform you that we will not be making the requested reimbursement to Miotox for these foreign filings." This interpretation is contrary to the terms of the License Agreement and Allergan's past practice.  Allergan's sudden change in position on this simple issue is yet another example of its callous treatment of Miotox.

Gibson, Dunn &
Crutcher LLP

26

1    **ANSWER: Allergan admits it has paid all patent prosecution and**

2    **maintenance expenses it was obligated to pay under the License Agreement.**

3    **Allergan further admits it has rejected requests for payment of costs it is**

4    **not obligated to pay.  Allergan denies the remaining allegations in**

5    **paragraph 41.**

6    42.    Over the life of these New Licensed Patents, Allergan's improper

7    calculation of Royalties, survey deficiencies and refusal to pay patent fees could cause

8    damage to Miotox in the amount of $600 million or more.

9    **ANSWER:  Allergan denies the allegations in paragraph 42.**

10    43.    Miotox re-alleges and incorporates by reference, as if fully set forth

11    herein, the allegations in paragraphs 1 to 42 above.

12    **ANSWER: Allergan repeats, realleges, and incorporates by reference its**

13    **answers to paragraphs 1-42 as if fully set forth herein.**

14    44.    The License Agreement constitutes a valid and binding contract between

15    Miotox and Allergan, to which those parties gave their mutual assent for adequate

16    consideration.

17    **ANSWER: Allergan admits the allegations in paragraph 44.**

18    45.    Miotox has fully satisfied all conditions, covenants and obligations under

19    the License Agreement, save and except for those conditions, covenants and

20    obligations, if any, whose performance has been prevented, excused or waived.

21    **ANSWER: Paragraph 45 alleges legal conclusions to which no response is**

22    **required, and on that ground, Allergan denies these allegations.**

23    46.    As alleged above, Allergan has breached the License Agreement in at

24    least three ways:

25    (a)    First, Allergan has refused to pay Miotox Royalties after May 9,

26    2014, based on all sales of Botox in the United States for use in the treatment of

27    migraine headaches in contravention of the License Agreement.

28

Gibson, Dunn &
Crutcher LLP

(b)     Second, Allergan has breached the License Agreement by improperly calculating Royalties for the United States, Canada, and the United Kingdom.

(c)     Third, Allergan has refused to pay Miotox's out-of-pocket costs, including legal expenses, for the maintenance of the Licensed Patents, including foreign filing fees.

**ANSWER:  Allergan denies the allegations in paragraph 46.**

47.     As a direct, foreseeable and proximate result of these breaches of the License Agreement, Miotox has suffered damages in an amount to be proven at trial.

**ANSWER:  Allergan denies the allegations in paragraph 47.**

48.     Miotox re-alleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 to 47 above.

**ANSWER: Allergan repeats, realleges, and incorporates by reference its answers to paragraphs 1-47 as if fully set forth herein.**

49.     Under California law, there is an implied covenant of good faith and fair dealing in every contract, that no party will do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

**ANSWER: Paragraph 49 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.**

50.     The License Agreement constitutes a valid and binding contract between Miotox and Allergan.

**ANSWER: Allergan admits the allegations in paragraph 50.**

51.     Miotox has fully satisfied all conditions, covenants and obligations under the License Agreement, save and except for those conditions, covenants and obligations, if any, whose performance has been prevented, excused or waived.  All conditions in the License Agreement required for Allergan's performance have occurred or have been excused.

Gibson, Dunn &
Crutcher LLP

1    **ANSWER: Paragraph 51 alleges legal conclusions to which no response is**
2    **required, and on that ground, Allergan denies these allegations.**

3        52.     After performing under the License Agreement one way for sixteen years,
4    Allergan has inexplicably reinterpreted the Agreement at the very moment that Miotox
5    provided it with the New Licensed Patents that will extend Allergan's protection in the
6    worldwide market and require continuing Royalty payments to Miotox.  These New
7    Licensed Patents will allow Allergan to enjoy an expanded market, patent protection in
8    additional countries and patent protection for new treatment techniques.  Allergan is
9    obtaining all of these benefits from the License Agreement while simultaneously trying
10   to deprive Miotox of the benefits it bargained for and earned by claiming, for the first
11   time, that the License Agreement should be viewed more restrictively.  Allergan's
12   interpretation eliminates sales that clearly give rise to Royalties to Miotox, and
13   requires a type of audit that has never been performed and is not addressed in the
14   License Agreement.  Allergan's change in position is an intentional tactic to deprive
15   Miotox of the benefits of the License Agreement.

16       **ANSWER: To the extent that paragraph 52 purports to summarize,**
17   **describe, or make allegations concerning any patents or the License**
18   **Agreement, Allergan states that the patents and the License Agreement**
19   **speak for themselves, and further that such summaries, descriptions, and**
20   **allegations are incomplete and therefore inaccurate, and accordingly denies**
21   **the allegations.  Allergan denies the remaining allegations in paragraph 52.**

22       53.     Allergan has also deprived Miotox of the benefits of the License
23   Agreement by intentionally using flawed surveys to reduce the amount of Royalties
24   due to Miotox in the United States, Canada and the United Kingdom— and refusing to
25   provide information to PWC so it can determine how deep the survey problems lie.  As
26   described above, Allergan elected to rely on faulty data even when a more reliable
27   option was available under the License Agreement.  For example, in Canada, Allergan
28   chose to use unverified input from sales representatives to determine Net Sales.  This

Gibson, Dunn &
Crutcher LLP

kind of sampling is entirely contrary to the License Agreement's intent that sampling procedures should "provide a reasonable approximation of reportable Net Sales." Allergan could have used the United States as a representative country, which is expressly permitted by the License Agreement, or could have relied on a valid, third party study, but it elected not to.  Allergan intentionally employed unauthorized survey methods to deprive Miotox of the benefit of the License Agreement.

**ANSWER: To the extent that paragraph 53 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan denies the remaining allegations in paragraph 53.**

54.     As described above, Allergan has breached the covenant of good faith and fair dealing by unfairly interfering with Miotox's ability to receive the benefits of the License Agreement, in refusing to pay Miotox all Royalties due after the expiration of the '468 Patent on May 9, 2014.  While it refuses to pay Miotox the Royalties owed, Allergan will continue to make profits from selling Botox for migraine headaches and other migraine-related conditions based on Miotox's intellectual property.  As a direct, foreseeable and proximate result of these beaches of the License Agreement, Miotox has suffered damages in an amount to be proven at trial.

**ANSWER:   Allergan denies the allegations in paragraph 54.**

55.     Miotox re-alleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 to 54 above.

**ANSWER: Allergan repeats, realleges, and incorporates by reference its answers to paragraphs 1-54 as if fully set forth herein.**

56.     As alleged above, Miotox agreed in the License Agreement to license the rights to the '468 Patent, and any future patents and applications to Allergan to make, have made, use and sell the Licensed Products for the Licensed Use.

Gibson, Dunn & Crutcher LLP

30

1   **ANSWER: To the extent that paragraph 56 purports to summarize,**
2   **describe, or make allegations concerning the License Agreement, Allergan**
3   **states that the License Agreement speaks for itself, and further that such**
4   **summaries, descriptions, and allegations are incomplete and therefore**
5   **inaccurate, and accordingly denies the allegations.**

6   57.   Miotox helped Allergan prolong its status as the exclusive Botox-for-
7   migraine-headache supplier in the market.  The New Licensed Patents obtained by
8   Miotox cover and relate to the treatment of migraine headaches with botulinum toxin
9   and all serotypes.  The existence of these patents will dissuade or prevent other
10   companies from entering the market to exploit Miotox's inventions.  As a result,
11   Allergan will, on information and belief, and for all practical purposes, remain the only
12   company primarily selling botulinum toxin for migraine headache treatment.  Allergan
13   will continue to generate substantial revenue and reap enormous profits selling Botox
14   for the treatment of migraine headaches and all migraine related conditions as defined
15   by the New Licensed Patents, regardless of whether the treatment is applied in a
16   manner covered by the New Licensed Patents, or in a manner not covered.

17   **ANSWER: To the extent that paragraph 57 purports to summarize,**
18   **describe, or make allegations concerning any patents or the License**
19   **Agreement, Allergan states that the patents and the License Agreement**
20   **speak for themselves, and further that such summaries, descriptions, and**
21   **allegations are incomplete and therefore inaccurate, and accordingly denies**
22   **the allegations.  Allergan lacks sufficient knowledge and/or information to**
23   **form a basis for admitting or denying the allegations about what Miotox is**
24   **informed of and believes in paragraph 57, and thus denies the allegations.**
25   **Allergan denies the remaining allegations in paragraph 57.**

26   58.   Allergan has accordingly benefited, and will continue to benefit, from
27   Miotox's New Licensed Patents and will also enjoy an expanded market, and
28   protection in additional countries where no intellectual property protection previously

1  existed.  Allergan obtained the ability to profitably market Botox for migraine

2  headaches in new territories outside of the United States because Miotox secured

3  patent protection in those countries.  To the extent that Allergan is now refusing to pay

4  Miotox all earned Royalties, these Royalties are a benefit unjustly retained at Miotox's

5  expense.

6  **ANSWER: Paragraph 58 alleges legal conclusions to which no response is**

7  **required, and on that ground, Allergan denies these allegations.  To the**

8  **extent that paragraph 58 purports to summarize, describe, or make**

9  **allegations concerning the License Agreement, Allergan states that the**

10  **License Agreement speaks for itself, and further that such summaries,**

11  **descriptions, and allegations are incomplete and therefore inaccurate, and**

12  **accordingly denies the allegations.  Allergan denies the remaining**

13  **allegations in paragraph 58.**

14  59.    As a proximate result of the wrongful acts alleged herein, Allergan has

15  unjustly incurred benefits at the expense of Miotox in an amount to be proven at trial.

16  **ANSWER:  Allergan denies the allegations in paragraph 59.**

17  60.    Miotox re-alleges and incorporates by reference, as if fully set forth

18  herein, the allegations in paragraphs 1 to 59 above.

19  **ANSWER: Allergan repeats, realleges, and incorporates by reference its**

20  **answers to paragraphs 1-59 as if fully set forth herein.**

21  61.    As set forth above, Miotox has a relationship with Allergan through the

22  License Agreement whereby Allergan is obligated to pay Miotox Royalties based on

23  all sales of Botox for the treatment of migraine headaches.  A dispute has arisen as to

24  the scope of Allergan's obligation to pay Royalties incurred after the expiration of the

25  '468 Patent on May 9, 2014.

26  **ANSWER: Paragraph 61 alleges legal conclusions to which no response is**

27  **required, and on that ground, Allergan denies these allegations.  To the**

28  **extent that paragraph 61 purports to summarize, describe, or make**

Gibson, Dunn &
Crutcher LLP

32

1    **allegations concerning the License Agreement, Allergan states that the**

2    **License Agreement speaks for itself, and further that such summaries,**

3    **descriptions, and allegations are incomplete and therefore inaccurate, and**

4    **accordingly denies the allegations.  Allergan denies the remaining**

5    **allegations in paragraph 61.**

6    62.    Allergan is the only party with access to the sales information underlying

7    the Royalty calculation, which it has refused to disclose even pursuant to an Non-

8    Disclosure Agreement proposed by PWC during its audit of Allergan.  Accordingly,

9    Miotox had, and will have, no way to calculate the amount of Royalties due under the

10   License Agreement, or the amount of Royalties improperly withheld based on

11   Allergan's erroneous interpretation of the License Agreement.

12   **ANSWER: Paragraph 62 alleges legal conclusions to which no response is**

13   **required, and on that ground, Allergan denies these allegations.  To the**

14   **extent that paragraph 62 purports to summarize, describe, or make**

15   **allegations concerning the License Agreement, Allergan states that the**

16   **License Agreement speaks for itself, and further that such summaries,**

17   **descriptions, and allegations are incomplete and therefore inaccurate, and**

18   **accordingly denies the allegations.  Allergan denies the remaining**

19   **allegations in paragraph 62.**

20   63.    As a proximate result of the wrongful acts alleged herein, Miotox has

21   suffered damage, and/or is owed restitution for the benefits unjustly retained by

22   Allergan at Miotox's expense.  An accounting is required to identify the balance due to

23   Miotox.

24   **ANSWER: Paragraph 63 alleges legal conclusions to which no response is**

25   **required, and on that ground, Allergan denies these allegations.  Allergan**

26   **denies the remaining allegations in paragraph 63.**

27   64.    Miotox re-alleges and incorporates by reference, as if fully set forth

28   herein, the allegations in paragraphs 1 to 63 above.

Gibson, Dunn &
Crutcher LLP

1
2

**ANSWER: Allergan repeats, realleges, and incorporates by reference its answers to paragraphs 1-63 as if fully set forth herein.**

3
4
5
6
7
8
9
10

65.     An actual controversy has arisen and now exists between Miotox, on the one hand, and Allergan, on the other hand, concerning their respective rights and duties under the License Agreement.  The License Agreement calls for Royalty payments based on all sales of Botox for the Licensed Use, which is any use for the treatment of migraine headaches.  Allergan wrongly asserts that the amount of Royalties owed to Miotox is based on the sales of Botox actually used in the precise manner taught by a claim of one of the New Licensed Patents, and refuses to continue to pay Miotox Royalties based on all sales for the Licensed Use.

11
12
13
14
15
16
17
18

**ANSWER: Paragraph 65 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  To the extent that paragraph 65 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and accordingly denies the allegations.  Allergan denies the remaining allegations in paragraph 65.**

19
20
21
22

66.     The License Agreement also calls for Allergan to pay out-of-pocket costs for the maintenance of patents, including foreign filings.  After abiding by this obligation since the inception of the License Agreement, Allergan now wrongly refuses to make such payments.

23
24
25
26
27
28

**ANSWER: Paragraph 66 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  To the extent that paragraph 66 purports to summarize, describe, or make allegations concerning the License Agreement, Allergan states that the License Agreement speaks for itself, and further that such summaries, descriptions, and allegations are incomplete and therefore inaccurate, and**

**accordingly denies the allegations.  Allergan denies the remaining allegations in paragraph 66.**

67.     Miotox desires a declaration of the rights and duties of Allergan with respect to the payment of Royalties, and a determination of the construction of the Royalty provisions of the License Agreement.

**ANSWER: Paragraph 67 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations about what Miotox desires, and thus denies the allegations in paragraph 67.**

68.     Miotox also desires a declaration of the rights and duties of Allergan with respect to the costs for maintenance of filed patents, including foreign filing fees.

**ANSWER: Paragraph 68 alleges legal conclusions to which no response is required, and on that ground, Allergan denies these allegations.  Allergan lacks sufficient knowledge and/or information to form a basis for admitting or denying the allegations about what Miotox desires, and thus denies the allegations in paragraph 68.**

## GENERAL DENIALS

Except as otherwise expressly admitted in paragraphs 1 through 68, above, Allergan denies each and every allegation contained in paragraphs 1 through 68 of the Complaint, including, without limitation, the headings and subheadings contained in the Complaint, and specifically denies liability to Plaintiff and denies that Plaintiff has suffered any legally cognizable damages for which Allergan is responsible.  Pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, allegations contained in the Complaint to which no responsive pleading is required shall be deemed denied. Allergan expressly reserves the right to amend and/or supplement its Answer.

With respect to all paragraphs in the Complaint in which Plaintiff prays for damages or other relief, Allergan denies that Plaintiff is so entitled under the law.

## AFFIRMATIVE AND OTHER DEFENSES

Allergan asserts the following affirmative and other defenses.  Allergan reserves the right to amend its Answer to assert any additional defenses not asserted herein of which it becomes aware through discovery or other investigation.  Allergan reserves the right to make any other amendments that may be done as of course, or to seek leave to amend if they are not as of course.  For the asserted affirmative and other defenses, Allergan does not assume the burden of proof with respect to any issue as to which applicable law does not place the burden upon Allergan.

### FIRST DEFENSE – FAILURE TO STATE A CLAIM

Plaintiff's Complaint fails, in whole or in part, to state a claim upon which relief can be granted, at least for the reason that Plaintiff fails to provide factual allegations sufficient to support the relief it seeks.

### SECOND DEFENSE –
### SATISFACTION OF CONTRACTUAL OBLIGATIONS

Plaintiff's claims for relief fail in whole or in part because Allergan performed all of its non-excused contractual obligations and satisfied all duties owed to Plaintiff.

### THIRD DEFENSE – GOOD FAITH

Plaintiff's claims for relief fail in whole or in part based on the doctrine of good faith, at least for the reasons that Allergan performed its contractual obligations in good faith, whereas Plaintiff failed to perform its contractual obligations in good faith and acted unreasonably.

### FOURTH DEFENSE – WAIVER

Plaintiff's claims for relief are barred in whole or in part by the doctrine of waiver, including waiver by conduct.

### FIFTH DEFENSE – RATIFICATION

Plaintiff's claims for relief are barred in whole or in part by the doctrine of ratification.

Gibson, Dunn &
Crutcher LLP

36

1

## SIXTH DEFENSE – EQUITABLE DEFENSES

2   Plaintiff's claims for relief are barred in whole or in part by equity, including,

3   without limitation, the equitable doctrines of laches, equitable estoppel, and unclean

4   hands.

5

## SEVENTH DEFENSE – FAILURE TO MITIGATE

6   Plaintiff has failed adequately or properly to mitigate its alleged damages.

7

## EIGHTH DEFENSE ADEQUATE LEGAL REMEDIES

8   Plaintiff is not entitled to any equitable relief because it has an adequate remedy

9   at law or the equitable remedy it seeks is improper.

10

## NINTH DEFENSE – PATENT MISUSE

11   Plaintiff is not entitled to any relief because its use of patents to attempt to

12   obtain benefits beyond those inhering in Plaintiff's statutory patent rights constitutes

13   patent misuse that renders the patents at issues unenforceable for the duration of the

14   conduct constituting misuse.

15

## COUNTERCLAIMS AGAINST MIOTOX, LLC

16   In further response to Plaintiff's Complaint, Allergan asserts the following

17   Counterclaims against Plaintiff and Counterclaim-Defendant Miotox LLC ("Miotox")

18   for declaratory judgments of patent non-infringement, invalidity and unenforceability.

19

## NATURE AND BASIS OF ACTION

20   1.   Allergan's Counterclaims arise under the Patent Laws of the United States

21   of America, 35 U.S.C. §§ 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C.

22   §§ 2201 *et seq.*

23

## THE PARTIES

24   2.   Allergan is a Delaware corporation with its principal place of business in

25   Irvine, California.

26   3.   Miotox is a California Limited Liability Company, with its principal place

27   of business in Beverly Hills, California.

28

Gibson, Dunn &
Crutcher LLP

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Allergan's Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367, 1446, 1454(a), 2201, and 2202.   The Court has removal and exclusive original jurisdiction over Allergan's Counterclaims for declaratory judgments of patent non-infringement, invalidity and unenforceability based on patent misuse.

5.      As a result of the actions and statements of Plaintiff, an actual case and controversy now exists between the parties regarding the infringement, invalidity, and unenforceability based on misuse of U.S. Patent Nos. 8,420,106; 8,491,917; 8,617,569; 8,722,060; and 8,883,143 (collectively, the "New Patents").

6.      This Court has personal jurisdiction over Miotox for the purposes of Allergan's Counterclaims, because Miotox is incorporated in and conducts its business within the State of California.

7.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1441(a), 1446(a), and 1454(a) because Allergan removed this case to the district and division within which the state court action was pending.  Venue is also proper pursuant to 28 U.S.C. §§ 1391 and 1400 because Miotox resides and conducts its business principally within this district, a substantial part of the events giving rise to the dispute occurred in this district, and Miotox is subject to personal jurisdiction in this district.

## THE PATENTS-IN-SUIT

8.      On April 16, 2013, U.S. Patent No. 8,420,106 ("the '106 patent") entitled "Extramuscular treatment of traumatic-induced migraine headache" was issued to William J. Binder.

9.      On information and belief, Dr. Binder assigned all his rights and interests in the '106 patent to Miotox on March 18, 2014.

10.      On information and belief, Miotox is the owner of the '106 patent.

Gibson, Dunn &
Crutcher LLP

11.     On July 23, 2013, U.S. Patent No. 8,491,917 ("the '917 patent") entitled "Treatment of migraine headache with diffusion of toxin in non-muscle related areas of the head" was issued to William J. Binder.

12.     On information and belief, Dr. Binder assigned all his rights and interests in the '917 patent to Miotox on March 18, 2014.

13.     On information and belief, Miotox is the owner of the '917 patent.

14.     On December 31, 2013, U.S. Patent No. 8,617,569 ("the '569 patent") entitled "Treatment of migraine headache with diffusion of toxin in non-muscle related foraminal sites" was issued to William J. Binder.

15.     On information and belief, Binder assigned all his rights and interests in the '569 patent to Miotox on March 18, 2014.

16.     On information and belief, Miotox is the owner of the '569 patent.

17.     On information and belief, U.S. Patent Application No. 13/986,197 entitled "Extramuscular treatment of traumatic-induced migraine headache" issued as U.S. Patent No. 8,883,143 ("the '143 patent") on November 11, 2014 to William J. Binder.

18.     On information and belief, Binder assigned all his rights and interests in the '143 patent to Miotox on March 18, 2014.

19.     On information and belief, Miotox is the owner of the '143 patent.

20.     On May 13, 2014, U.S. Patent No. 8,722,060 ("the '060 patent") entitled "Method of treating vertigo" was issued to William J. Binder.

21.     On information and belief, Binder assigned all his rights and interests in the '060 patent to Miotox on March 18, 2014.

22.     On information and belief, Miotox is the owner of the '060 patent.

23.     On information and belief, Binder filed U.S. Patent Application No. 13/478,922 ("the '922 application") entitled "Treatment of migraine headache with diffusion of toxin in non-muscle related areas of the mouth" on May 23, 2012.

Gibson, Dunn &
Crutcher LLP

39

24.     On information and belief, Binder assigned all his rights and interests in the '922 application to Miotox on March 18, 2014.

25.     On information and belief, Binder filed International Application No. PCT/US2013/000131 entitled "Treatment of migraine headaches with presynaptic neurotoxin" ("the '131 PCT application") on May 10, 2013.

26.     Based on publically available records at the World Intellectual Property Organization and the European Patent Office, Binder is the owner of the '131 PCT Application.

27.     The '106 patent, '917 patent, '569 patent, '143 patent, '922 application and the '131 PCT application generally relate to certain methods of treating migraine-related headaches using certain neurotoxins such as Botulinum toxins.

28.     The '060 patent is directed to certain methods of treating migraine associated vertigo using certain neurotoxins such as Botulinum toxins.

29.     The '106 and '143 patents cover certain methods of selection and treatment of traumatic-induced migraine headaches.

30.     The '569 and '917 patents cover treatment of migraine headaches by extramuscular injections of certain neurotoxins like Botulinum toxin to certain nerve exit points and other non-muscle related areas of the head, respectively.

## FACTUAL BACKGROUND

31.     Allergan formerly licensed U.S. Patent No. 5,714,468 ("the '468 Patent") from Miotox under the License Agreement.

32.     The '468 patent described and claimed, among other things, the use of Botox for treatment of migraine headaches.

33.     Allergan paid Miotox a royalty under the License Agreement on all sales within the United States of Botox used by physicians for migraine headache treatment covered by the then unexpired claims of the '468 patent.

34.     The '468 patent expired on May 9, 2014.

Gibson, Dunn &
Crutcher LLP

35.     All royalty payments that Allergan owed to Miotox under the License Agreement based on the '468 patent have been paid in full.

36.     Miotox notified Allergan of the New Patents and requested that the parties amend the License Agreement to incorporate the New Patents.

37.     On February 5, 2014, Allergan proposed an amendment to the License Agreement under which Allergan would license the New Patents and make royalty payments to Miotox for all sales of Botox that is actually used in a manner covered by one of the valid and unexpired claims of the New Patents.

38.     On April 25, 2014, Miotox rejected Allergan's proposed amendment. Miotox insisted, as a precondition of agreeing to license the New Patents to Allergan, that Allergan agree to make royalty payments on **any and all** sales within the United States of Botox for migraine headache treatment by physicians (including for treatment in a manner formerly covered by the now expired '468 patent), and not merely those sales of Botox used for treatment in manners covered by a valid and unexpired patent claim of the New Patents.  At that time, Dr. Binder, on behalf of Miotox, informed Allergan that any license of the New Patents would be "conditioned on payment of royalties, to the invention of the use of Botox and other toxins for the treatment of migraine headaches" in any manner.

39.     During an April 28, 2014 meeting, Dr. Binder, on behalf of Miotox, repeated Miotox's position that it would not license the New Patents to Allergan unless Allergan first agreed to make royalty payments on every sale of Botox for the treatment of migraine headaches, regardless of whether or not the sale resulted in one of the methods claimed in the New Patents actually being practiced.

40.     On June 16, 2014, Allergan reiterated its proposed amendment to license the New Patents and make royalty payments on only those sales of Botox resulting in the practice of a method covered by a valid and unexpired claim of the New Patents.

41.     Miotox has subsequently rejected Allergan's proposals and continues to condition any license of the New Patents on an agreement by Allergan to make royalty

Gibson, Dunn &
Crutcher LLP

41

1  payments on all sales within the United States of Botox for treatment of migraine

2  headaches, not merely royalty payments as to those sales of Botox for use in a manner

3  covered by a valid and unexpired claim of the New Patents.

4     42.    As the owner of the New Patents, Miotox has standing to enforce patent

5  rights relating to the New Patents, including the right to bring claims for patent

6  infringement based on the alleged use or practice of the methods covered by the New

7  Patents.

8     43.    Miotox's communications prior to this lawsuit and its allegations in the

9  Complaint demonstrate Miotox's belief that Allergan and/or physicians have been and

10  will continue to use or practice the methods of migraine headache treatment covered

11  by the New Patents.

12     44.    Based on Miotox's communications and allegations to date, Allergan

13  believes that Miotox will imminently sue Allergan for infringement of one or more of

14  the New Patents if Allergan continues to refuse to agree to Miotox's proposed royalty

15  obligations as a precondition of licensing the New Patents.

16     45.    The facts alleged herein show that an actual case and controversy exists

17  between the parties having adverse legal interests regarding the misuse, validity,

18  enforceability, and non-infringement of the New Patents, of sufficient immediacy and

19  reality to warrant the issuance of a declaratory judgment.

20     46.    Accordingly, it is necessary for Allergan to obtain declarations that: (i)

21  Allergan does not infringe any valid, enforceable, and unexpired claims of the '106

22  patent; (ii) Allergan does not infringe any valid, enforceable, and unexpired claims of

23  the '143 patent; (iii) the '569 patent is invalid; and (iv) Miotox's conduct in setting

24  conditions on a license of the New Patents constitutes patent misuse, rendering each of

25  the New Patents unenforceable until such time as Miotox ceases its misconduct.

26

27

28

Gibson, Dunn &
Crutcher LLP

42

## COUNT ONE

### Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,420,106

47.     Allergan realleges and incorporates herein all allegations in paragraphs 1-46 of these Counterclaims.

48.     The claims of the '106 patent recite methods for selection and treatment of externally caused migraine treatment.  Specifically, the claims require physicians to identify a patient group and to determine from among the patient group a specific patient with a post traumatic migraine headache before treatment.

49.     Allergan does not practice the methods for selection and treatment as claimed in the '106 patent.

50.     On information and belief, Allergan's customers and physicians do not practice the methods for selection and treatment as claimed in the '106 patent.

51.     An actual and justiciable controversy exists between Miotox and Allergan regarding whether Allergan and/or Allergan's customers and physicians infringe any claim of the '106 patent under 35 U.S.C. § 271(a), (b) and/or (c).  A judicial declaration is necessary to determine the parties' respective rights.

52.     Allergan is entitled to a judgment declaring that Allergan's manufacture, use, offer for sale, sale, and/or importation of Botox does not and will not constitute infringement of the '106 patent, whether directly, indirectly, contributorily, by inducement, literally, or under the doctrine of equivalents.

53.     Allergan is also entitled to a judgment declaring that customer and physician use of Botox does not and will not constitute infringement of the '106 patent, whether directly, indirectly, contributorily, by inducement, literally, or under the doctrine of equivalents.

## COUNT TWO

### Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,883,143

54.     Allergan realleges and incorporates herein all allegations in paragraphs 1-53 of these Counterclaims.

55.     The claims of the '143 patent recite methods for selection and treatment of externally caused migraine treatment.  Specifically, the claims require physicians to identify a patient group and to determine from among the patient group a specific patient with a post traumatic migraine headache before treatment.

56.     Allergan does not practice the methods for selection and treatment as claimed in the '143 patent.

57.     On information and belief, Allergan's customers and physicians do not practice the methods for selection and treatment as claimed in the '143 patent.

58.     An actual and justiciable controversy thus exists between Miotox and Allergan regarding whether Allergan and/or Allergan's customers and physicians infringe any claim of the '143 patent under 35 U.S.C. § 271(a), (b) and/or (c).  A judicial declaration is necessary to determine the parties' respective rights.

59.     Allergan is entitled to a judgment declaring that its manufacture, use, offer for sale, sale, and/or importation of Botox does not and will not constitute infringement of the '143 patent, whether directly, indirectly, contributorily, by inducement, literally, or under the doctrine of equivalents.

60.     Allergan is also entitled to a judgment declaring that customer and physician use of Botox does not and will not constitute infringement of the '143 patent, whether directly, indirectly, contributorily, by inducement, literally, or under the doctrine of equivalents.

## COUNT THREE

## Declaratory Judgment of Invalidity of U.S. Patent No. 8,617,569

61.     Allergan realleges and incorporates herein all allegations in paragraphs 1-60 of these Counterclaims.

62.     The claims of the '569 patent are invalid for failure to comply with one or more provisions of Title 35 of the United States Code related to patentability, including but not limited to, 35 U.S.C. §§ 101, 102, 103, and 112, as well as relevant provisions governing proceedings before the U.S. Patent and Trademark Office.

63.     The claims of the '569 patent are invalid under 35 U.S.C. § 101 for failing to meet the statutory utility requirement at least because the '569 patent fails to disclose any migraine treatment using a "tetanus toxin."

64.     The claims of the '569 patent are invalid for lack of definiteness under 35 U.S.C. § 112 at least because its claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, including because the terms "neurotoxin" and/or "Endotoxin" are indefinite.

65.     The claims of the '569 patent are invalid for failing to meet the written description requirement under 35 U.S.C. § 112 at least because the specification does not disclose a "tetanus toxin" as recited in the claims.

66.     The claims of the '569 patent are invalid for lack of enablement under 35 U.S.C. § 112 because the '569 patent fails to enable one of ordinary skill in the art to make and use the full scope of the claims without undue experimentation.

67.     The claims of the '569 patent are invalid under 35 U.S.C. §§ 102 and 103 as anticipated and/or obvious over at least U.S. Patent No. 5,714,468, U.S. Patent No. 7,655,244, U.S. Patent No. 7,704,511, U.S. Application Publication No. 2009/0263426, U.S. Application Publication No. 2010/0189655, and/or U.S. Application Publication No. 2009/0263426.

68.     Allergan is entitled to a judicial declaration that the claims of the '569 patent are invalid.

## COUNT FOUR

### Declaratory Judgment of Unenforceability for Patent Misuse

69.     Allergan realleges and incorporates herein all allegations in paragraphs 1-68 of these Counterclaims.

70.     Miotox's refusal to license the New Patents to Allergan unless Allergan agrees to make royalty payments on sales of Botox for all methods of migraine headache treatment, not just the methods described in the claims in the New Patents, is

Gibson, Dunn &
Crutcher LLP

an impermissible attempt to obtain economic rights and benefits beyond the legitimate scope of those inhering in Plaintiff's statutory patent rights, which has anticompetitive effects and constitutes misuse of the New Patents.

71.    Miotox's attempt to enforce the New Patents by requiring Allergan to pay royalties on sales that do not result in any infringement of any valid claims of the New Patents as a condition of licensing those patents constitutes misuse of the New Patents.

72.    The royalty structure that Miotox has imposed as a condition on Allergan's license of the New Patents effectively seeks to impermissibly extend the term of the '468 patent by requiring post-expiration royalty payments on sales of Botox within the United States for treatment of migraine headaches in manners that had been covered by the claims in the '468 patent prior to expiration, but that are not covered by the methods claimed in the New Patents.

73.    An actual and justiciable controversy thus exists between Miotox and Allergan regarding whether Miotox's conduct constitutes patent misuse.

74.    Allergan is entitled to a declaratory judgment that Plaintiff's misconduct in requiring the above described royalty structure as a condition on the grant of any license in the New Patents constitutes misuse of the New Patents, thereby rendering the New Patents unenforceable for the duration of that misconduct.

75.    Allergan is entitled to a declaratory judgment that the New Patents are unenforceable unless and until such time that Miotox's patent misuse abates.

## PRAYER FOR RELIEF

WHEREFORE, Allergan requests relief as follows:

a) A judgment in favor of Allergan and against Plaintiff on all of Plaintiff's claims;

b) A judgment in favor of Allergan and against Plaintiff on all of Allergan's Counterclaims;

c) A declaration that Allergan does not infringe any valid, enforceable, and unexpired claims of the '106 and '143 patents;

d) A declaration that the '569 patent is invalid;

e) A declaration that Miotox's misconduct in setting the above described royalty structure as a condition on Allergan's license of the New Patents constitutes patent misuse;

f) A declaration and judgment barring Miotox's right to enforce any of the New Patents until such time as Miotox ceases its patent misuse;

g) That no fees or expenses be awarded to Plaintiff;

h) A declaration that this case is exceptional under 35 U.S.C. § 285 and an award to Allergan of its costs, expenses, and attorneys' fees, plus interest on any sums awarded thereunder; and

i) Such other and further relief as the Court deems just and proper.

### JURY DEMAND

Allergan hereby demands a trial by jury.

Dated:  November 10, 2014

JEFFREY T. THOMAS
ANNE Y. BRODY
SEAN S. TWOMEY
GIBSON, DUNN & CRUTCHER LLP


By:  /s/ Jeffrey T. Thomas
Jeffrey T. Thomas

Attorneys for Defendants ALLERGAN, INC. and ALLERGAN BOTOX LIMITED

## PROOF OF SERVICE

I, Arlene R. Thompson, declare as follows:

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is 3161 Michelson Drive, Irvine, California, in said County and State.  On November 10, 2014, I served the following document(s):

**DEFENDANTS ALLERGAN, INC., AND ALLERGAN BOTOX'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

on the parties stated below, by the following means of service:

Mark D. Petersen
Christina R. Hollander
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104

Email:  mpetersen@fbm.com;
chollander@fbm.com

*Attorneys for Plaintiff*
*MIOTOX LLC*

☑ **BY UNITED STATES MAIL**: I placed a true copy in a sealed envelope or package addressed to the persons as indicated above, on the above-mentioned date, and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited with the U.S. Postal Service in the ordinary course of business in a sealed envelope with postage fully prepaid. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing set forth in this declaration.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Irvine, California.

☑ I am employed in the office of Jeffrey T. Thomas, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☑ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 10, 2014.

_____
Arlene R. Thompson