O

# United States District Court
# Central District of California

| | |
|---|---|
| MIOTOX LLC,<br><br>          Plaintiff,<br><br>      v.<br><br>ALLERGAN, INC.; ALLERGAN BOTOX LIMITED; and DOES 1–25, inclusive,<br><br>          Defendants. | Case № 2:14-cv-08723-ODW(PJWx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [59] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [61]** |

## I. INTRODUCTION

Plaintiff Miotox LLC ("Miotox") filed a Complaint for breach of contract against Defendants Allergan, Inc. and Allergan Botox Limited (collectively "Allergan") for failure to make adequate royalty payments under a license agreement. Allergan counterclaimed for patent invalidity, non-infringement, and patent misuse. The parties have filed cross motions for summary judgment on the limited issue of interpretation of the licensing agreement. For the reasons discussed below, the Court **DENIES** Miotox's Motion for Summary Judgment (ECF No. 59) and **GRANTS** Allergan's Motion for Summary Judgment (ECF No. 61).

## II.   FACTUAL BACKGROUND

In 1992, Dr. William J. Binder ("Dr. Binder") developed a novel therapy for the treatment of migraine headaches. (ECF No. 70 ["MUF"][1] ¶ 1.) Dr. Binder filed patent applications based on this therapy, and on February 3, 1998, U.S. Patent No. 5,714,468 ("the '468 Patent") entitled "Method For Reduction of Migraine Headache Pain" was issued to him. (ECF No. 66 ["AUF"][2] ¶ 10.) His method calls for the administration of presynaptic neurotoxins, such as botulinum toxin A ("Botox"), to areas such as the face, neck, and back to reduce or prevent the pain associated with migraine headaches. (AUF ¶ 11.) The '468 Patent expired on May 9, 2014. (AUF ¶ 13.)

Dr. Binder formed Miotech, Inc. (now Miotox) in 1994 to promote his inventions and to enable continued development of novel treatments using Botox® (hereafter, "Botox"). (MUF ¶ 7.) Dr. Binder's continued research and development efforts have led to additional novel migraine headache therapies. Dr. Binder filed several patent applications in 2012 including:

1. U.S. Patent No. 8,420,106, Extramuscular Treatment of Traumatic-Induced Migraine Headache ("the '106 Patent");
2. U.S. Patent No. 8,617,569, Treatment of Migraine Headache With Diffusion of Toxin in Non-Muscle Related Foraminal Sites ("the '569 Patent");
3. U.S. Patent No. 8,883,143. Treatment of Traumatic-Induced Migraine Headache ("the '143 Patent").

(MUF ¶¶ 140–45.)

Allergan and Miotech entered into an option agreement on July 31, 1997, which

---

[1] Statement of Uncontroverted Facts and Conclusions of Law in Support of Miotox LLC's Motion for Summary Judgment.
[2] Allergan Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Summary Judgment on Contract Interpretation.

2

gave Allergan the option to acquire an exclusive license to Miotech's patents relating to the treatment of migraine headaches using a botulinum toxin or other neurotoxins. (AUF ¶ 1.) Miotech assigned its patent rights to Plaintiff Miotox on October 23, 1998. On October 30, 1998, Allergan exercised its option and entered into the License Agreement with Miotech. (AUF ¶ 2.) The parties later amended the License Agreement to substitute Miotox as the correct licensor. (AUF ¶ 18.)

Under the License Agreement, Allergan agreed to pay royalties on "Net Sales" in exchange for a license to the Licensed Patents. (AUF ¶ 4.) The following are the relevant terms of the License Agreement and their corresponding definitions:

| Term | Definition |
|---|---|
| Net Sales | The actual selling price of Licensed Product sold by LICENSEE, its Affiliate, or any sublicensee to others in countries in which Licensed Patents have been granted for the Licensed Use . . . |
| Licensed Product | Any medical product containing Botulinum Toxin or other toxin made, used, or sold by LICENSEE, its Affiliate, or any sublicensee thereof whose use is covered by a Valid Patent Claim. |
| Valid Patent Claim | A bona fide, unexpired claim in the Licensed Patents for the Licensed Use which has not been held invalid by a final decision of a court or other governmental agency. |
| Licensed Use | The use of Licensed Products for the treatment of migraine headache[s]. |
| Licensed Patents | All patents and patent applications in the Territory presently owned or later acquired by LICENSOR or which LICENSOR has or may have a right to grant licenses, which cover the Licensed Use. |

(AUF ¶¶ 6–8.)

The License Agreement also contains an integration clause in Section 9(c) stating that the License Agreement "constitutes the entire agreement and understanding of the parties relating to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, whether oral or written relating to the subject matter hereof . . . ." (AUF ¶ 9.) At the time the parties entered

into the License Agreement, the sole patent covered by the Agreement was the '468 Patent. (AUF ¶ 12.) The '468 Patent broadly covered the use of botulinum toxins (such as Botox) for the treatment of migraine headache. (AUF ¶ 11.)

On November 21, 2013, less than six months before the expiration of the '468 Patent, Miotox contacted Allergan about amending the list of Licensed Patents included in Schedule 1 to the License Agreement. (AUF ¶ 19.) Miotox sought to add four patents and one patent application, which included the '106 Patent, '569 Patent, and '143 Patent that were filed in 2012. (*Id*.) Before agreeing to the amendment, Allergan wished to verify the parties' understanding with respect to the royalty provision in light of the impending expiration of the '468 Patent. (MUF ¶ 147.) Allergan stated that its understanding was that once the '468 Patent expired on May 9, 2014, Allergan would only owe royalties on sales of Botox for the purpose of one of the methods covered by a valid claim of the New Patents. (MUF ¶ 148.) Miotox disagreed and interpreted the Agreement to require Allergan to pay royalties on all sales of Botox relating to the treatment of migraine headaches, regardless of the '468 Patent's expiration. (MUF ¶ 149.)

On October 8, 2014, Miotox filed claims for breach of contract, unjust enrichment, and other related claims in the Los Angeles Superior Court. Allergan removed the case to this Court and counterclaimed for a declaratory judgment of non-infringement of the '106 Patent, non-infringement of the '143 Patent, invalidity of the '569 Patent, and unenforceability of all the New Patents due to patent misuse. (ECF No. 6.) On May 5, 2015, the Court directed the parties to file cross-motions for summary judgment on the limited issue of interpreting the License Agreement. (ECF No. 45.) On June 19, 2015, both Miotox and Allergan moved for summary judgment (ECF Nos. 59, 61); both parties opposed on July 17, 2015 (ECF Nos. 176, 178) and replied on August 8, 2014 (ECF Nos. 211, 213). The Court held a hearing on the Motions on August 17, 2015. The Motions are now before the Court for consideration.

### III.  LEGAL STANDARD

Summary judgment should be granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine dispute for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

### IV.  DISCUSSION

Miotox and Allergan disagree on how to interpret of the License Agreement. The crux of the dispute is which Botox sales are royalty-bearing. Miotox contends that Allergan agreed to pay royalties for all sales of Botox related to the treatment of migraine headaches, regardless of whether it is within the scope of the Licensed Patents. Allergan contends that the License Agreement requires Allergan to pay

royalties only on the Net Sales of the Licensed Product when Botox is used in a way that is covered by a Valid Patent Claim. During the hearing on these Motions, Miotox spent considerable time explaining and referencing numerous pieces of evidence to support its position that the face of the contract was clear. Unfortunately, Miotox lost sight of the fact that its tortured argument only further proved that the clear language did not support its interpretation in the License Agreement.

"The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 934 (C.D. Cal. 2004). "The mutual intent of the parties is to be determined from the language of a contract, 'if the language is clear and explicit, and does not involve an absurdity.'" *F.B.T. Prods., LLC v. Aftermath Records*, 827 F. Supp. 2d 1092, 1102 (C.D. Cal. 2011) (quoting Cal. Civ. Code § 1638).

Miotox's interpretation overlooks how the definitional terms in the License Agreement work together. The License Agreement provides that Allergan will pay royalties on percentages of Net Sales. Net Sales, defined in further detail above, means "the actual selling price of Licensed Product sold . . . ." Thus, royalties are tied to the sale of Licensed Product. Licensed Product is defined as "any medical product containing Botulinum Toxin or other toxin . . . whose use is covered by a Valid Patent Claim." Lastly, Valid Patent Claim is defined as an unexpired claim in the Licensed Patent for the Licensed Use. Miotox attempts to argue that royalties are based on sales for the Licensed Use, which does not depend on the scope of any patent claims. What Miotox fails to recognize is that Licensed Use depends on Licensed Product, which as just explained, depends on a Valid Patent Claim.

It is undisputed that from the time the License Agreement was created until recently, the '468 Patent was the primary Licensed Patent for sales in the United States pursuant to the License Agreement. Because the '468 Patent covered all uses of Botox to treat migraine headache, Allergan paid royalties on all sales of Botox used

to treat migraine headache until the patent expired. Therefore, Allergan's payments were consistent with the terms of the License Agreement. Now that the '468 Patent has expired, Allergan is only obligated to pay royalties on Net Sales of the New Patents that Miotox holds, which are much more limited in scope.

Miotox attempts to introduce extrinsic evidence to support its position that Allergan must continue to pay royalties on all sales of Botox, as long as Miotox holds any patent calling for the use of Botox, administered in any way, for the treatment of migraines. Generally, a contract is governed by its plain language, and parol evidence is inadmissible to vary or contradict the terms of an integrated writing. Cal. Civ. Code §§ 1625, 1856. In determining whether parol evidence is admissible, the Court looks at: (1) whether the writing was intended to be integrated, i.e. a complete and final expression of the parties' agreement, and (2) whether the agreement is "reasonably susceptible" to the interpretation urged by the party offering the evidence. *Bionghi v. Metro. Water Dist.*, 70 Cal. App. 4th 1358, 1364–65 (1999); *see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co*., 69 Cal. 2d 33, 37 (1968) (defining the test for admitting parol evidence as whether the offered evidence is relevant to prove a meaning to which the language of the instrument is "reasonably susceptible").

Regarding the first step, there is no dispute that the License Agreement contains an integration clause expressing the clear intent of the parties that the License Agreement is the entire agreement between the parties.[3] *See supra*. Thus, the Court must address whether the License Agreement is "reasonably susceptible" to Miotox's interpretation. In making the determination, the Court considers evidence concerning the parties' intent in order to determine whether ambiguity exists. *Winet v. Price*, 4

---

[3] "The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. The instrument itself may help to resolve that issue." *Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968). The existence of an integration clause is a key factor in divining that intent. *Grey v. Am. Mgmt. Servs.,* 204 Cal. App. 4th 803, 807 (2012). "This type of clause has been held conclusive on the issue of integration, so that parol evidence to show that the parties did not intend the writing to constitute the sole agreement will be excluded." *Id*.

Cal. App. 4th 1159, 1165 (1992). "If the court decides, after considering [the] evidence, that the language of a contract, in the light of all the circumstances, is fairly susceptible to either one of the two interpretations contended for . . . extrinsic evidence relevant to prove either of such meanings is admissible." *Pac. Gas,* 69 Cal. 2d at 40 (internal citations and quotations omitted).

The Court finds that the evidence presented by Miotox does not support its position that the language of the License Agreement is reasonably susceptible to its interpretation. The key term is "Licensed Product." Miotox argues that the parties' negotiations reveal that the only substantive negotiation over the term "Licensed Product" was to ensure that unapproved uses would be royalty-bearing and not tied to patent infringement. (Miotox Mot. 13.) That is, Miotox's interpretation is that Allergan owes royalties for all sales of Botox used for treating migraine headaches so long as there is an unexpired Miotox patent on any method of migraine treatment.

As mentioned above, Valid Patent Claim is defined as "a bona fide, unexpired claim in the Licensed Patents for the Licensed Use which has not been held invalid . . . ." Therefore, Botox must be used in a way covered by a bona fide, unexpired claim in a Licensed Patent to be a "Licensed Product." Miotox's interpretation effectively broadens the scope of "Licensed Product" by changing "whose use is ***covered by a*** Valid Patent Claim" to "whose use is ***related to any*** Valid Patent Claim." These two interpretations are inconsistent and thus, the evidence must be excluded. *See Gerdlund v. Elec. Dispensers Int'l,* 190 Cal. App. 3d 263, 273 (1987) (excluding extrinsic evidence because "[t]estimony of intention which is contrary to a contract's express terms, however, does not give meaning to the contract: rather it seeks to substitute a different meaning.").

Finding Miotox's parol evidence inadmissible, the Court limits its interpretation of the License Agreement to the four corners of the document. *See Tahoe Nat'l Bank v. Phillips,* 4 Cal. 3d 11, 23 (1971) ("[I]n determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which

the instrument is reasonably susceptible becomes irrelevant; as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. Irrelevant evidence cannot support a judgment."). Consistent with current Supreme Court precedent,[4] California courts have interpreted patent license agreements narrowly so that such agreements are normally construed to only require royalty payments on sales that are covered by an unexpired licensed patent. *Bettis Rubber Co. v. Kleaver*, 104 Cal. App. 2d 821, 825 (1951). "There is a presumption that royalties are not to be paid after the expiration of a patent; if the intention is to have them continue longer, the parties should phrase their contract in language from which such intention may fairly be inferred." *Id*. (quoting *E.R. Squibb & Sons v. Chem. Found.*, 93 F.2d 475, 477 (2d Cir. 1937)). There is no language in the License Agreement to suggest that that the parties intended for Allergan to pay royalties beyond the expiration of the '468 Patent. As Allergan points out, the opposite is true. The License Agreement specifically limits the term "Licensed Product"—and therefore Net Sales (i.e. royalty payments)—to uses covered by a Valid Patent Claim, which is defined as a bona fide, ***unexpired*** claim. (Allergan Mot. 17.)

Miotox argues that its broad interpretation is reasonable because patent applications are included in the definition of "Licensed Patents." (Miotox Opp'n 9–11.) Specifically, Miotox argues that because "Valid Patent Claim" includes claims in pending patent applications, the phrase "covered by" cannot reasonably be interpreted to mean "infringe" a Valid Patent Claim because one cannot infringe a pending patent claim. (*Id*.) Miotox's reasoning in unconvincing. The License Agreement does not say that royalty-bearing sales require infringement by Allergan. Rather, Allergan's royalty obligations are tied to the scope of Botox use covered by the patents. The Court agrees with Allergan that a sale is royalty bearing if it results in a doctor

---

[4] In *Kimble v. Marvel Entertainment, Inc.*, the Supreme Court recently upheld its previous decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) that a patent holder cannot charge royalties for the use of his invention after its patent term has expired. 135 S.Ct. 2401, 2413–15 (2015).

practicing a method covered by an unexpired Miotox patent, regardless of whether as a matter of law that sale involves direct or indirect infringement by Allergan. (Allergan Opp'n 11–12.)

Miotox also argues that the License Agreement was not limited to an agreement to pay royalties on Net Sales in exchange for a license to the Licensed Patents. (Miotox Opp'n 18–20.) Miotox contends that the License Agreement granted Allergan an exclusive license to the Licensed Patents, Improvements, and to the use of Clinical Data and therefore justifies Allergan's same royalty payment even after the expiration of the '468 Patent. (*Id*. at 24–25.) As Allergan correctly points out, the language of the License Agreement does not support this broad grant of rights. The royalties in the License Agreement are tied solely and directly to Net Sales **of the Licensed Product** which is dependent on a Valid Patent Claim. (Allergan Reply 12.) Further, Allergan does not disagree that it is required to pay for Improvements. But, consistent with the language of the License Agreement, Allergan's payment would be based on royalties on sales of Botox being used to treat migraine headaches in a manner covered by a Valid Patent Claim of an Improvement patent. (Allergan Opp'n 9.) Lastly, with respect to Clinical Data, the License Agreement references a separate consulting agreement with Dr. Binder and does not relate to the royalty provision. (Allergan Reply 12.) In fact, Miotox received consideration separate from the patent license royalties for providing clinical data and assistance. (*Id*. at 5.)

Throughout the many pages of briefing and exhibits Miotox has presented many tedious and convoluted arguments to support its interpretation. Ironically, in attempting to show the clarity and reasonableness of its interpretation, Miotox has only made its position more obscure and has distracted from the most obvious interpretation of the License Agreement. In contrast, Allergan's position that royalties are tied to the practice of the Licensed Patents is clearly supported by the explicit language of the License Agreement. Miotox has failed to show that there is a genuine dispute of material fact on this point.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Miotox's Motion for Summary Judgment (ECF No. 59) and **GRANTS** Allergan's Motion for Summary Judgment (ECF No. 61). Per the Court's initial scheduling Order (ECF No. 45) the parties shall file a joint proposed schedule for the remaining issues in the case by October 16, 2015.

**IT IS SO ORDERED.**

October 5, 2015

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**