**O**

# United States District Court
# Central District of California

MIOTOX LLC,

               Plaintiff,

   v.

ALLERGAN, INC. and ALLERGAN
BOTOX LIMITED,

               Defendants.

Case № 2:14-cv-08723-ODW(PJWx)

**CLAIM CONSTRUCTION ORDER ('060 PATENT)**

## I.     INTRODUCTION

Plaintiff Miotox LLC owns several patents that claim the method of treating migraines and migraine-related conditions by injecting the patient with Botox®. Miotox and Defendants Allergan, Inc. and Allergan Botox Limited (collectively "Allergan") entered into a licensing agreement that gave Allergan the exclusive right to sell Botox® to doctors to use in a manner covered by these patents.  Miotox now brings suit against Allergan for failing to make adequate royalty payments under the agreement, which stems in part from a disagreement about the scope of the patents' claims.  The patent now at issue is U.S. Patent No. 8,722,060 ("the '060 patent"), entitled "Method of Treating Vertigo."  The '060 patent claims "[t]he method for treating Migraine Associated Vertigo comprising administering to a human having Migraine Associated Vertigo a therapeutically effective amount of [Botox®]," and the parties dispute the meaning of the term "Migraine Associated Vertigo."  For the

1    reasons discussed below, the Court adopts **ALLERGAN**'s construction.

## II.    FACTUAL BACKGROUND

### A.    Licensing Agreement

Miotox is owned and operated by Dr. William J. Binder.  (*See* Compl. ¶¶ 9, 12, ECF No. 1-2.)  In 1992, Dr. Binder developed a method for treating the symptoms of migraine headaches, which calls for the injection of the patient with a presynaptic neurotoxin such as Botox®.  (*Id.* ¶ 8.)  In 1998, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 5,714,468 to Dr. Binder, which claimed this method for treating migraine headaches.  (*Id.*)  Dr. Binder subsequently assigned to Miotox the rights to the '468 patent.  (*See id.*)  That same year, Miotox and Allergan entered into a licensing agreement that gave Allergan the exclusive right to sell Botox® to doctors to use in a manner covered by this patent.  (*Id.* ¶¶ 12–14, Ex. A.)  The agreement also provided that any additional patents that Miotox may later acquire relating to the use of Botox® to treat symptoms of migraine headaches would also be licensed to Allergan.  (*Id.* ¶¶ 14, 19.)

### B.    The '060 Patent

In May 2012, Dr. Binder applied for the '060 patent.  ('060 Appl., MTX 001493–001509.)  The application recited the method for "reducing the symptoms of vertigo associated with [Migraine Associated Vertigo]" by injecting the patient with Botox®.[1]  (*Id.* at 8:5–8, MTX 001494.)

#### 1.    State of the Art

At the time of the application, Migraine Associated Vertigo ("MAV")[2] was a recognized disease condition in the medical community.  ('060 patent col. 1, ll. 54–56; Purcell Decl. ¶ 14, ECF No. 242-2.)  However, MAV was—and still is—a poorly

---

[1] The application also recited 21 other proposed claims.  Dr. Binder withdrew those claims after they were rejected by the claims examiner.  ('060 Amendment, MTX 001534.)

[2] MAV is also known as migrainous vertigo, vestibular migraine, vertiginous migraine, and migraine-related vestibulopathy.  ('060 Patent col. 1, ll. 56–58; Purcell Decl. ¶ 14.)

understood disease.  The dominant symptom of MAV is vertigo, but it is unknown exactly how that symptom is "associated" with migraine diseases.  (Purcell Decl. ¶ 15; Joint Appendix ("JA") at 1 ("[M]any patients who experience migraines have vertigo or dizziness as the main symptom rather than headache."), ECF No. 252.)  In fact, despite its name, the head pain of a migraine headache (cephalalgia) often does *not* occur at the same time as the vertigo, if it occurs at all.  (Purcell Decl. ¶ 21; JA at 1; '060 patent col. 2, ll. 2–3.)  Thus, the link between vertigo and migraines is often based on the patient either experiencing vertigo together with other migraine symptoms—such as aura (seeing spots and patterns), photophobia (sensitivity to light), phonophobia (sensitivity to sound), and osmophobia (sensitivity to odors)—or having an underlying history of migraine headaches.  (JA at 37, 42, 103, 124.)

Moreover, at the time of the application, there was no generally accepted set of diagnostic criteria for MAV in the field.  Specifically, the second edition of the International Classification of Headache Disorders ("ICHD-II"), which was the operative edition at the time, did not have any diagnostic criteria for MAV.[3]  (Purcell Decl. ¶¶ 17, 19; *see also* Claim Constr. Hr'g Tr. 5:8–21 (ICHD diagnostic criteria is the "gold standard" for migraine diagnosis), ECF No. 264.)  Thus, practitioners tended to diagnose MAV using either their own criteria or criteria proposed in medical journals by other practitioners.  (Purcell Decl. ¶ 20; Claim Constr. Hr'g Tr. 6:2–9.)  Finally, because there was an emphasis in the field on diagnosing only one condition for a given set of symptoms, MAV was considered a diagnosis of exclusion.  (JA at 427.)  That is, MAV was diagnosed only when the patient's symptoms were not better accounted for by other similar disorders.  (Claim Constr. Hr'g Tr. 14:4–24, 20:2–25.)

### 2.   Prosecution History

In the '060 patent application, Dr. Binder described MAV as follows:

Migraine-associated vertigo (MAV) or vertiginous migraine is a

---

[3] The International Headache Society has since included proposed diagnostic criteria for MAV in the beta version of the ICHD-III.  (Purcell Decl. ¶ 18.)

recognized disease condition consisting of dizziness and/or vertigo. Other terms used to describe this condition include vestibular migraine, migrainous vertigo, or migraine-related vestibulopathy.  While thought to be related to migraine headache, patients diagnosed with MAV and the like do not have classic migraine headaches, or have chronic non-specific headaches that do not fit into the migraine classification developed by the International Headache Society.

('060 Appl. at 2:15–20, MTX 001497.)

In March 2013, the USPTO claims examiner rejected the claim as anticipated by a prior patent owned by Dr. Borodic.  ('060 Appl. Detailed Action ¶¶ 8–10, MTX 001524.)  The examiner reasoned that "Borodic disclose[d] and claim[ed] a method of treating headache and facial pain by administering a therapeutically effective amount of botulinum neurotoxin to a subject." (*Id.* ¶ 9.)

Dr. Binder contested the rejection.  ('060 Amendment, MTX 001532–36.)  Dr. Binder argued that the Borodic patent claimed the method of treating sinus headaches, not migraine headaches, and that Borodic himself specifically differentiated between the treatment of the two.  ('060 Amendment, MTX 001534–35.)  He further argued that "patients diagnosed with Migraine Associated Vertigo are sufficiently differentiated from classic migraine headaches that they are not included in the migraine classification developed by the International Headache Society, *as mentioned on page 2, lines 15-20 of the specification*." ('060 Amendment, MTX 001535 (emphasis added).)  Shortly thereafter, the claims examiner withdrew the objection.  ('060 Notice of Allowance, MTX 001553.)  The USPTO issued the '060 patent to Dr. Binder on May 13, 2014.  (JA at 893.)  This patent is now licensed to Allergan under the licensing agreement.

### 3.    Specifications and Claim Language

The '060 patent contains one independent claim (Claim 1) and four dependent claims (Claims 2–5).  ('060 patent col. 4, ll. 29–40.)  The independent claim recites "[t]he method for treating Migraine Associated Vertigo comprising administering to a human having Migraine Associated Vertigo a therapeutically effective amount of

presynaptic neurotoxin in a pharmaceutically safe form."[4]  ('060 patent col. 4, ll. 29–32.)   The specification includes a lengthy description of vertigo, including that "[v]ertigo is the feeling that you or your environment is moving or spinning."  ('060 patent col. 1, ll. 5–6.)  It also uses the same language used in lines 15 to 20 of page 2 of the application to describe MAV.  (*Compare* '060 patent col. 1, ll. 54–62, *with* '060 Appl. at 2:15–20.)

### III.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The court determines the meaning and scope of the patent claims.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."  *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Thus, in construing claim terms, courts must look primarily to (1) the words of the claims themselves (both asserted and nonasserted), and (2) the specifications and the prosecution history of the patent (i.e., the intrinsic evidence).  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–17 (Fed. Cir. 2005) (en banc); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Extrinsic evidence—such as expert and inventor testimony, dictionaries, and treatises—can be used "to aid a court in construing claim terms as they would be understood in the relevant art."  *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1317–18.  However, because extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms," *Phillips*, 415 F.3d at 1318, such evidence "may not be used to vary the meaning disclosed by the patent

---

[4] The parties agree that the only presynaptic neurotoxin at issue is Botox®.

1  itself." *Goldenberg*, 373 F.3d at 1164.

2      There are two instances where the plain and ordinary meaning of a claim term

3  will not govern: (1) the patentee acts as his or her own lexicographer and gives a

4  special definition to the disputed term; or (2) the patentee disavows the full scope of a

5  claim term. *Thorner*, 669 F.3d at 1365 (citing *Vitronics Corp.*, 90 F.3d at 1580). To

6  act as his or her own lexicographer, the patentee must "clearly set forth a definition of

7  the disputed claim term in either the specification or prosecution history." *CCS*

8  *Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). However, the

9  patentee need not expressly define the term; he or she can also define the term by

10 implication. *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d

11 1258, 1268 (Fed. Cir. 2001); *Vitronics Corp.*, 90 F.3d at 1582.

12     "The standard for disavowal of claim scope is similarly exacting." *Thorner*,

13 669 F.3d at 1366. "The patentee may demonstrate an intent to deviate from the

14 ordinary and accustomed meaning of a claim term by including in the specification

15 expressions of manifest exclusion or restriction, representing a clear disavowal of

16 claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir.

17 2002); *see also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed.

18 Cir. 2004) ("To overcome the presumption biasing claim construction in favor of the

19 accustomed usage of a term in the relevant community at the relevant time, [there

20 must be] a clear disavowal of such scope in the specification, prosecution history, or

21 both.").

## IV.   DISCUSSION

### A.   Proposed Constructions

24     The parties dispute the meaning of the term "Migraine Associate Vertigo" as

25 used in Claim 1 of the '060 patent. Allergan argues that Dr. Binder acted as his own

26 lexicographer and defined MAV to exclude patients who also receive a separate

migraine diagnosis based on the same set of symptoms.[5]  (Allergan Opening Br. 8–10, ECF No. 246.)  Allergan similarly argues that Dr. Binder disavowed the treatment of MAV where there was a concurrent migraine diagnosis based on the same set of symptoms.  (*Id.* at 10–11.)  Thus, Allergan proposes the following construction: "A migraine-associated disease condition in which (1) a person feels dizziness and/or that he himself or his environment is moving or spinning and (2) the person does not have a classic migraine headache or has a chronic non-specific headache that does not fit into any migraine classification developed by the International Headache Society."  (Joint Claim Construction and Prehearing Statement, Ex. C, ECF No. 242.)  This definition uses language directly from the specifications.

Miotox, on the other hand, proposes a much broader construction: "Recurrent episodes of vertigo associated with migraine."  (*Id.* at Ex. A.)  Miotox argues that this is the plain and ordinary meaning of the term, and that Dr. Binder's statements in the specifications and prosecution history do not show a clear intent to depart from this plain and ordinary meaning.  (Miotox Opening Br. 14–15, ECF No. 245; Miotox Opp'n Br. 4–12, ECF No. 254.)  Thus, Miotox argues, the '060 patent covers the use of Botox® to treat MAV regardless of whether any other migraine conditions are diagnosed or have ever been diagnosed.  (*Id.*)  Miotox supports its construction with the expert testimony of Dr. Ian Purcell, who is a clinical neurologist with a practice that focuses on oto-neurology and headache conditions.  (Purcell Decl. ¶ 4.)

/ / /

/ / /

---

[5] Allergan concedes, however, that the '060 patent covers the treatment of MAV where the patient has otherwise received a separate migraine diagnosis.  To illustrate the difference, suppose an individual arrives at a doctor's office presenting with a set of symptoms that are indicative of MAV (vertigo, aura, etc.).  If the doctor diagnoses those symptoms as MAV only, then any Botox® used to treat those symptoms would be covered by the patent—even if the patient has an underlying migraine diagnosis or a history of migraine headaches.  If, on the other hand, the doctor diagnoses those symptoms as MAV *and* another migraine-type headache, Allergan contends that any Botox® treatment would not be covered.  (Allergan Opp'n Br. 11–13.)

**B.    Analysis**

    **1.    Meaning in the Art**

    The meaning of MAV to a person of ordinary skill in the art at the time of prosecution was vague at best.  While the various sets of proposed diagnostic criteria had some common themes or similar individual criterion, it is undisputed that there was no universally accepted set of criteria for MAV—something that was repeatedly lamented in the field as hampering its diagnosis and treatment.  (Claim Constr. Hr'g Tr. 6:2–9; JA at 187.)  Moreover, there was little-to-no understanding of the pathology of MAV—that is, how the vertigo symptoms were connected to migraine headaches. The only things that clearly *were* understood at the time are: (1) that MAV was a recognized disease condition; (2) that MAV included vertigo symptoms; (3) that such symptoms have some amorphous connection to migraine headaches; and (4) that a set of symptoms were diagnosed as MAV only after all other similar conditions were ruled out.  It is through this lens that the Court considers the intrinsic evidence.  *See Goldenberg*, 373 F.3d at 1164; *Phillips*, 415 F.3d at 1318.

    **2.    Intrinsic Evidence**

    Whatever the understanding of MAV in the art, the Court is persuaded that Dr. Binder defined MAV in the '060 patent to exclude patients who are also diagnosed with a separate migraine condition based on the same set of symptoms.   This definition is set out in column 2, lines 15 to 20, of the specification, in which Dr. Binder stated unequivocally that "patients diagnosed with MAV and the like *do not have* classic migraine headaches, or have chronic non-specific headaches that do not fit into the migraine classification developed by the International Headache Society." ('060 patent col. 1, ll. 54–62 (emphasis added).)  Notably, Dr. Binder did not say that MAV patients "often," "sometimes," or "commonly" do not have classic migraine headaches—which were qualifiers he used to describe every other MAV symptom and

characteristic in the specification.[6]   Given the uncertainty at the time as to the pathology of and diagnostic criteria for MAV, the fact that Dr. Binder chose to use such a definite term of exclusion suggests a clear intent to deviate from any contrary understanding that may have existed in the field at the time.  *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("[W]here there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning."); *cf. Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003) (where there are multiple dictionary definitions of a claim term, "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor").

Perhaps even more telling, though, are Dr. Binder's statements in the prosecution history.  The USPTO claims examiner rejected Claim 1 on the basis that Dr. Borodic's prior patent already disclosed the method of treating headaches by injecting the patient with Botox®.  In response, Dr. Binder distinguished the claims in the Borodic patent, arguing that Borodic disclosed only the method of treating sinus headaches, not migraine headaches, and that the two are materially dissimilar.  Dr. Binder then went even further, arguing that the treatment of MAV was even more dissimilar because MAV patients were "sufficiently differentiated from classic migraine headaches that they are not included in the migraine classification developed by the International Headache Society."  ('060 Amendment, MTX 001548.)  *See Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (noting that

---

[6] "Persons with MAV *often* describe chronic dizziness and disequilibrium in the form of a 'rocking' sensation.  *Sometimes* the vertiginous effects are described as episodes of rotational vertigo, changes in vision, visual 'snow', nausea and severe motion intolerance.  Neurological examinations (including neuroimaging) are *often* completely normal.  Patients with chronic dizziness *often* do not experience acute rotational vertigo or even the pain of a migraine headache.  *Commonly* prescribed medications for vertigo include hydrochloride (Antivert), diphenhydramine (Benadryl), scopolamine transdermal patch (TrandermScop) and promethazine hydrochloride (Phenergan)."  ('060 patent col. 1, l. 63 to col. 2, l. 7 (emphases added).)

use of the word "is" may "signify that a patentee is serving as its own lexicographer" (citing *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007))). Dr. Binder expressly noted that his statements in the specification already made this precise distinction.  Thus, there is little question that Dr. Binder specifically defined MAV as not being or including a "classic [ICHD] migraine headache[]," and that Dr. Binder disclaimed the treatment of classic migraine headaches.  Accordingly, a person of ordinary skill in the art would interpret Claim 1 as excluding the treatment of patients whose symptoms are diagnosed as an ICHD migraine—even if those symptoms are *also* diagnosed as MAV.  As Allergan points out, this is also consistent with the art at the time, as doctors generally did not diagnose a set of symptoms as MAV until they ruled out other possible diagnoses.

Miotox heavily criticizes Allergan's lexicography and disavowal arguments. Miotox first contends that these statements in the specification and prosecution history do not have the meaning that Allergan ascribes to them.  Miotox argues that these statements simply reflect what was already known in the art at the time: (1) that MAV does not necessarily present with head pain (cephalalgia); and (2) that the ICHD-II did not recognize MAV.  (Miotox Opp'n Br. 7, 10; Purcell Decl. ¶¶ 25, 27–28.)  The Court finds Miotox's explanations unconvincing.  Whatever their meaning, the statements appear to express only one single thought or concept; yet Miotox nevertheless attempts to explain the statements with two separate and unconnected explanations—i.e., that the statements mean *both* that MAV patients do not necessarily have cephalalgia *and* that the ICHD-II did not recognize MAV at the time of prosecution.[7]  In contrast, Allergan gives one logical and coherent explanation for

---

[7]  Miotox appears to suggest that the presence or absence of cephalalgia is somehow determinative of whether or not the patient receives a migraine diagnosis that was recognized under the ICHD-II.  (Purcell Decl. ¶¶ 25, 28.)  However, Dr. Purcell testified that up to twenty percent of persons suffering from migraine headaches do not experience cephalalgia, and thus it is unclear how the lack of head pain equates to not receiving an ICHD-II diagnosis.  (Claim Constr. Hr'g Tr. 54:4–21.)

the statements: a set of symptoms diagnosed as MAV is not also diagnosed as an ICHD-II migraine.

Moreover, the Court is unconvinced that the term "classic migraine headaches" would be understood to refer to cephalalgia.  First, Dr. Binder states definitively that MAV patients "do not have" classic migraine headaches, yet as Miotox itself acknowledges, it was recognized in the art that MAV patients can indeed present with cephalalgia.  (Claim Constr. Hr'g Tr. 10:10–12.)  Thus, contrary to Miotox's argument, a person of ordinary skill in the art would not interpret Dr. Binder as simply stating what was known in the art at the time.  Second, Miotox's explanation would make Dr. Binder's later reference to MAV patients "often . . . not experienc[ing] . . . the pain of a migraine headache" at best superfluous—by unnecessarily repeating his description of cephalalgia symptoms in MAV patients—and at worst contradictory— by stating that MAV patients only "*often* [do] not experience" cephalalgia after stating unequivocally that they "do not have" cephalalgia.  Finally, the fact that Dr. Binder referred to cephalalgia as "the pain of a migraine headache" in one portion of the specification cuts against interpreting the phrase "classic migraine headache" as also referring to cephalalgia.  *Cf. Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("[C]laim terms are presumed to be used consistently throughout the patent.").

### 3.    Miotox's Other Arguments

Miotox levels numerous other criticisms at Allergan's construction, the most pertinent of which the Court will address here.  First, Miotox argues *ad nauseam* that Allergan's construction "ignores basic precepts of the English language" by effectively defining "'Migraine Associated Vertigo' . . . to mean vertigo *not associated with migraine*." (Miotox Opening Br. 1 (original emphasis), 2, 15, 21; Miotox Opp'n Br. 2, 16, 20.)  However, the Court is not persuaded by Miotox's emphasis on the dictionary definition of each individual word in the term "migraine associated vertigo."  To a person of ordinary skill in the art, MAV does not mean

literally all "migraine[s]" that are in any way "associated" with "vertigo."  Rather, the term MAV refers to a "recognized disease condition," and it is the meaning of that recognized disease condition to those of ordinary skill in the art that the Court must discern.  *See Phillips*, 415 F.3d at 1322 ("'[A] general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term." (citation omitted)).  Indeed, as both Dr. Binder noted in the specification and Dr. Purcell noted in his expert testimony, MAV is known by at least four other names (*see supra* note 2), making Miotox's reliance on each individual word in the term "migraine associated vertigo" clearly misplaced.

Second, Miotox argues that the language used in Allergan's tracker survey[8] is not consistent with Allergan's construction.  (Miotox Opp'n Br. 1, 3–6.)  However, the Court fails to see the relevance of Allergan's survey language.  The meaning of the claim term does not depend on what Allergan understands the meaning to be.  Rather, the meaning that controls is the one that a person of ordinary skill in the art would understand it to be in light of the intrinsic evidence.  *Thorner*, 669 F.3d at 1365.  To the extent Allergan's construction is not captured in the tracker survey, the solution is to change the survey language to match the construction, not change the construction to match the survey language.

Finally, Miotox argues that Allergan's construction does not even capture its own arguments.  (Miotox Opp'n Br. 14–16 & nn.15, 18.)  That is, although Allergan concedes that the '060 patent covers the treatment of MAV where the patient has, say, an underlying ICHD migraine diagnosis, Miotox argues that Allergan's construction does not actually account for this.  Rather, Allergan's construction, as worded, excludes the treatment of a MAV patient who has ever been diagnosed with ICHD migraines.  While the question is close, the Court is satisfied that Allergan's construction accounts for this distinction.  The fact that Allergan's construction uses

---

[8] Allergan determines how doctors use the Botox® it sells to them by sending surveys to those doctors, the results of which form the basis for calculating royalty payments to Miotox.

the singular form "*a* classic migraine headache" and "*a* chronic non-specific headache" makes sufficiently clear that Allergan is excluding only those who receive such a diagnosis for *one* particular set of symptoms that was also attributed to MAV. If Allergan was purporting to exclude patients who have *ever* had a classic migraine diagnosis, the construction would need to explicitly state so.

### 4.    Miotox's Definition is Overbroad

In addition to the foregoing, the Court agrees with Allergan that Miotox's definition is overbroad, in that it would cover the treatment of migraine conditions outside of MAV.  It is undisputed, for example, that recurrent vertigo is a symptom of other non-MAV migraine conditions such as a basilar migraine.   Thus, as even Miotox's expert conceded, a patient diagnosed with only a basilar migraine would nevertheless fall within Miotox's definition of MAV.[9]  (Claim Constr. Hr'g Tr. 22:8–23:14.)  Because a person of ordinary skill in the art clearly would not interpret MAV to include basilar migraines, Miotox's definition is inadequate.  (Claim Constr. Hr'g Tr. 11:17–12:11.)

Allergan also argues that Miotox's construction would read on prior art and would render the claims indefinite.  (Allergan Opp'n Br. 7–10.)  However, the Court declines to address these arguments given that the other tools of claim construction do not leave any ambiguity as to which construction the Court should adopt.  *Phillips*, 415 F.3d at 1327 ("While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.   Instead, we have limited the maxim to cases in which 'the

---

[9] Miotox argues that a basilar migraine would not fall within its MAV definition because it is always assumed that a person of ordinary skill in the art would first exclude a basilar migraine diagnosis before diagnosing MAV.  (Claim Constr. Hr'g Tr. 13:6–14:2.)  This argument simply begs the question.   The very purpose of this claim construction is to precisely define what constitutes "Migraine Associated Vertigo" as used in Claim 1 of the '060 patent.   Miotox cannot purport to define MAV but nonetheless rely on other unwritten assumptions and parameters in deciding whether a particular patient falls within that definition.

court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.'" (citations omitted)).

## V.    CONCLUSION

For the reasons discussed above, the Court adopts **ALLERGAN**'s construction and construes the term "Migraine Associated Vertigo" as used in Claim 1 of the '060 patent to mean: "A migraine-associated disease condition in which (1) a person feels dizziness and/or that he himself or his environment is moving or spinning and (2) the person does not have a classic migraine headache or has a chronic non-specific headache that does not fit into any migraine classification developed by the International Headache Society."

**IT IS SO ORDERED.**

September 6, 2016

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**